1               IN THE UNITED STATES DISTRICT COURT

2                FOR THE EASTERN DISTRICT OF TEXAS

3                        SHERMAN DIVISION

4

UNITED STATES OF AMERICA       )

5                              )

VS.                            )   Criminal No. 4:08cr224

6                              )

DAVID ALLAN VOGEL             )

7

8                          MOTION HEARING

9            BEFORE THE HONORABLE AMOS L. MAZZANT

10               UNITED STATES MAGISTRATE

11                     NOVEMBER 4, 2009

12

13   APPEARANCES:
     FOR THE GOVERNMENT:        Mr. Kevin Collins
14                              Assistant United States Attorney
                                One Grand Center
15                              1800 Teague Drive
                                Sherman, Texas 75090
16                              (903)868-9454

17   FOR THE DEFENDANT:         Mr. Scott Smith
                                Attorney at Law
18                              120 South Crockett Street
                                Sherman, Texas 75090
19                              (903) 868-8686

20   COURT REPORTER:            Ms. Lori Barnett
                                P.O. Box 1993
21                              Van Alstyne, Texas 75495
                                (903)712-2273

22

23   Proceedings recorded by mechanical stenography, transcript

24   produced by CAT.

25

```
 1                   P R O C E E D I N G S
 2           MR. SMITH:  The next case is 4:08cr224 United
 3      States of America vs. David Vogel.  For the Government?
 4           MR. COLLINS:  Kevin Collins, Your Honor, and the
 5      Government is ready to proceed.
 6           THE COURT:  Okay.  Mr. Collins.  And for the
 7      defendant?
 8           MR. SMITH:  Your Honor, Scott Smith here for the
 9      defendant.
10           THE COURT:  Okay.  We have two matters, why don't
11      we go ahead and take up first the defendant's motion for
12      appointment of co-counsel.  I would like to hear you on
13      that, Mr. Smith.
14           MR. SMITH:  Your Honor, I honestly think that if
15      the first motion is granted that we filed, that moots out
16      this motion.  If you grant a release of certain funds,
17      there will be no need to hire co-counsel because
18      Mr. Vogel would then have the ability to hire his own
19      counsel.  I can speak to the motion though, if you would
20      like.
21           THE COURT:  I understand, but I would still like
22      to hear from you all on that, and we'll proceed then on
23      the second motion.
24           MR. SMITH:  Certainly, Your Honor.
25           As you are aware, and I know this Court has gone
```

1  through numerous motions as has Judge Crone, and you're

2  very aware of the depth and complexity of these

3  proceedings.  We have, as you well know, a million or so

4  pages of discovery.  And the organizational scheme that

5  we're getting it is not the best.  It's -- it's

6  haphazard, it's in various different places, it's -- most

7  of it is electronic and cumbersome to handle.  And I,

8  being a solo practitioner with a fairly active practice

9  before I was assigned this case, I'm finding it very

10  difficult to plod through all of the information and make

11  the appropriate motions, make the appropriate acquisition

12  of expert assistance and the like, and believe that the

13  assistance of co-counsel in this particular case is very

14  necessary for me to provide effective assistance of

15  counsel to Mr. Vogel.

16      Mr. Vogel has asked that I find someone who can

17  give exclusive attention to this case.  I don't know of

18  anybody on the CJA panel who is able to do that, but I do

19  believe it's very necessary for co-counsel to be

20  appointed for us to proceed in an effective matter and

21  present an effective defense for Mr. Vogel.

22      THE COURT:  I understand.  Mr. Collins, the

23  Government -- I know the Government has indicated they

24  are opposed.

