# United States District Court
### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| V. | § | CASE NO. 4:08-CR-224 (1) |
| | § | Judge Crone |
| DAVID A. VOGEL (1) | § | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

Pending before the Court are Defendant's Motions to Suppress Evidence (Dkt. #206, #207 #208, #209, #210). Having considered the relevant pleadings, and argument and testimony given at the May 11, 2010 hearing, the Court is of the opinion that Defendant's motions should be denied.

### BACKGROUND

Defendant is charged with violation of 21 U.S.C. § 846, conspiracy to manufacture, distribute, or dispense, or possess with the intent to manufacture, distribute, or dispense, outside the scope of professional practice and not for a legitimate medical purpose a Schedule III controlled substance (Hydrocodone) in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(D), conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h), and engaging in a monetary transaction in property derived from specified unlawful activity in violation of 18 U.S.C. §§ 1957 and 2. Defendant seeks to suppress evidence obtained in connection with the following search warrants: (1) July 31, 2007 search warrant for the Planet, Inc. (Dkt. #206); (2) November 13, 2007 search warrant for America Online (Dkt. #207); (3) October 11, 2007 search warrant for America Online (Dkt. #208); (4) November 13, 2007 search warrant for the Madison Pain Clinic (Dkt. #209); and (5) November 13, 2007 search warrant for Defendant's New Hampshire Residence (Dkt. #210). Defendant's motions make essentially the same arguments, so the Court will addresses all five

motions together. First, Defendant argues that the affidavits used to obtain the search warrants contain false statements and that the good-faith exception to the exclusionary rule does not apply. Second, Defendant argues that the search warrants were overbroad.

*Investigator Dunn*

Defendant offered the testimony of DEA Investigator Joel L. Dunn ("Dunn"). Dunn completed the affidavits used to obtain search warrants for an AOL account and for Madison Pain Clinic ("MPC"). The investigation of Defendant and MPC began in 2006. Generally, DEA believed that Defendant was involved in distributing Hydrocodone outside the scope of a professional medical practice. DEA received reports from informants regarding MPC. These reports included, but were not limited to, accusations that doctors working for MPC were prescribing drugs to patients in states where the doctors were not licensed. Other reports came from family members of individuals that were addicted to narcotics and continued to receive prescriptions for narcotics from MPC. One informant reported that a drug overdose was linked to a prescription from MPC. Another informant reported that a person with an MPC prescription committed suicide. Dunn included this type of information gathered from informants in the affidavits he used to obtain search warrants.

Dunn and other DEA officers first visited MPC's website in 2006. They learned that MPC required a "patient protocol." The protocol included filling out a questionnaire concerning the patient's medical history. The website advertised that psychologists and chemical dependency counselors were utilized by MPC. According to the website, patients were required to submit identification and medical records. Dunn noted that MPC dealt almost exclusively in Hydrocodone and that a "membership fee" had to be paid by the patient/client in order to receive prescriptions from MPC.

DEA set up five undercover buys where agents posed as potential MPC clients. The agents used fake names, fake identifications, false medical records, and submitted to blood work and urinalysis, if requested. DEA attempted to make the undercover clients appear to be "obviously drug seeking" by using names of physicians from television programs. Dunn and DEA wanted to know if MPC would check the authenticity of the submitted records, but no follow-up of any kind was done by Defendant or MPC. Dunn stated that the information included in the patient applications "bordered on ludicrous" but was never questioned. All five of the undercover applicants received prescriptions from MPC for Hydrocodone. All of the medical records submitted by the undercover agents were false, and no physical exam was requested by MPC or Defendant for any of the five fictitious patients. A physician affiliated with MPC spoke over the phone with the agents for a very short duration before writing a prescription for the patient. No face-to-face physical examinations ever occurred. None of the undercover agents ever received a mental status exam of any kind.

The undercover officers did not participate in any diagnostic testing, but MPC did ask for urinalysis and blood work. However, this does not constitute diagnostic testing because MPC told the undercover agents and DEA informants in writing that the urinalysis and blood work was not diagnostic in nature and blood and urine analysis to assess liver function has nothing to do with prescribing controlled narcotics.