25      MR. COLLINS:  Yes, Your Honor, we're opposed

```
 1        factually to two things that Mr. Smith just said, and
 2        then I have a general comment with respect to how the
 3        Court may wish to move forward.
 4            With respect to Mr. Smith's comments about the
 5        million pages of discovery, although it is true that the
 6        volume of pages likely reaches a million pages, it's
 7        really just a smaller subset of pages that's relevant
 8        here, and it's not necessary for either the Government or
 9        the defense to -- to pour through all million of those
10        pages.  Certainly we've made those available under Rule
11        16 and they are welcome to do so, but it's probably not
12        the most effective use of Mr. Smith's time.
13            And with respect to his inability to file motions
14        because of discovery problems or any other issues that
15        may arise, we are here on two motions today that
16        Mr. Smith has filed.  And certainly from the Government's
17        perspective the defendant has had the ability to file a
18        number of motions which we have had to respond to.  So I
19        just wanted to be clear on those two points.
20            In terms of our opposition, if -- if the Court
21        feels it's necessary that Mr. Vogel requires a second
22        counsel, we certainly don't want to stand in objection to
23        that.  But we -- we are mindful of the fact that there's
24        more than one defendant in this case and we're concerned
25        that if the Court were to grant counsel for Mr. Vogel,
```

```
 1        that we would immediately get three -- three additional
 2        motions from the three codefendants and we would be here
 3        again, and all of a sudden we would be dealing with eight
 4        defense counsel versus the four that we're currently
 5        dealing with.  So if the Court is inclined to add another
 6        lawyer to the defense team for Mr. Vogel, perhaps there's
 7        a way to craft an order that makes that lawyer's work
 8        available to the co-counsel on the defense team.  Of
 9        course, I'm not privy to any joint defense agreements
10        that they may have developed, but if we could have that
11        individual who may be appointed use his or her resources
12        for the other members -- the other defendants, that might
13        make it a little bit easier.
14             And the only other thing the Government would ask,
15        Your Honor, is that we would appoint Mr. Smith as lead
16        counsel on the case so that any notifications, any
17        conferences that we're required to do under the rules, as
18        long as we spoke to Mr. Smith that would be sufficient
19        and we wouldn't have other attorneys coming in and saying
20        that we hadn't been notified of, you know, some
21        obligation.
22             THE COURT:  I assume Mr. Smith has no objection to
23        that part of it?
24             MR. SMITH:  I'm sorry, I was thinking ahead.  What
25        was the last statement?
```

1          THE COURT:  I think they want to make sure you're

2     the lead counsel.  If the Court deemed it necessary to

3     appoint additional counsel, that you're deemed as the

4     lead counsel.

5          MR. SMITH:  I assumed that would be the case.

6          THE COURT:  Okay.  Any response, Mr. Smith?

7          MR. SMITH:  Of course.  First of all, you look

8     over at this table, there's three U.S. Attorneys sitting

9     there, there's at least two others that have appeared of

10    record, they've got half their office in Sherman I

11    suspect working on this.  They've also had several

12    agents -- and I cited this in my motion -- who worked six

13    months as a team to develop information on this case.

14    That's six agents full-time working on this case.  And

15    while there may be a million documents, I think it's

16    disingenuous to suggest we shouldn't be looking at all of

17    them.  I can't do my client service like that.  If they

18    are irrelevant, they should be set aside and designated

19    as irrelevant, they won't use them.  If there are eight

20    defense counsel, that's what it's going to take, and

21    that's just too bad.  This is a complex case and it's

22    just too much for one solo practitioner to do on his own.

23         THE COURT:  Okay.  Thank you.  I will take that

24    motion under advisement.

25         Let's move on to the motion to -- for release and

1          exemption to pay attorney's -- attorney's fees.

2                  MR. COLLINS:  Your Honor, before we move on to the

3          second motion, the Government would like to clarify the

4          number of counsel assigned to this case.  Although at

5          times different names have appeared on the -- on the

6          Pacer list, one of those names is the criminal chief and

7          he's notified of major cases in the district and that's

8          why his name appears.  He's not providing any substantive

9          help on this case.  Another name, Ms. Reno, Ms. Tammy

10         Reno, she's actually left the district and is currently

11         serving administrative detail up in Washington D.C. and

12         no longer has any impact on the case.  A minor

13         clarification, but we just wanted to get that on the

14         record.

15                 THE COURT:  I understand.  Okay.  Let's go on to

16         the next motion.  Before we present any kind of evidence

17         I would like to hear some argument about how you think we

18         should proceed in this matter.  And since Mr. Smith, this

19         is your motion --

20                 MR. SMITH:  Certainly, Your Honor.

21                 I think the first question we have to ask is, is

22         Mr. Vogel entitled to a hearing.  And from reading the

23         motions and responses and replies, I think everybody

24         seems to be in agreement that the Jones test from the

25         Tenth Circuit seems to be the test that should be applied

1      here.  It's been referred to by the Fifth Circuit in a

2      couple of cases we both cite, and I think that's the test

3      that we look at.  And if that is in fact the correct

4      test, we must do two things -- we, being Mr. Vogel.

5           First, he must demonstrate that he has no assets

6      other than those restrained, with which to retain private

7      counsel.  Second thing, he needs to make a prima facia

8      showing of a bonafide reason to believe that the grand

9      jury made a mistake in determining that the restrained

10     assets are derived from gross proceeds from the offense.