MPC was not a DEA-registered facility licensed to distribute controlled substances. However, on several occasions undercover officers were told to pick up their prescription orders at MPC. DEA used three different agents, posing as the same client, to pick up prescriptions. The agents were never asked for identification.

Dunn considers MPC's patient history questionnaire to be cursory. He did not believe MPC

conducted meaningful or legitimate physical or mental examinations, diagnostic testing, treatment plans, or follow-ups. The only plan for treatment was to prescribe drugs. No follow-up by MPC ever occurred.

Based upon a variety of factors, DEA determined that MPC was issuing prescriptions not in the course of legitimate medical practice and not for a legitimate medical purpose. Those factors included, but were not limited to, the following: no face-to-face examination occurred; no physical examination was conducted; only a brief telephone conversation with a doctor occurred; answers to the online questionnaire were not verified; there was no legitimate diagnostic testing; there was no treatment plan other than narcotics; there was no follow-up with clients; drug-seeking customers were solicited via the internet; customers were required to fill prescriptions at captive pharmacies; MPC dealt almost exclusively in Hydrocodone, a controlled substance; charged approximately four times the amount charged elsewhere; supplied inordinately large quantities of dosage units and refills; membership fee; accepted only cash as a form of payment and did not accept insurance; dealt in a very high volume of controlled substances; distributed millions of dosage units to customers throughout the country; distributed controlled substances from a non-DEA registered facility; customers could request specific controlled substances; customers could unilaterally increase the strength of drugs prescribed; failed to confirm identity of customers receiving drugs; connected to drug overdoses; and generated significant revenues from the sale of narcotics. All of these factors were incorporated in the affidavits, in some form.

Based upon these factors, Dunn and other agents determined that there was probable cause to believe that Defendant and MPC were distributing controlled substances not for a legitimate medical purpose and outside the scope of legitimate professional medical practices. Based upon

4

information from informants and information gathered by undercover officers, DEA obtained a search warrant for the Planet, Inc. (the "Planet"), which was MPC's internet service provider. DEA obtained two search warrants for an AOL account registered to Defendant. DEA also obtained search warrants for the physical location of MPC and Defendant's home.

Upon reviewing seized MPC records, Dunn became aware that MPC employed Dr. Hester ("Hester"), a psychologist, and Maggie Pepe ("Pepe"), a chemical dependency counselor. Dunn saw their mental status reports in some of the MPC client files. None of the undercover agents ever met with either of these individuals, nor were asked to meet with them for evaluation. Dunn was not aware of Hester or Pepe until after the warrants were served. He could not quantify how many patients had such reports in their files. Dunn does not know if Hester or Pepe ever met with or spoke to MPC clients, but Pepe stated in many of her reports that her assessment was based only upon the questionnaire filled out by the client. None of DEA's undercover agents nor any of the informants reported having any type of mental status exam at any time.

In regard to the scope of the search warrants, DEA considered the entire MPC operation to be illegal, therefore any evidence related to the illegal distribution of controlled substances was covered. At that point in the investigation, agents were unsure of the identity of all the persons involved in the conspiracy; therefore, they requested the entirety of the email accounts and electronic records related to Defendant and MPC. Through the use of an earlier pen register, DEA believed that Defendant was controlling the entire MPC operation, including the email accounts, website, and facility, remotely from his home in New Hampshire. Time limits for documents to be seized were not placed on the search warrants for the Planet, Inc., MPC's offices, or Defendant's home, as DEA was unsure how far back the conspiracy reached. The search warrants for the AOL account did,

however, have a time limit. Within the time limit, the entirety of the AOL account was seized because AOL did not have the capability to filter out certain types of information.

After the search warrants for the Planet and the AOL account were executed, DEA began to review the electronic documents. At that time agents became aware that the documents might contain communications between Defendant and his attorneys. To avoid reading any privileged information, DEA set up a "filter team" consisting of agents that were not part of the investigation team. Due to the volume of documents, agents conducted key word searches. When a document was returned on the key word search, the agent would read the "to /from line" first. If the document appeared to be from a law firm, it would be immediately sent to a member of the filter team, who would take the document to an Assistant United States Attorney ("AUSA") that was not part of the prosecution team. The AUSA would determine if the document was privileged or not. Privileged documents were retained, to be presented to any defendants that would subsequently be charged. A similar filter strategy was employed during the search of MPC's offices and Defendant's home. Any documents or evidence that might be privileged were presented to an on-site member of the filter team.