11     Now importantly what the Tenth Circuit case says, and of

12     course it's been followed by Fifth Circuit authority, is

13     that Mr. Vogel as the defendant merely has to produce

14     information suggesting this.  He doesn't have the burden

15     to prove it, he just has the burden to produce

16     information.  And the reason for that is it's sort of a

17     gatekeeping function to keep frivolous cases from coming

18     into the system.  Once he meets that threshold burden to

19     produce, the Government then has the burden to prove or

20     establish -- prove the Government to establish probable

21     cause to believe that the assets are traceable to the

22     underlying offense.

23          And finally, the thing that I think is important

24     to know is that the Court is not constrained by the rules

25     of evidence.  They are looser rules, you can allow things

```
1     to come in for these purposes.  And I think that's the
2     framework for which we're working, as established by the
3     Jones case that both parties cited.  And with that, I
4     think that's the conclusion of my opening statement is
5     about what -- how we got here today.
6              THE COURT:  Mr. Collins?
7              MR. COLLINS:  Your Honor, the Government agrees
8     that that's the framework upon which the Court should
9     proceed today.  The defendant has the burden to prove
10    that he doesn't have any additional non-restrained funds
11    to meet his defense, or actually to cover any reasonable
12    living expenses in the ordinary course of his -- of
13    living.  And he also has to prove that there's at least
14    some evidence that the grand jury made an erroneous
15    finding of probable cause with respect to the intent
16    to -- for criminal forfeiture in the -- in the two
17    indictments.
18             The only other issue that should be considered
19    while we're discussing these points is the fact that
20    Mr. Vogel does in fact have at least one counsel, and
21    possibly after today two counsel.  And there are -- there
22    is case law in the Supreme Court that states that you're
23    not entitled to the attorney of your choice, you're just
24    entitled to effective assistance of counsel.  And
25    certainly that should be considered as we're listening to
```

1    these arguments that -- that he -- there can't be made an

2    argument that he needs to tap into restrained funds so

3    that he can -- you know, so he can pay for the service of

4    the attorney of his choice.

5         THE COURT:  But isn't that true in the case where

6    the Government has seized the defendant's money?  Does

7    that same -- in terms of the way the Supreme Court looks

8    at that issue, whether or not -- I mean yes, you have a

9    right to hire counsel if you can afford it, otherwise all

10   you're entitled to is effective assistance of counsel,

11   but does that also apply in a situation where the

12   Government has seized all the defendant's money, which in

13   this case if the money wasn't seized he would have used

14   that to pay for counsel.

15        MR. COLLINS:  Yes, it -- it applies to the

16   unrestrained funds.  In this -- in this instance we

17   believe there's sufficient probable cause to demonstrate

18   that these are in fact restrained funds that flowed from

19   illegal activities.

20        THE COURT:  And let me ask both counsel, in my

21   looking at the cases it doesn't seem like the Fifth

22   Circuit has yet decided -- I know you both cited Jones --

23   the Fifth Circuit hasn't set out or adopted that that's

24   the frame work.  Look,  I understand that's what both of

25   you say, we should proceed on --

1          MR. SMITH:  It's not been specifically adopted.

2          THE COURT:  Because I know the Fifth Circuit, the

3     way they kind of approached it, was they didn't -- and

4     this may be kind of in a footnote where they didn't --

5     they just basically say we're not sure what the standard

6     should be on whether or not to have the probable cause

7     hearing is the way I read the cases.  And I just wanted

8     to see -- I didn't see a Fifth Circuit case that

9     basically said we're adopting this Jones framework and

10    this is how you should proceed.

11         MR. SMITH:  No, I don't think there is one.  I

12    think they cite with approval Jones, the cases that

13    follow it, and that's implicitly I think why we're both

14    using that framework.

15         MR. COLLINS:  Your Honor, probably the closest

16    that the First Circuit gets is United States vs. Holyland

17    Foundation For Relief and Development.  I brought a

18    courtesy copy if the Court needs it.

19         THE COURT:  I have it here.  No, that's fine.  I

20    just wanted to make sure we're all on the same page in

21    terms of where -- of the -- the current state of the

22    Fifth Circuit law.

23         MR. SMITH:  Judge, I don't know if you read the

24    Progenee (sic) case that I cited, it wasn't published, it

25    was a district court opinion out of Louisiana.  And

1    curiously arising out of the same sort of facts, and it

2    basically applied the Jones factors.

3          THE COURT:  I understand.  Well, Mr. Smith,  I

4    guess we start off with you.