Dunn made no attempt to mislead the magistrate judges issuing the warrants in this case. All of his statements included in the affidavits were true at the time the affidavits were drafted and, in his opinion, continue to be true. Dunn never sought out or reviewed privileged documents. He considers privileged documents not to be useful because DEA cannot use them as part of its case.

*Special Agent Fairbanks*

Defendant offered the testimony of Special Agent Jonathan Fairbanks ("Fairbanks") of DEA. Fairbanks provided the affidavits used to obtain search warrants for the Planet and Defendant's

home. Fairbanks based his affidavits on information given to him by other agents and on his own observations during the investigation. He did not speak to any MPC clients or review any MPC files until after the warrants were served. Fairbanks went undercover as a patient of MPC. He fabricated records showing that he had a back injury. MPC never presented him with a treatment program other than narcotics, no follow-up treatment occurred, no mental status examination occurred, and he never met face to face with a physician. He did not speak with MPC clients until after the warrants were served. He was not aware of any mental health examinations occurring until after the warrants were served, and he did not receive a mental health examination while posing undercover as an MPC client.

The affidavit used to obtain a warrant for the Planet asked for all files related to MPC. This is because the Planet could not filter out certain electronic information due to the way the files were stored on the Planet's servers. The Planet stored information for clients other than MPC on the servers.

The warrant for Defendant's home was for all information related to MPC's illegal activities. DEA's investigation led Fairbanks and other agents to believe that Defendant's family lived primarily off of income from MPC and that Defendant operated MPC remotely from his home.

DEA employed a "filter team" to avoid having the investigation team and prosecution team read potentially privileged documents. During the physical search of Defendant's home, a designated person was onsite to retrieve any potentially privileged documents.

## ANALYSIS

Defendant provides two arguments for why the evidence obtained with the five warrants at issue should be suppressed. First, Defendant argues that the affidavits used to obtain the search

warrants contain false statements and that the good-faith exception to the exclusionary rule does not apply. Second, Defendant argues that the search warrants were overbroad.

When considering the validity of a search warrant, the Court engages in a two-step inquiry: (1) the Court must determine whether the good-faith exception to the exclusionary rule applies; and (2) then the Court must determine whether the warrant was supported by probable cause. *United States v. Payne*, 341 F.3d 393, 399 (5th Cir. 2006); *United States v. Laury*, 985 F.2d 1293, 1311 (5th Cir. 1993); *United States v. Satterwhite*, 980 F.2d 317, 320 (5th Cir. 1992). The Court need not reach the question of probable cause if the good-faith exception applies, and the case does not involve a "novel question of law." *Payne*, 341 F.3d at 399; *Laury*, 985 F.2d at 1311; *Satterwhite*, 980 F.2d at 320. Since this case does not appear to present a novel question of law, the Court should initially address the good-faith issue.

In *United States v. Leon*, 468 U.S. 897 (1984), the Supreme Court concluded "that evidence obtained by officers in objectively reasonable good-faith reliance upon a search warrant is admissible, even though the affidavit on which the warrant was based was insufficient to establish probable cause." *Satterwhite*, 980 F.2d at 320 (citing *Leon*, 468 U.S. at 922-23, 104 S.Ct. at 3420). The good-faith exception does not apply under any one of four situations: (1) the issuing magistrate was misled by an affiant who knowingly, or with reckless disregard for the truth, provided the affidavit on which the magistrate relied; (2) the magistrate wholly abandoned his judicial role and acted as part of the law enforcement team; (3) the law enforcement officer relied on a warrant based on an affidavit so lacking in indicia of probable cause as to render belief in its existence entirely unreasonable; and (4) the warrant itself was so facially deficient that the executing officers could not have reasonably relied on its validity. *United States v. Cherna*, 184 F.3d 403, 407-08 (5th Cir.