5          MR. SMITH:  Your Honor, I think our burden to

6    produce is met if we offer Exhibits Number 1 through 10,

7    and then I can simply explain how those meet our burden.

8          THE COURT:  Have you provided a copy of the

9    exhibits to the Government?

10         MR. SMITH:  I gave them to them shortly before the

11   hearing.

12         THE COURT:  Any objection to these exhibits?

13         MR. COLLINS:  No, Your Honor.

14         THE COURT:  I'll admit these exhibits.

15         Go ahead and explain to me, since I'm being

16   tendered these exhibits at this present moment --

17         MR. SMITH:  I understand.

18         THE COURT:  So tell me how this meets your burden.

19         MR. SMITH:  Your Honor, the first burden is the

20   burden of indigency.  And I think that's been answered

21   for some time now in this case.  As you recall, we had

22   numerous hearings and you eventually made a determination

23   that he could proceed in forma pauperis, which is a

24   finding under the CJA Act that he does not have the

25   ability to hire counsel.  That's Exhibit 1, which is the

1       order that you entered in this case making that

2       determination.

3              If you look at Exhibit 2, which is a declaration

4       Mr. Vogel filed in the civil proceedings, at paragraphs

5       15 and 16 he describes how the seizures of these funds

6       have left him without the ability to support himself,

7       which of course is not the issue today, and more

8       importantly number 16, I'll be able to find any legal

9       defense to the actions taken by the Government.  I think

10      that adequately establishes our burden that he is in fact

11      indigent, and I'll move on to my discussion of burden of

12      producing that the assets are not tied to this offense.

13             And probably the easiest way to look at this is

14      look at Exhibit 4.  It's a summary.  And Mr. Vogel had

15      purchased at one time in -- excuse me -- in 2004, a

16      condominium in Trump Towers.  And we've got attached

17      hereto as Exhibit 5 the title policy which establishes

18      his purchase price was $2.2 million.  That was in fact

19      sold about three -- just under three years later for a

20      profit of about a million 725 -- excuse me, a million

21      five.  And we've got the various exhibits, 7, 8, and the

22      various declarations of Mr. Vogel and an attorney that

23      established those funds went from one account to the

24      other and finally were seized by the Government in the

25      amount of 3.7 and some change.  Basically establishing

1     that the value of the condominium grew by $1.5 million

2     and that growth has absolutely nothing to do with any

3     sort of illegal activity, that's just a virtue of market

4     gaining.

5         THE COURT:  When is it alleged that the

6     allegations in the indictment took place?

7         MR. SMITH:  2000 to 2007 is the framework of the

8     time they establish -- or they allege for the conspiracy.

9         THE COURT:  And how are we establishing that the

10     acquisition in November of 2004 isn't tied to anything

11     here?

12         MR. SMITH:  That's the Government's burden to

13     prove that.  I mean, let's assume that it is.  The growth

14     is not something that's tied to any sort of illegal

15     activity, that was simply the growth that happened

16     through the passage of time, and while it was owned by

17     Mr. Vogel.  That's an absolute -- has nothing to do with

18     Madison Pain Clinic.

19         THE COURT:  Well how do you separate that,

20     Counsel, if the actual asset that was purchased was --

21     was some -- some proceeds from the alleged illegal

22     activities went into the purchase of the $2.2 million

23     property?  How would the Court ever -- how would you ever

24     separate that even if --

25         MR. SMITH:  Just precisely the way we're doing it.

```
 1              THE COURT:  No, I understand, but --

 2              MR. SMITH:  2.2 originally.  If the Government

 3         claims that's still tainted money, they are entitled to

 4         seize that if they can prove it.  But the growth has

 5         nothing to do with that.  And that's -- and you do it by

 6         tracing, exactly what we've done here.  You show -- you

 7         do it like you do if you sold an asset on an income tax

 8         return, you have a basis, you have a sale, and then the

 9         difference is the -- is the gain.  And our point is the

10         gain is not attributable to the Madison Pain Clinic.  And

11         that's easily traced by the documents that we've offered

12         to produce, or have produced here before the Court.

13              The last document is Exhibit Number 10, which is

14         the --

15              THE COURT:  Do you have any -- do you have any

16         case law indicating that gains from properties if it's

17         tied to illegal activities, that the defendant gets to

18         parse out gains?

19              MR. SMITH:  One second.

20                   (Pause)

21              MR. SMITH:  Your Honor, I don't have a case in

22         front of me, but -- but in the commingling sense, if

23         funds are commingled and you can trace them back out,

24         they are not seizable.

25              THE COURT:  Yes, but this is not a commingle
```