1999). However, "[w]hen a warrant is supported by more than a 'bare bones' affidavit, officers may rely in good faith on the warrant's validity." *Id*. at 321 (citations omitted). A "bare-bones" affidavit is one that contains "wholly conclusory statements, which lack the facts and circumstances from which a magistrate can independently determine probable cause." *Id*. (citations omitted). Defendant makes arguments that the good-faith exception should not apply based on the first situation described above.

In arguing that the agents knowing and intentionally, or with a reckless disregard for the truth, misled the magistrate judges in this case, Defendant focuses upon the "patient protocol" of MPC. Defendant states that "[t]he allegations that MPC did not require medical history, diagnostic testing, treatment plans, mental status examinations, and physical examinations is a deliberate falsehood or was made with a reckless disregard for the truth." Defendant argues that DEA undercover agents "were required to complete detailed questionnaires and consent forms, provide medical records, submit to diagnostic testing, and had a telephonic consultation with a licensed physician." Defendant further argues that, based upon "the four year investigation of MPC, the DEA either knew or should have known that the clinic required medical history, diagnostic testing, treatment plans, mental status examinations, and physical examination."

The Government counters that Defendant mischaracterizes the contents of the affidavits. The Court agrees with the Government. The affidavits state, "MPC fills the drug orders without a valid prescription and without providing or requiring a face-to-face meeting with a licensed physician or any *meaningful or legitimate* physical examination, medical history, diagnostic testing, treatment plan, or follow-up." (emphasis added). To support this assertion, the affidavits set out facts, known to DEA at the time, detailing reports from informants and from DEA's undercover agents.

9

Defendant simply has not shown that DEA's affiants misled the magistrate judges issuing the search warrants in any way. There is no evidence that the affiants made any false statements whatsoever, whether intentionally or with a reckless disregard for the truth.

The affiants take the position that the patient protocol did not provide a meaningful or legitimate physical examination, medical history, diagnostic testing, treatment plan, or follow-up. Defendant can point to no information in the affidavits or testimony of Dunn and Fairbanks that contradicts the conclusion made by DEA that the MPC patient protocol was not meaningful or legitimate. For example, Defendant acknowledges that "the majority of physical examinations were conducted telephonically" and the affidavits list several instances of the only contact with an MPC physician being in the form of a phone call, with no face-to-face meeting. The affidavits contain evidence that MPC acknowledged that the urinalysis and blood work required under the protocol did not serve a diagnostic purpose. The affidavits state that several confidential sources informed DEA that MPC was prescribing controlled substances over the internet without requiring a physical examination or a doctor-patient relationship. The affidavits detail how DEA made undercover purchases of controlled substances without seeing an MPC doctor, submitting to a physical examination or diagnostic testing, providing a legitimate medical history, without undergoing a mental status exam, or being presented with a treatment or follow-up plan. These facts support the affiants' assertion that the patient protocol did not provide a meaningful or legitimate physical examination, medical history, diagnostic testing, treatment plan, or follow-up.

Simply, Defendant has not supplied evidence showing that a deliberate misstatement was made or reckless disregard for the truth occurred, or that any misstatement was made by the affiants. Defendant focuses on whether or not DEA, after serving the warrants, learned that some of MPC's

clients were evaluated by mental health professionals. However, this has nothing to do with what the affiants knew at the time they sought the warrants. At the time the warrants were sought, DEA believed that no mental health evaluations ever occurred, based upon information from informants and undercover agents. The Court notes that there is no evidence in the record showing that the mental health evaluations that Defendant alleges occurred would somehow contradict the affiants' statements that MPC's patient protocol was not meaningful and legitimate. Based upon the foregoing conclusions, the Court finds the first situation in which the good-faith exception will not apply to a search warrant does not overcome the presumption that "it [was] objectively reasonable for [DEA] to execute [the] warrant." *United States v. Pope*, 467 F.3d 912, 916 (5th Cir. 2006). Because the good-faith exception applies, the Court need not address whether the magistrate judges had a substantial basis for finding probable cause, because this case does not present a novel question of law. *Payne*, 341 F.3d at 399; *Laury*, 985 F.2d at 1311; *Satterwhite*, 980 F.2d at 320.

Defendant next argues that the warrants are overbroad because DEA failed to restrict the items to be seized to the time frame listed in the indictment and to specific individuals known to investigators at the time the warrants were sought. Defendant also argues that the warrants were overbroad because attorney-client communications may have been seized. The Court does not agree with Defendant's contentions.