1      issue.  The issue is, is that the asset -- and I'm just

2      thinking if that -- if that original asset has some ties

3      to the criminal activity and if that asset could have

4      been properly seized, I'm not sure -- my question is,

5      it's not -- is it a commingling, or is that just the

6      assets increased in value, but --

7          MR. SMITH:  I think the increase is something that

8      should be released to Mr. Vogel.  We might be in a

9      different discussion if it hadn't ever sold and we were

10     talking about, you know, vague difference -- you know,

11     what could it sell for.  But we know what it sold for and

12     we know exactly what the number is.  So we are able to

13     trace it back to this 1.56 million dollars.

14         THE COURT:  Okay.  Go ahead and proceed,

15     Mr. Smith.

16         MR. SMITH:  The last point is that the Chase

17     account was a -- which is Exhibit Number 10, was an

18     account that was maintained by Mr. Vogel.  We've produced

19     the statement, he's got his declaration which says that

20     this was basically largely funded through a margin

21     account funds, loans, and therefore I think that produces

22     or meets our obligation of production that the Government

23     would then have to rebut through testimony.

24         THE COURT:  Okay.  Now explain -- just walk me

25     through it to make sure I understand.  The money, 3.7

1      went into -- where did it -- it went into the First

2      Republic account?

3            MR. SMITH:  Back to Exhibit 4, is that where you

4      are, Your Honor?

5            THE COURT:  Exhibit 4, yes.

6            MR. SMITH:  That's the summary, and that sort of

7      traces it and tags it to the various exhibits.  The money

8      initially went into First Republic account 6959, in two

9      different segments.  One chunk came from the title

10     company, and one chunk came from an attorney's office.

11     It was then transferred into, within three weeks, the

12     second First Republic account 3755.  And we've got those

13     account statements to show that.  Then the Government

14     seized it out of 3755 and the only thing that was in that

15     account was the money that was tied to the sale of the

16     condominium, and that's established through the

17     declaration of Mr. Vogel.  So we have been able to trace

18     it to the penny.

19           THE COURT:  Okay.  Mr. Collins, response as to

20     this?

21           MR. COLLINS:  Yes, Your Honor, I'll take -- I'll

22     take the items up in the order in which they were

23     presented.

24           First, Mr. Smith relied upon Exhibit 1 to

25     demonstrate that Mr. Vogel was indigent.  A couple of

```
1          points on that, Your Honor.

2                First of all, the Court knows that at least is

3      aware of his financial affidavit which was submitted in

4      camera.  Obviously, the Government does not have access

5      to that document.  But in addition to whatever may -- may

6      be on that document with respect to his assets, it's also

7      been clear through various proceedings in this court that

8      Mr. Vogel has a $400,000 house in New Hampshire.  He's

9      represented to the Court that that's held in trust, but

10     he -- he is in fact a trustee of that house and could

11     have the power to take a lien out against that house or

12     liquidate that house in an effort to cover some of his

13     legal expenses.  In addition to that, Mr. Vogel still may

14     be in possession of a coin collection.  I -- the

15     Government is unclear whether or not he has ever

16     surrendered that coin collection into the Court's

17     registry.  But at various times throughout all the

18     proceedings in this -- in this matter he's represented

19     the value of that coin collection to range from $10,000

20     to $100,000.  Again, that's a -- that's a significant

21     asset that might be used to provide for his defense.  So

22     I think as the Court considers the -- whether or not

23     Mr. Vogel is indigent, the Government would ask that the

24     Court also consider this $400,000 house in New Hampshire

25     and the status of his coin collection.
```

```
1              With respect to the tainted assets, and sort of

2       this novel approach of tracing the assets, Mr. Smith says

3       in this instance we have a nice clear trace because

4       the -- the asset was sold.  It's novel, but it -- it goes

5       against the spirit of asset forfeiture, and certainly

6       likely against the case law.  This is a new argument and

7       certainly the Government does not have a case to present

8       to the Court today, but the -- the policy behind asset

9       forfeiture is not to allow criminals to make off with the

10      proceeds of their illegal acts.  It strikes the

11      Government as patently unfair that Mr. Vogel could say

12      that, well, I may have bought the house with tainted

13      funds but -- I may have bought any asset with tainted

14      funds, in this instance an apartment, but that asset

15      accrued in value or increased in value so I should get

16      the benefit of that.  You can take the first two million,

17      but I'm going to keep that 1.2.  That just -- that just

18      strikes me as patently opposite of what the criminal

19      forfeiture laws would provide for.

20              And -- and finally -- well, that's just it, Your

21      Honor.

22           THE COURT:  Are you aware of any cases regarding

23      this issue of -- the argument the defendant is asserting

24      is, is that because the asset was sold, it's not really a

25      commingled asset and you can separate the asset that may
```

1    be tied to criminal activity and the actual gain that was

2    made.