First, Defendant offers no authority, and the Court is aware of none, that the warrants in this case should have been restricted to the time frame covered by the indictment. The Government argues, and the Court agrees, that "the failure of the warrants to specify an explicit time for the documents sought is not alone conclusive as to the validity of the warrants." *U.S. v. Kahlid*, No. 93-2345, 1991 WL 684525 at *2 (5th Cir. Nov. 14, 1994). The particularity required is whether "the

description in the warrant would permit an executing officer to reasonably know what items are to be seized." *United States v. Beaumont*, 972 F.2d 553, 559-560 (5th Cir. 1992). The warrant must identify the place to be searched and the items to be seized. *United States v. Kimbrough*, 69 F.3d 723, 727 (5th Cir. 1995). Generic language is permissible to describe categories or types of items to be seized. *Id*. Here, the indictment was returned in December of 2008, more than a year after each of the five warrants was executed. At the time DEA sought the search warrants, the investigation was still ongoing and the Government had not yet determined the full scope of the conspiracy. To anticipate a date range for documents to be sought, when the full scope of the MPC operation was unknown, would not be possible.

Similarly, Defendant cites no authority requiring a search warrant to limit evidence seized to communication between only the Defendant, co-conspirators, and "other persons known by the investigators to be relevant to the investigation." At the time the warrants were sought, the Government was not fully aware of all the parties that were involved in MPC's operation and believed that many unknown parties were likely involved in the conspiracy. To limit the warrant to communications made between known conspirators only is simply not required.

The evidence sought here was limited in the affidavits to narcotics violations and money laundering. The types of documents specified in the warrants were limited to those related to the suspected criminal activities. The agents were permitted to seize only evidence related to the drug and money laundering conspiracy. No part of MPC's business was unrelated to the conspiracy, and each of the five warrants sought information closely related to MPC's business. Therefore, it was reasonable for the magistrate judges to conclude that seizure of any of Defendant's or MPC's documents related to the conspiracy was appropriate.

The Court disagrees with Defendant that evidence obtained pursuant to the five warrants at issue should be suppressed because some of the documents obtained during the search may be subject to the attorney-client privilege. The Government provided testimony that a "filter team" was established to provide Defendant with any documents that may be privileged and that members of the investigation and prosecution teams did not view or rely upon privileged documents. The Government has provided testimony that DEA did not seek out privileged documents and was not aware that Defendant was using email accounts related to MPC to communicate with his attorneys. Defendant has access to all of the documents seized under the warrants, but has not designated any of the documents as privileged. Defendant states that, "screening attorney client communication from the remaining electronic communications is an impossible task and the defendant has no way to prove otherwise." Essentially, Defendant's argument is that because yet-to-be-identified documents obtained under the warrants may be subject to the attorney-client privilege, all evidence obtained under the warrants should be suppressed. Defendant provides no authority for such an argument. Defendant may identify documents that are protected under the attorney-client privilege in order to prevent their use at trial, but he has not carried his burden to show which documents are privileged and that those documents were illegally obtained.

Based upon the foregoing, the Court finds that Defendant's motions to suppress evidence should be denied.

## RECOMMENDATION

The Court recommends that Defendant's Motions to Suppress (Dkt. #206, #207, #208, #209, #210) should be DENIED.

Upon agreement of the parties, within five (5) days after service of the magistrate judge's

report, any party may serve and file written objections to the findings and recommendations of the magistrate judge. 28 U.S.C. § 636(b)(1)(c).

Failure to file written objections to the proposed findings and recommendations contained in this report within five days after service shall bar an aggrieved party from *de novo* review by the district court of the proposed findings and recommendations and from appellate review of factual findings accepted or adopted by the district court except on grounds of plain error or manifest injustice. *Thomas v. Arn*, 474 U.S. 140, 148 (1985); *Rodriguez v. Bowen*, 857 F.2d 275, 276-77 (5th Cir. 1988).

**SIGNED this 25th day of May, 2010.**

_____
AMOS L. MAZZANT
UNITED STATES MAGISTRATE JUDGE