3         MR. COLLINS:  Your Honor, like -- like I said a

4    moment ago, I haven't researched this point.  I'm happy

5    to do so and respond in writing to the Court.  So I'm not

6    familiar today on any particular case that would address

7    that issue.  But again, criminals aren't allowed to

8    invest their proceeds of criminal activity into legal --

9    into legal means and then get to recoup the legal return

10   on their criminal activity.  Once -- once the dollars

11   that go into the pot are tainted, what comes out of the

12   pot is also tainted and -- and we -- we often focus on

13   the drug conspiracy issue in this case, but let's not

14   forget there's a money laundering count here, as well.

15   And so this sort of begins to support the idea that

16   perhaps he was using illegal proceeds and investing in

17   assets, and then trying to wash that money out so that he

18   could -- he could have clean -- clean claim to that -- to

19   that income.

20        THE COURT:  Thank you, Mr. Collins.

21        Mr.  Smith, do you want to respond?

22        MR. SMITH:  Yeah, I do, Your Honor, because we're

23   not sentencing this man.  This is not the end of the

24   line, this is before he has ever had his trial.  And he's

25   simply asking for enough money be released from this

1    because he's established it's not connected to the -- the

2    alleged offense.

3          THE COURT:  Right.  But Mr. Smith, we do have --

4    the grand jury found a probable cause finding.

5          MR. SMITH:  Without an adversarial hearing, Your

6    Honor.

7          THE COURT:  I understand.

8          MR. SMITH:  This is the first chance we have had.

9          THE COURT:  I understand.  But it's not like --

10         MR. SMITH:  We're not asking that the $1.5 million

11   be given to Mr. Vogel.  We're asking that you release so

12   much as is necessary for him to retain the counsel of his

13   choosing.  That's all we're doing.  And you talk about

14   fairness in terms of the forfeiture laws, if the

15   Government gets back 2.2 that they can trace to the

16   initial offense, that's what they are entitled to.

17   They're not entitled to a windfall.

18         THE COURT:  Any other response, Mr. Smith?

19         MR. SMITH:  Any other?

20         THE COURT:  Anything else you want to say in

21   response to the Government's --

22         MR. SMITH:  Yeah, in response to the indigency

23   issue, I think that's res judicata in this case.  You

24   determined it, they didn't challenge it, I think that's a

25   determination he is indigent.

1          THE COURT:  Okay.  Well I think what I'm going to

2     do is -- we're going to go ahead and proceed on to -- I'm

3     going to take this issue under advisement.  I still

4     want -- I do want some -- I will allow you an additional

5     week to brief this issue of this idea of commingling.

6     I'm just not aware of any -- this is a unique issue I

7     have not seen before, so I will give y'all the

8     opportunity to see whether or not something -- I guess a

9     week from today if you give me additional information on

10    that.  But in the meantime, I think we're going to go

11    ahead and proceed.

12          Are you ready to proceed --

13          MR. COLLINS:  Yes, Your Honor.

14          THE COURT:  -- with the probable cause hearing?

15          MR. COLLINS:  Yes, Your Honor.

16          THE COURT:  Okay.  Mr. Collins, who is your first

17    witness?

18          MR. COLLINS:  Can I have a minute, Your Honor?

19          THE COURT:  Yes.

20                    (Pause)

21          MR. COLLINS:  Your Honor, it's -- it's the

22    Government's position that the Government is -- is not

23    required to put on witnesses with respect to probable

24    cause.  That -- the case law is not clear on this point,

25    but one way to approach this is that the defendant has to

1     disprove that there was probable cause.  The Government

2     is going to stand on the fact that two grand juries

3     reached a probable cause conclusion supporting the

4     indictments.  Both indictments included criminal

5     forfeiture provisions.

6             THE COURT:  Mr. Collins, though, the difference

7     between this case and the finding by probable cause by

8     the grand jury, it wasn't an adversarial proceeding.  So

9     tell me if I'm wrong, but I thought that an adversarial

10    proceeding requires the Government to go ahead and

11    establish the probable cause with the opportunity for the

12    defense to question that and present their own witnesses,

13    too.

14            MR. COLLINS:  Well, Your Honor, that -- that may

15    be true, but under United States vs. Holyland, which is

16    the Fifth Circuit decision, footnote 17 --

17            THE COURT:  Let me find it here.  There's not a

18    footnote 17.

19            MR. COLLINS:  I'm sorry, Your Honor it's --

20    it's -- I apologize.  It's on the bottom of page 507.

21            THE COURT:  Yeah, I see it.  Okay.  So basically

22    what that's saying -- tell me if I'm wrong again -- the

23    way I read that footnote, is that it requires the Court

24    to make the first initial determination before we can go

25    on to have a probable cause hearing.  But once -- if

1          defendant meets their burden, then I think it allows us

2          to proceed in the way I was going to proceed.  Is that

3          the way you read that?

4               MR. COLLINS:  That's the way I read it, Your

5          Honor, but it is with respect to whether or not there's

6          some erroneous conclusion with respect to the grand

7          jury's decision that there was probable cause.  And at

8          this point we haven't addressed that issue.

9               THE COURT:  Well the only thing that's been

10         addressed is -- the only argument they are making

11         regarding that is this idea -- Mr. Smith, tell me if I'm

12         wrong -- is we're back to the question of whether or not

13         the 1.5 gain, if that's considered untainted as a matter

14         of law is really what you're -- that's the basis you're

15         here before us.  You're not -- because you've not

16         presented any evidence to the Court trying to establish

17         that the original asset that was seized --

18              MR. SMITH:  And under Jones and Progenee (sic)

19         we're not required to.  We're required to produce

20         information leading -- leading to question about the

21         viability of the grand jury's findings.

22              THE COURT:  Right.  But the only question you're

23         raising is the question regarding the gain.  That's the

24         only thing that -- that's the only thing you're

25         establishing here because the grand jury established

1 probable cause in seizing the overall assets.  So the

2 only thing I'm hearing from you is the question of

3 whether or not the $1.5 million gain is allowed to be

4 separated.

5   MR. SMITH:  Then perhaps you've overlooked one

6 thing, and that is -- that is the easiest one to argue,

7 that's why I focussed on that.  But there's also Exhibit

8 10, which is a separate account, which was a $500,000

9 investment account maintained by Mr. Vogel.  Which was --

10 when it was liquidated by -- at the behest of the

11 Government, only yielded 332,000.  But we contend that as

12 well is an untainted asset.

13   THE COURT:  Okay.  But how is it untainted?  I

14 mean just you're making that assertion is not sufficient.

15   MR. SMITH:  Well, it's also contained in Exhibit

16 Number 1 -- or excuse me, 2, which is Mr. Vogel's

17 declaration that that account was acquired in much part,

18 most part, some part at least by leverage margin account

19 loans, which would have nothing to do with Madison Pain

20 Clinic.

21   THE COURT:  Okay.  Let's make sure we separate

22 these issues.  First, as to the Chase account and the

23 1.5 million --

24   MR. SMITH:  That's the Republic account.

25   THE COURT:  Right.  That's the Republic account?

1              MR. SMITH:  Yes, sir.

2              THE COURT:  The argument there is only the 1.5

3      gain.

4              MR. SMITH:  That's all we've produced.

5              THE COURT:  Correct.  Okay.  So now let's go

6      back -- so Exhibit 10 is the Chase account and it was --

7      I guess -- was the total amount seized 330 --

8              MR. SMITH:  It's 330,000 and some change.  And

9      I'll be honest with you, Your Honor, if we get through

10     the first one with the million five, that's obviously

11     going to be more than enough to cover the release for

12     attorneys fees that we're requesting.

13             THE COURT:  I understand, but we're here on this

14     first question and so I want to make sure we've

15     established it on the first question.  And as to the 1.5,

16     that's a legal question that I'm going to have you all

17     brief and see if you can find something on that novel

18     approach.  And I'll give you a week to do that.  But as

19     to the second, since you've just submitted these things,

20     I want to look at where in his statement --

21             MR. COLLINS:  Page three, paragraphs 12 and 13 is

22     what I see, Your Honor.

23             THE COURT:  Mr. Smith, I don't see that statement

24     that clearly says that -- it's not an all-inclusive

25     statement, so I don't know that it meets the standard to

1       show that that asset is untainted.

2           MR. SMITH:  Well, respectfully we agree that it

3       doesn't say that it's totally untainted, but I think that

4       meets our burden of production, and the Government then

5       has the burden to prove that it's not.

6           THE COURT:  Let me hear from the Government on

7       this.

8           MR. COLLINS:  Your Honor, we respectfully

9       disagree.  I think a self-serving affidavit from a

10      criminal defendant that is vague with respect to the

11      dates in which he opened the account, on its face says

12      some of the money of which was purchased with margin

13      loans in and of itself fails to meet any burden to

14      suggest that this is some evidence.  There needs to be

15      some credible evidence that these aren't tainted funds

16      and this self-serving affidavit with the admission that

17      only some of this money was used -- was purchased with

18      margin loans doesn't meet the standard.

19          THE COURT:  Mr. Smith, do you have any other

20      evidence to present?

21          MR. SMITH:  Well the account itself is styled in

22      this person's name, it's not styled in Madison Pain

23      Clinic, that supports what he's saying.

24          THE COURT:  I don't see how that does, I mean --

25          MR. SMITH:  Well, if it was Madison Pain Clinic

1    account, it would be styled as such.

2         THE COURT:  The grand jury made a finding of

3    probable cause, so we're saying that if he's -- if the

4    Government proves he's committed the alleged acts,

5    doesn't mean he kept all the money in the name of the

6    company versus his personal account.

7         MR. SMITH:  I understand that.  I just believe

8    that our burden is much lighter and much less.  And his

9    affidavit, although be it from the defendant, was

10   admitted into evidence and is certainly there to support

11   the allegation that this account is not all tainted

12   funds, and that triggers their obligation to prove

13   otherwise.

14        THE COURT:  Any other evidence?

15        MR. SMITH:  No, sir.

16        THE COURT:  Okay.  Well here's what I'm going to

17   do is -- go ahead and submit your brief in a week, I

18   don't know if that's sufficient on the second account to

19   force the Government to meet this other burden.  I'll

20   give you the opportunity to explain to me why in the

21   brief you think that is.  And can y'all have those briefs

22   a week from today?

23        MR. COLLINS:  Yes, Your Honor.

24        THE COURT:  Mr. Smith?

25        MR. SMITH:  I think I can, yes, sir.

```
 1              THE COURT:  And I'll go ahead and decide the issue
 2     as to the additional attorney prior to that.  And of
 3     course if we end up releasing funds and have another
 4     hearing, then we can go ahead and you'll be relieved at
 5     that point.
 6              Anything further from defendant?
 7              MR. SMITH:  I just want to make sure we're clear.
 8     The Government apparently is of the opinion they don't
 9     have any obligation to produce evidence with respect to
10     the condominium under Melrose.  Is that where we're
11     leaving this?
12              THE COURT:  No, the Government --
13              MR. SMITH:  I don't understand.
14              THE COURT:  -- I don't know whether they are
15     citing any case law either for this proposition.  They
16     are asserting that the gain -- you can't separate the
17     gain from the original asset.
18              MR. SMITH:  So if in fact we can, then those funds
19     should be available.
20              THE COURT:  Well then we'll address that.
21              MR. SMITH:  Isn't that the full legal issue?
22              THE COURT:  On that issue.  I mean I think it
23     sounds like it's going to be a question of law whether or
24     not that can be separated.  And if it can be separated, I
25     don't know that the Government is conceding that issue at
```

1          this point.

2                    MR. SMITH:  Then they need to bring forth their

3          evidence today if they are not conceding that --

4                    THE COURT:  Well, I want to make sure -- I'm going

5          to make a decision before we proceed based on that

6          footnote in the Fifth Circuit case.

7                    MR. SMITH:  Melrose is a civil case.

8                    THE COURT:  I understand.

9                    MR. SMITH:  And they were talking about using the

10         civil proceedings for criminal discovery.  This is much

11         different here because we've got a defendant who has not

12         had his trial yet and has a Sixth Amendment right, which

13         is different from a civil case.

14                   THE COURT:  I understand, Mr. Smith, but I want to

15         see what y'all produce and research before we proceed any

16         further.

17                   MR. SMITH:  Be pleased to do so.

18                   THE COURT:  Anything further from the Government?

19                   MR. COLLINS:  No, Your Honor.

20                   THE COURT:  Okay.  We'll be in recess.

21                        (End of proceedings)

22

23

24

25

```
 1    I certify that the foregoing is a correct transcript

 2    from the record of proceedings in the above-entitled

 3    matter.

 4

 5    /s/ Lori Barnett                    12/3/09
      Court Reporter                      Date
 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```