1562

1      UNITED STATES DISTRICT COURT
          EASTERN DISTRICT OF TEXAS
2            SHERMAN DIVISION

3
   UNITED STATES OF AMERICA   |  DOCKET NO. 4:08CR224
4                             |
                             |  JUNE 29, 2010
5   VS.                       |
                             |  9:27 A.M.
6                             |
   DAVID A. VOGEL            |  BEAUMONT, TEXAS
7
   ------------------------------------------------------------

8

9        VOLUME 7 OF 8, PAGES 1562 THROUGH 1686

10       REPORTER'S TRANSCRIPT OF JURY TRIAL

11       BEFORE THE HONORABLE MARCIA A. CRONE,
       UNITED STATES DISTRICT JUDGE, AND A JURY
12
   ------------------------------------------------------------
13

14

15  APPEARANCES:

16  FOR THE GOVERNMENT:    MAUREEN E. SMITH
                          STEVAN ADAM BUYS
17                         KEVIN DOW COLLINS
                          U.S. ATTORNEY'S OFFICE
18                         1800 TEAGUE DRIVE
                          SUITE 500
19                         SHERMAN, TEXAS 75090

20

21  FOR DAVID A. VOGEL:    THOMAS SCOTT SMITH
                          JAMES BRETT SMITH
22                         SMITH & SMITH
                          120 SOUTH CROCKETT
23                         POST OFFICE BOX 354
                          SHERMAN, TEXAS 75091-0354
24

25

1563

1  COURT REPORTER:          TONYA B. JACKSON, RPR-CRR
                            FEDERAL OFFICIAL REPORTER
2                           300 WILLOW, SUITE 239
                            BEAUMONT, TEXAS  77701
3

4

5

6     PROCEEDINGS REPORTED USING COMPUTERIZED STENOTYPE;
     TRANSCRIPT PRODUCED VIA COMPUTER-AIDED TRANSCRIPTION.
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1564

# TABLE OF CONTENTS

PAGE

DIRECT EXAMINATION OF ROY HEUSS -          1575

   MR. BRETT SMITH

CROSS-EXAMINATION OF ROY HEUSS - MR. BUYS   1583


DIRECT EXAMINATION OF VICTORIA NORTHROP -   1585

   MR. BRETT SMITH

CROSS-EXAMINATION OF VICTORIA NORTHROP -    1591

   MS. SMITH


DIRECT EXAMINATION OF DOUGLAS CUMMINS -     1592

   MR. BRETT SMITH

CROSS-EXAMINATION OF DOUGLAS CUMMINS -      1602

   MR. BUYS


DIRECT EXAMINATION OF DOUGLAS GROVER -      1603

   MR. SCOTT SMITH

CROSS-EXAMINATION OF DOUGLAS GROVER -       1634

   MS. SMITH

REDIRECT EXAMINATION OF DOUGLAS GROVER -    1654

   MR. SCOTT SMITH

RECROSS-EXAMINATION OF DOUGLAS GROVER -     1659

   MS. SMITH

1565

1  FURTHER REDIRECT EXAMINATION OF DOUGLAS          1662
2  GROVER - MR. SCOTT SMITH
3
4  EXAMINATION OF DAVID A. VOGEL -                   1665
5    MR. SCOTT SMITH (OUTSIDE PRESENCE OF JURY)
6
7  DEFENSE RESTS                                     1667
8
9  DIRECT EXAMINATION OF DOUGLAS GROVER -            1671
10    MS. SMITH
11 CROSS-EXAMINATION OF DOUGLAS GROVER -             1682
12    MR. SCOTT SMITH
13
14 GOVERNMENT RESTS AND CLOSES                       1685
15
16 DEFENSE CLOSES                                    1685
17

18                      INDEX OF EXHIBITS

19
20 GOVERNMENT'S EXHIBIT 171                          1623
21 GOVERNMENT'S EXHIBIT 300                          1643
22 GOVERNMENT'S EXHIBIT 301                          1646
23 GOVERNMENT'S EXHIBIT 302                          1648
24 GOVERNMENT'S EXHIBIT 302                          1648
25 EXHIBIT 303                                       1651

1566

1   GOVERNMENT'S EXHIBIT 183-2                    1659

2   184                                          1661

3   GOVERNMENT'S EXHIBIT 207                      1674

4   GOVERNMENT'S EXHIBIT 207                      1675

5   GOVERNMENT'S EXHIBIT 208                      1677

6   GOVERNMENT'S 205 AND 206                      1679

7   205 AND 206                                  1679

8   206                                          1681

9

10

11  DEFENDANT'S EXHIBIT 100                       1597

12  DEFENDANT'S EXHIBIT NO. 3                     1617

13  EXHIBIT 3                                     1617

14  136                                          1624

15  EXHIBIT NO. 136                              1625

16  DEFENDANT'S EXHIBIT 144                       1626

17  EXHIBIT 144                                  1627

18  DEFENDANT'S EXHIBIT NO. 4                     1628

19  DEFENDANT'S EXHIBIT NO. 22                    1630

20  EXHIBIT NO. 137                              1662

21

22

23

24

25

1567

1          (Open court, defendant present, jury not

2   present, 9:27 a.m.)

3          THE COURT:  Okay.  I understand you wanted to

4   discuss matters before we began?

5          MR. COLLINS:  Your Honor, I have two

6   preliminary matters.  No. 1, Agent John Fairbanks has

7   been outside the courtroom for the last week.  We're

8   under the impression now that defense will release him,

9   and we just want to know if you would excuse him.

10         THE COURT:  I will excuse him if everybody

11  doesn't want him anymore.

12         MR. SCOTT SMITH:  Our impression was he was

13  told after he testified we didn't need him, but we

14  certainly don't intend to call him.  He can be released.

15         THE COURT:  Okay.  That's fine.

16         MR. COLLINS:  And then the second matter, your

17  Honor, is Dr. Alexander DeLuca is on the defense's

18  witness list.

19         THE COURT:  Right.

20         MR. COLLINS:  The government has prepared

21  video clips extracted from his Web site, in case he goes

22  south on a question, that we can play the video clip; and

23  we just want to make sure the court was aware of that and

24  wouldn't be surprised by that.

25         THE COURT:  I'm not surprised.  I, too, have

1568

1 looked at the video clips.

2          MR. SCOTT SMITH:  Your Honor, I did want to

3 bring up a matter relating to witnesses who have been

4 targeted by the government.  We filed a pretrial brief

5 regarding this.  It's Document No. 312.  And it's our

6 position that the government filed a notice under seal,

7 as Document No. 308, nine days after our witness list was

8 filed basically designating most all of our employee

9 witnesses as potential targets in this investigation,

10 some of whom, like Dr. Venegas, who haven't worked there

11 in years.  We believe the government has made those

12 witnesses unavailable, in particular Dr. Venegas and

13 potentially Jana Sandlin who is being -- talking with

14 Mr. Grove right now.  And if that is the case, we would

15 like the court's permission to use hearsay evidence

16 because of their unavailability and based on the reasons

17 that we expressed in our trial brief.

18          THE COURT:  Do you have a response to that?

19          MR. BUYS:  Yes, your Honor.  The government

20 has done nothing to make these witnesses unavailable.

21 They received target letters months and months and months

22 before they made anybody's witness list.  They were

23 directly involved in this conspiracy.  That investigation

24 continues.  The fact that they're not yet charged has no

25 bearing upon whether or not they will be charged; and, in

1569

1  fact, the government has done nothing to make them

2  unavailable.  Certainly it doesn't impact their decision

3  to assert their Fifth Amendment privilege; and that, in

4  turn, would not impact defense counsel's ability to use

5  hearsay statements of those witnesses.

6        MR. SCOTT SMITH:  I meant to add that I have

7  been contacted by attorneys for Beverley Edwards and

8  Carlos Venegas who both have advised that they would take

9  the Fifth Amendment.  By agreement with the government,

10  we agreed that they did not need to come present to the

11  court to do that, that I could proffer that to the court

12  and that would be accepted by the government as

13  satisfactory proof that they would indeed take the Fifth.

14        THE COURT:  All right.  That's Dr. Venegas and

15  Edwards?

16        MR. SCOTT SMITH:  Yes, your Honor.

17        THE COURT:  That's fine.  All right.  I think

18  that these people were made targets a long time ago, from

19  what I recall.

20        MR. SCOTT SMITH:  Our position is that perhaps

21  they were, but Dr. Venegas left in 2006.  This case has

22  been indicted; this case has been brought to trial.

23  Dr. Hoblit has been indicted; Dr. Hoblit has pled guilty.

24  At some point they're no longer targets.

25        THE COURT:  Well, I don't think that this is

1570

1  the point at this point because it seems like a lot of

2  these things have taken awhile to develop.  I think the

3  agent testified yesterday that "Well, we would have done

4  it; but we had another case we were working on" and

5  "Yeah, we waited another year because we had another case

6  we were working on."  I think he also said stay tuned

7  about Mr. Fox and stuff.  So, I mean, I think staying

8  tuned still is out there.

9          I don't know what's going to happen to these

10  people.  Some of those people have had other problems

11  with the medical board.  I did read those interesting

12  things, but that's not the same as this.  But, I mean, I

13  think they continue to be a target.  If they were a

14  target, I don't think they've excused themselves at this

15  point from being a potential target.  Maybe it depends on

16  how this case goes as to what happens to them.  I don't

17  know, but I don't think -- I think it's appropriate to

18  advise them of their Fifth Amendment right, and they have

19  the right to choose to go forward or not.  And I will say

20  in other cases people have been advised and they went

21  ahead and testified.  It's just -- you know, it depends

22  on the individual.

23          MR. SCOTT SMITH:  So, our motion to use

24  hearsay --

25          THE COURT:  So, I don't think that they're

1  unavailable.

2           No, you cannot use hearsay.

3           MR. SCOTT SMITH:  So, that motion is denied,

4  for the record?

5           THE COURT:  That motion is denied.

6           MR. SCOTT SMITH:  Thank you, your Honor.

7           MR. BUYS:  Your Honor, if you could just

8  clarify one point in light of the court's comments just

9  now that the medical board disciplined Venegas and others

10  is not related to this case.  I simply point out -- if

11  the court read it, the court may have noticed -- that

12  Dr. Venegas was expressly disciplined for giving a

13  prescription to a person over the Internet with whom he

14  had never met in person or without establishing a

15  pre-existing doctor/patient relationship.  And that is

16  2001.  That's during the course of this conspiracy; and

17  he went to work for MPC after that time, knowing full

18  well that he had previously been disciplined for

19  prescribing medication to someone he had met over the

20  Internet.

21           MR. SCOTT SMITH:  That is not related to the

22  Madison Pain Clinic, though.

23           THE COURT:  I don't think that makes it

24  admissible.  I mean, it also says he had a sexual

25  relationship with some patient.  I take it he met that

1572

1  person in person and it wasn't just on the Internet.

2  So -- you know.

3          MR. BUYS:  Right.

4          THE COURT:  And prescribed that person maybe

5  pills, too.

6          MR. BUYS:  Well, our concern is that defense

7  counsel made representations about -- defense counsel

8  made representations I think on day one of this trial

9  that Dr. Venegas has a positive reputation in the

10  community, something to that effect, "You know him to be

11  a well-respected internist" or something like that.  So,

12  the government felt like they had raised the issue of his

13  reputation as a medical professional.

14          THE COURT:  I don't remember that, but I'm not

15  saying it didn't happen.  I don't recall it.

16          MR. SCOTT SMITH:  I don't recall that either.

17          THE COURT:  I mean, if you can find that some

18  way in the transcript, we could maybe --

19          MR. SCOTT SMITH:  What I remember is somebody

20  that they had called, in response to their questions,

21  indicated that Dr. Venegas had been on a talk show of

22  some sort.  That's all I remember about Dr. Venegas.  I

23  don't think we held him out as any sort of super expert

24  or anything.

25          MR. BUYS:  Well, Brett Smith, respectfully,

1  asked Agent Fairbanks directly "Are you aware that

2  Dr. Venegas is a well-respected internist in the Dallas

3  area?"  I don't have the transcript in front of me.  Your

4  court reporter, of course, would.

5          THE COURT:  Well, she can look for that; and I

6  may change my mind on that if that's been the situation

7  where -- and what did Fairbanks say?

8          MR. BUYS:  He said that he didn't know about

9  Dr. Venegas' reputation in the community, I think.

10          THE COURT:  Okay.  Well, Ms. Jackson can try

11  to find it.  And this was having to do with questions to

12  Agent Fairbanks --

13          MR. BUYS:  That's my recollection.

14          THE COURT:  -- about Dr. Venegas.

15          Okay.  Well, she can try to find that --

16          MR. BUYS:  Okay.  Thank you.

17          THE COURT:  -- and I might reconsider this.

18  She's not going to find it right now, but she can find it

19  on a break.

20          MR. SCOTT SMITH:  That's all we have outside

21  the presence.

22          THE COURT:  Okay.  So, we're ready to go now?

23          Tell me about your witnesses today so we'll

24  have a better feel on this.

25          MR. SCOTT SMITH:  I believe we're going to

1  start with three patient witnesses, who should be short;

2  follow that either with Dr. DeLuca or Mr. Grover; and

3  perhaps -- and this is not iced up at this point, but

4  Mr. Vogel could testify as well.  And that should be the

5  conclusion of our case.

6            THE COURT:  Okay.  So, maybe today?

7            MR. SCOTT SMITH:  Yes, your Honor.

8            THE COURT:  Okay.  So, we'll have to work on

9  the charge.  I did see you agreed on most of that insert,

10 but we'll work on that later.  Okay.

11           And is the government planning on any

12 rebuttal?  Do you know?

13           MR. BUYS:  Your Honor, we're not sure yet.

14 Probably not, but it sort of depends on what we hear

15 today.

16           THE COURT:  Okay.  Well, are we ready to have

17 the jury come in, then?

18           MR. SCOTT SMITH:  Your Honor, could I speak

19 with Mr. Grove to see what the position is of Ms. Jana

20 Sandlin?  She's outside --

21           THE COURT:  Yes, you should find that out.

22           COURTROOM DEPUTY:  She's in the library.

23           Are you talking about Mr. David Grove?

24           MR. SCOTT SMITH:  Yes.

25           COURTROOM DEPUTY:  He's in the library talking

1575

1  to her.

2           (Jury enters courtroom, 9:39 a.m.)

3           MR. SCOTT SMITH:  That matter, too, is going

4  to take one additional minute.

5           THE COURT:  It will take one additional

6  minute?

7           MR. SCOTT SMITH:  That's what we were advised,

8  yes.

9           THE COURT:  Okay.  Well, can you begin?

10          MR. SCOTT SMITH:  Yes, yes.

11          (Oath administered)

12            DIRECT EXAMINATION OF ROY HEUSS

13            CALLED ON BEHALF OF THE DEFENDANT

14  BY MR. BRETT SMITH:

15  Q.    Good morning, sir.

16  A.    Good morning.

17  Q.    Can you state your name for the record?

18  A.    I'm Roy A. Heuss.

19  Q.    And, Roy, can you tell the jury where you live?

20  A.    I live in Burnett, Texas, which is about 60 miles

21  northeast of Austin.

22  Q.    Okay.  And, Mr. Heuss, what do you do for a

23  living?

24  A.    I'm a building contractor.  I've been in the

25  contracting business for 35 years.

1576

1  Q.    Okay.  Have you ever been a patient of the Madison
2  Pain Clinic?
3  A.    Yes, I have.
4  Q.    Okay.  Can you tell the jury when you were a
5  patient of the Madison Pain Clinic?
6  A.    The exact dates I'm not sure of; but I think it
7  was from 2002 until they closed, which was -- I'm not
8  sure what date that was -- 2006, 2007.
9  Q.    Okay.  And can you tell the jury a little bit
10 about your experiences with the Madison Pain Clinic?
11 A.    Well, they're -- at the time I was -- I didn't
12 have any health insurance and it's hard to get a pain
13 clinic to take you on if you don't have any health
14 insurance and the Madison Pain Clinic was kind enough to
15 explain their procedure to me over the phone and take me
16 on as a patient and give me the prescriptions that I
17 needed to be able to keep working --
18 Q.    Okay.
19 A.    -- since I'm not really a good candidate for
20 surgery, because of my herniated disk in my neck.  It
21 would be a triple fusion.  I wouldn't have any movement
22 in my neck whatsoever.
23 Q.    Okay.  Well, let's step back a little bit.  Can
24 you tell the jury about your injuries and what -- what
25 injuries do you have?

1  A.    Well, I have two herniated disks in my neck,

2  C4-C5, C5-C6.  I got spinal stenosis.  I got one shoulder

3  that's 2 and a half inches lower than the other, which

4  causes pinched nerves on both sides of the neck.  I've

5  got MRIs and CAT scans for all that stuff.  I've also got

6  a compression fracture in my lower back, L5; and

7  that's -- a lot of that is simply from repetitive use

8  injuries.

9  Q.    Okay.

10  A.    In the construction business, you tend to a lift a

11  lot of things; and sometimes you fall with them --

12  Q.    Okay.

13  A.    -- and that can cause those kinds of things.

14  Q.    I'm assuming with those injuries, Mr. Heuss, you

15  suffer from chronic pain?

16  A.    Yeah.  And my primary care doctor in Burnett, who

17  is aware of all these injuries and my chronic pain, has

18  told me before that I needed to be in pain management.

19  He said I needed to have something to control the pain,

20  but he was not going to write the prescriptions, he would

21  send me wherever.

22  Q.    Okay.

23  A.    I tried that.

24  Q.    Your primary care physician recognized your need

25  for pain medication but did not want to administer those?

1578

1  A.     No, sir, he did not.

2  Q.     Okay.  And is that how you ended up finding the

3  Madison Pain Clinic?

4  A.     Yes, that's -- after I was turned down by a couple

5  of pain clinics because I didn't have any insurance -- a

6  lot of pain clinics won't take you on if you don't have

7  insurance -- then I looked on the Internet, searching for

8  pain clinics that were anywhere in Texas, and came across

9  them and called them and spoke with someone there and

10 they explained their procedure and it sounded like it

11 would work for me for what I needed.

12 Q.     Okay.  And do you recall filling out their initial

13 questionnaire?

14 A.     Yeah, uh-huh.  Yes, sir.

15 Q.     Okay.  And did they require you to go through any

16 steps before you got your medication?  Did you have to do

17 any other things?

18 A.     I sent in three years' worth of records; MRIs; my

19 primary care physician's name, address, phone number, fax

20 number, so forth, et cetera.  They said that that would

21 be reviewed by their doctor or doctors.

22 Q.     Okay.  Did you ever submit to -- do you recall

23 ever giving a blood or urine test?

24 A.     I did all that through my primary care.

25 Q.     Okay.

1579

1  A.     And yeah, I did -- well, let me back up there.  I

2  did have to go to a lab and do blood tests --

3  Q.     Okay.

4  A.     -- before they would accept me as a patient.

5  Q.     Okay.  And do you remember if you ever sent them a

6  copy of any type of identification?

7  A.     Oh, absolutely.

8  Q.     Okay.  And when you obtained refills, did you have

9  to fill out forms in order to obtain refills from the

10 Madison Pain Clinic?

11 A.     Yes.  There was forms that had to be filled out,

12 and you also had to talk to the doctor.

13 Q.     Okay.  Let's tell this jury a little bit about the

14 reason you've chosen to go with pain management.  We've

15 talked about pain management, but really in this

16 situation we're talking about the use of hydrocodone to

17 control your pain.

18 A.     Uh-huh, yes, sir.

19 Q.     What are some of the surgical alternatives that

20 have been offered to you, and why do you not want to take

21 those options?

22 A.     I have a neurosurgeon, Dr. Matthew Hummell, in

23 Austin.  He immediately wanted to do a triple fusion in

24 my neck.  That would leave me without any mobility in my

25 neck at all whatsoever.

1580

1  Q.     And I'm assuming that would make it difficult for

2  you to work in the home building business.

3  A.     That would make it difficult for me to even turn

4  my head.

5  Q.     Okay.

6  A.     Much less work.

7          And in the business that I'm in, he gave me --

8  well, initially he gave me a 50/50 chance that the

9  surgery would give me less pain and that it might last

10 for five years before it needed to be redone.  Not having

11 any insurance, the cost of that surgery was going to be

12 somewhere in the neighborhood of around $45,000 out of my

13 pocket.  That just simply wasn't an option.

14 Q.     Okay.  Have you tried any other forms of therapy

15 like epidural injections?

16 A.     I've had the epidurals in my neck.  I've had the

17 nerve block shots, everything that we could try.  I've

18 done the decompression therapy at the chiropractor.

19 Q.     Have you had favorable results from any of those

20 alternate treatments?

21 A.     Not on my end, uh-huh.

22 Q.     What about the epidural shots?  Tell the jury

23 about your experience with those.

24 A.     The epidural shots, once I did get insurance, I --

25 I was with another pain management clinic; and the only

1 way that they would take you on is if you did all the

2 other protocols, the epidural shots, the nerve blocks, so

3 forth and so on.  I did those; but unfortunately, my

4 deductible is somewhere in the neighborhood of around

5 $8500.  Since I'm in the Texas Health Risk Pool, I'm

6 basically uninsurable.  The shots were running me $1500 a

7 pop every month.  I was getting two shots a month.  They

8 lasted for one day.

9 Q.    Okay.

10 A.    So, that was -- and on that record from that pain

11 clinic -- that was Hill Country pain clinic, Hill Country

12 Pain Associates -- he put on his record 100 percent

13 effective for 24 hours.  That was the diagnosis that he

14 gave me.

15 Q.    The pain management program from the Madison Pain

16 Clinic from 2002 to 2007, basically the hydrocodone

17 therapy, did that work to control your pain?

18 A.    It keeps the pain at a level that I can function.

19 Q.    Okay.

20 A.    I can get up in the morning, I can go to work, I

21 can come home, take a nap.  I can be with my wife, my

22 grandkids, and be -- and live a normal life, uh-huh.

23 Q.    And since the clinic was shut down, have you had

24 difficulty getting doctors to write your prescriptions?

25 A.    Well, when the clinic was shut down, I had to -- I

1  did have insurance at that point; but that was the

2  insurance with the high deductible.  I went to a pain

3  clinic that was in San Antonio.  That was Hill Country

4  Pain Associates.  We went through all the shots, all the

5  nerve blocks.  They basically told me when they found out

6  that my insurance wasn't covering this stuff, that they

7  didn't expect me to come back.  And after I got the bill

8  for it, I didn't go back.

9  Q.    Okay.

10  A.    Since then I have found another doctor who is

11  willing to sign a pain contract with me and help me with

12  the medications that I need.  My dosage on the

13  hydrocodone over all these years has basically been about

14  the same.  It has increased slightly, but it's basically

15  been the same dosage over all these years.

16  Q.    Okay.  Let's tell the jury a little bit about that

17  dosage, if you don't mind.

18  A.    Sure.

19  Q.    When you take a hydrocodone, about how long is it

20  effective for you?

21  A.    Three hours.

22  Q.    Okay.  So, it's possible that in a 12-hour day you

23  could take up to 6, 7 pills?

24  A.    It's possible, if it's needed, yes.

25  Q.    Okay.  And I think actually when you went -- at

1583

1  one point you actually went to the Madison Pain Clinic in

2  person?

3  A.     Yes.  They changed their protocol, and we -- and

4  I -- I was told everyone had to come in.  And I went and

5  saw a Dr. Hoblit that was there at the time.

6  Q.     And what was your experience with Dr. Hoblit?

7  A.     I thought he was very professional, much like any

8  other doctor I had seen.

9  Q.     Okay.  All right.  Thank you, sir.

10        MR. BRETT SMITH:  We'll pass the witness.

11             CROSS-EXAMINATION OF ROY HEUSS

12  BY MR. BUYS:

13  Q.     Good morning, sir.  I don't want to mispronounce

14  your name.  Would you say it for me, please?

15  A.     It's Heuss.

16  Q.     Heuss (pronouncing).

17  A.     Yes.

18  Q.     And that's H-E-U-S-S?

19  A.     Yes, sir.

20  Q.     Heuss.  Thank you.  Mr. Heuss, you stated that you

21  came to Madison Pain Clinic on one time and saw

22  Dr. Hoblit; is that right?

23  A.     Yes, one time.

24  Q.     When was that?

25  A.     That was right before they closed down, I believe,

1584

1  yeah.

2  Q.    So, in 2007?

3  A.    I think it was, yeah -- late 2006, I think it was.

4  Q.    Well, they closed their doors in November of 2007.

5  So, would it have been closer to late 2007?

6  A.    It seems to me like they initiated that policy in

7  2006, and it was maybe three -- maybe three or four

8  months before they were closed down.

9  Q.    Okay.  Very good.  And you started receiving

10  medication from them in 2002; is that right?

11  A.    I believe that's correct, yeah.

12  Q.    So, from 2002 until 2006 or '7 whenever you saw

13  Dr. Hoblit, you were never examined by an MPC doctor; is

14  that right?

15  A.    Not by their doctor there, no, huh-uh.

16  Q.    Now, how about your current doctor?  You said you

17  now have a doctor who is helping you?

18  A.    I have -- yes.

19  Q.    And where is he located?

20  A.    He's in Waxahachie.

21  Q.    And is that near where you live?

22  A.    It's within about -- it's a short drive, yeah.

23  Q.    What's his name?

24  A.    Dr. Phillips.

25  Q.    Dr. Phillips.  And have you seen Dr. Phillips in

1  person?

2  A.     Yes, sir, I have.

3  Q.     Was that before he started prescribing hydrocodone

4  for you?

5  A.     Yes, sir, it was.

6  Q.     Thank you, sir.  Good luck with your recovery.

7  A.     Thank you.

8          MR. BRETT SMITH:  No further questions, your

9  Honor.

10         THE COURT:  All right.  Thank you.  You may

11 step down.

12         MR. BRETT SMITH:  May this witness be excused?

13         THE COURT:  Yes, you're excused.

14         MR. BRETT SMITH:  Call Victoria Northrop.

15         (Oath administered)

16      DIRECT EXAMINATION OF VICTORIA NORTHROP

17         CALLED ON BEHALF OF THE DEFENDANT

18 BY MR. BRETT SMITH:

19 Q.     Ma'am, can you state your name for the record?

20 A.     My name is Vickie Northrop.

21 Q.     Ms. Northrop, can you tell the jury where you came

22 from?

23 A.     I'm from Palm Bay, Florida.

24 Q.     And what do you do there, ma'am?

25 A.     I'm the president and CEO of the Greater Palm Bay

1586

1  Chamber of Commerce.

2  Q.    And before your job in Palm Bay, Florida, what's

3  your work history like?  I mean, what have you done for a

4  living?

5  A.    I've spent the good part of 12 years launching

6  electric vehicle companies from Europe and from Canada.

7  I worked for Ford Motor Company for about 7 years.

8  Q.    And if you don't mind, ma'am, what's your

9  educational background?

10  A.    I have an MBA from Baker College out of Michigan

11  and an undergrad from Barry University out of Miami.

12  Q.    Okay.  Ms. Northrop, can you tell the jury if

13  you've ever been a patient of the Madison Pain Clinic?

14  A.    Yes, sir.

15  Q.    And can you tell them when you were a patient at

16  the Madison Pain Clinic?

17  A.    It was in 2007, when I was living in Southaven,

18  Mississippi, working out of Ford Motor Company's

19  Carlsbad -- well, actually they were based in Carlsbad;

20  but Cordova, Tennessee, was their office.

21  Q.    And what condition caused you to seek out or find

22  the Madison Pain Clinic?

23  A.    When I worked for Ford, they moved their

24  salespeople every 18 to 36 months; so, every time they

25  would move me, I would have to be stuck trying to find a

1587

1  doctor that would take my records and review my

2  information and treat my pain.  So, right around

3  2002-2003 it became evident that the only place to do

4  this is through online pharmacies and online physicians.

5  So, I started researching this online.

6          By the time I got to Southaven, Mississippi, I

7  was traveling every week for Florida.  I was in a plane

8  every Monday and every Friday to fly in and out for my

9  job.  It was pretty bad.  To try to find a doctor in a

10  tiny little town, Southaven, Mississippi, was pretty much

11  impossible.  I went online; I researched.  There's a

12  couple of blogs and boards where you can go research

13  information to find out who is the best and who isn't the

14  best.  I tried a few others and -- but it became evident

15  that actually Madison was considered the best.  The --

16  Q.     Okay.  Let me stop you there.

17  A.     I'm sorry.  Sure.

18  Q.     What was the condition that resulted in your pain?

19  A.     I have two herniated, now bulging disks in my

20  neck; and my jaw is herniated, the disk in my jaw.  The

21  fifth cranial nerve has been affected, creating migraine

22  headaches pretty much on a monthly basis.

23  Q.     And had you -- before you found Madison, what was

24  your experience with other physicians in regards to

25  treating your pain management?

1588

A.    It was difficult.  Some of the worst ones I ever
saw were in Albany, New York.  I've had neurologists who
wouldn't even talk to me.  I mean, they wouldn't even
look me in the eye and talk to me about my pain and just
insist on doing surgery, and that's within the first
15 minutes of seeing them.

Q.    And you understand how a neurologist makes the
bulk of their money, right?

A.    Surgery.

Q.    They get paid doing surgeries.

A.    Right.

Q.    Okay.  And that was an option you did not want to
consider?

A.    No.  I had just taken the job at Ford.  I was
traveling 70 percent of the time.  I couldn't go work for
Ford Motor Company and 3 months later say, "Well, I need
to take 6 months off to have surgery on my neck."  I
couldn't do that.  So, I just needed to treat the pain
and hopefully try to find a solution here to the problem.

Q.    And when you say treating the pain, were you on a
hydrocodone pain management program?

A.    Yes, sir.

Q.    And did that work for you?

A.    Yes.

Q.    Okay.  Tell the jury about your lifestyle and

1  living with the pain and dosaging with hydrocodone.

2  A.    I did all the research to make sure that I didn't

3  go over.  I mean, I definitely wanted to make sure that I

4  didn't fall into any addiction patterns.  The increase

5  was actually pretty small when you think about it,

6  considering I had been on this medication for 17 years.

7  I went from 3 a day to 4 a day to 6 a day in 15 years.

8  And I've read about so many cases where people within the

9  first year are taking 20 a day.  So, not to use

10 somebody's addiction problem as my own benchmark.  I just

11 always made sure I stayed within just the level that I

12 needed.  I never took more than I needed.  And I told

13 doctors, "I break them in half.  I only take what I

14 need."  I know what it feels like to take too much.  I've

15 made that mistake; and I'll tell you, you don't make that

16 mistake twice.  You are so sick that it just defeats the

17 whole purpose of trying to get yourself out of pain when

18 you take too much.  So, I make sure I take the dosage

19 exactly how they tell me to take it and when to take it.

20 Q.    And, Ms. Northrop, if my math is correct, if

21 you're taking 6 pills a day 7 days a week, that's 42

22 pills, correct?

23 A.    Correct.

24 Q.    And, roughly, if we have 4 weeks out of the month,

25 then dosaging could be upwards of 160 pills if you have a

1590

1 chronic pain condition and you're on hydrocodone for a

2 long time.

3 A.     That's correct.

4 Q.     You were telling the jury a little bit about how

5 you found Madison Pain Clinic.  Can you tell them about

6 that?

7 A.     Certainly.  Madison Pain Clinic was discussed at

8 length in one of the blogs.  They were considered the

9 Cadillac of pain clinics.  The information that people

10 wrote on the blogs was if you aren't a legitimate pain

11 patient, you are not going to get through what they're

12 going to put you through.  It's expensive, and it's

13 time-consuming.  They make you go take urine tests.  They

14 give you psychological exams.  They spend a tremendous

15 amount of time going over your records.  And I was led to

16 believe that, you know, nobody could get through, you

17 know, if they didn't have a chronic pain problem.

18          It got to the point where I just decided to

19 spend the money.  You know, it was worth it to me to keep

20 my job and to keep what I was trying to -- to have a

21 decent, normal life; and I would just spend the $350 a

22 month to get through, you know, what they put you

23 through.  I went and had all the tests done, went through

24 the psychological exams that they put me through, and was

25 treated for about eight or nine months.

1591

1 Q.    Now, Ms. Northrop, it wouldn't come as a surprise
2 if I told you that this jury has already heard that a few
3 people did slip through the system?
4 A.    I would imagine that if you were good enough to
5 fake records and IDs, that you possibly could get
6 through.  At the end there, they were doing face-to-face;
7 and I was prepared to fly to Houston and meet with them.
8 Q.    And overall, what was your experience with the
9 Madison Pain Clinic?
10 A.    Dr. Hoblit was wonderful.  I mean, I can't even
11 begin to tell you.  He spent at least 30 minutes on the
12 phone with me.  He was very sympathetic.  He had all my
13 records in front of him.  He was hands-down one of the
14 best doctors I've ever dealt with.
15 Q.    Okay.  Thank you, ma'am.
16           MR. BRETT SMITH:  I'll pass the witness.
17           CROSS-EXAMINATION OF VICTORIA NORTHROP
18 BY MS. SMITH:
19 Q.    Ms. Northrop, you never saw a Madison Pain Clinic
20 physician, did you, in person?
21 A.    No, ma'am.  I think they closed down before I was
22 able to fly down there.
23 Q.    But you never saw one, was my question.
24 A.    Did I ever see that doctor?
25 Q.    Right.

1592

1  A.      No.  I was seeing a regular general physician in
2  Southaven.
3  Q.      Thank you.
4          MS. SMITH:  No further questions, your Honor.
5          MR. BRETT SMITH:  May this witness be excused,
6  your Honor?
7          THE COURT:  Yes.  You may step down, and
8  you're excused.
9          MR. BRETT SMITH:  We call Douglas Cummins.
10         (Oath administered)
11         DIRECT EXAMINATION OF DOUGLAS CUMMINS
12         CALLED ON BEHALF OF THE DEFENDANT
13 BY MR. BRETT SMITH:
14 Q.      Good morning, Mr. Cummins.
15 A.      Good morning.
16 Q.      Can you state your name for the jury?
17 A.      Douglas Allen Cummins.
18 Q.      And, Mr. Cummins, you and I had never met before
19 yesterday, correct?
20 A.      Correct.
21 Q.      We had talked on the phone on an occasion?
22 A.      About this court meeting, yes.
23 Q.      Okay.  Can you tell the jury:  Where did you come
24 in from to be here today?
25 A.      I flew in from Stamford, Connecticut, 2,000 miles.

1593

1  Q.    Now, you're actually a local boy, correct?

2  A.    Yes, sir, born and raised Texan.

3  Q.    Can you tell the jury where you were raised?

4  A.    Texas City, Texas.  Went to school in Houston.

5  Q.    And where did you go to school in Houston?

6  A.    University of Houston Honors College.  Spent most

7  of my life here.  So...

8  Q.    Okay.  What did you do after college?

9  A.    I started my own company two years out of college,

10 a small IT consulting firm, which I still own and operate

11 today.

12 Q.    Okay.  And have you ever worked in law

13 enforcement?

14 A.    Actually, during college, I co-oped for U.S.

15 Customs.  I was on a U.S. Customs joint task force with

16 DEA doing -- gathering intelligence for drug interdiction

17 and trafficking and weapons trafficking, all the typical

18 things we would gather in tow for.

19 Q.    Okay.  You obviously have some physical ailments

20 and injuries, correct?

21 A.    Several, yes.

22 Q.    Okay.  And there are lots of them.  So, let's

23 start at the beginning and tell the jury when the first

24 traumatic injury was that you suffered and tell them a

25 little bit about that.

1594

1  A.     The worst injury -- there were many, but the first

2  of the worst was 1995.  I was there on Memorial in

3  Houston, which is a major thoroughfare in Houston; and

4  it's a 45-mile-an-hour zone where I was at, four-lane

5  traffic.  I was broadsided by an SUV, a 19-year-old girl.

6  I don't even know -- there was no crossing there.  She

7  just came out of the blue and broadsided me.  I was

8  crushed in the car, thrown into a gas station.  Basically

9  the -- three fire trucks, two ambulances came.  I had to

10 be cut out of the car with torches, and then they had to

11 use Jaws of Life to medevac me to Memorial.

12 Q.     Okay.  And when you -- as a result of that, what

13 injuries did you sustain or what injuries were you

14 diagnosed with?

15 A.     The left side of my body was crushed.  My left hip

16 was crushed, my left shoulder.  All of my ribs were

17 separated along the cartilage bone line; so, basically

18 all my ribs were broken.  I had internal bleeding,

19 traumatic brain injury.  I had four fractures in my

20 pelvis, in my SI and IT joints.  I had numerous, multiple

21 injuries, including glass and cutting and scarring and

22 that sort of thing.  I also did die in the ER for

23 approximately two minutes from the injuries.

24 Q.     And you're basically talking about where you were

25 flatlined, and they had to basically bring out the shock

1  cart and hit you and bring you back?

2  A.     Yes, sir.  I was dead for two minutes.  Right.

3  Q.     Okay.  After that, what was your recovery like?

4  A.     It was horrible.  I spent a good six months with

5  very intense physical therapy.  Again, since I own my own

6  company, a lot of that was, you know, not compensated.

7  But the physical therapy was intense, painful.

8           When you have an injury like that, basically

9  they submerge you up to your chest in water so there's no

10  weight on your feet and make you walk slowly.  And over

11  the course of six months, at the end of six months I was

12  able to walk on crutches.  Then I spent another year on

13  crutches and canes before I could walk freely at all, and

14  then it was still very painful.

15  Q.     And I'm assuming back in '95 is when you started

16  pain management through the use of medications, correct?

17  A.     That's correct.  Actually, at the time of the

18  wreck, I was a bodybuilder, health fanatic.  I was in

19  excellent physical shape, martial artist, everything.  I

20  never wanted to have anything to do with pain medicine;

21  but after that, it was just a requirement just to get

22  through the day.

23  Q.     Okay.  So, now -- and then you -- I think you also

24  sustained a subsequent injury after that, correct?

25  A.     There have been other injuries.  I was ran off the

1  road on a motorcycle once; I sustained several

2  significant injuries from that.  And also most

3  recently -- I've had two other severe accidents recently.

4          In 2005, I was hit as a pedestrian by a car,

5  by a reckless driver; and my leg was shattered.  My

6  tib-fib was shattered in nine places.  So, it had to be

7  titanium reconstructed; and I still have the titanium

8  reconstruction in my leg, basically a nail that's inside

9  my bone that they had to hollow out the bone from my knee

10 to my ankle and fill it with titanium and screws to

11 basically hold my knee to my ankle for the duration.  And

12 that also took many, many months of physical therapy,

13 et cetera, to get back where I can hobble.  As you see, I

14 still have the hobble.

15 Q.    Sure.  Okay.  Tell the jury how you found the

16 Madison Pain Clinic.

17 A.    Well, I mean, I thank God for the Internet.  That

18 site -- he came recommended from several people on the

19 Internet, from -- there's pain forums for people to go

20 to, you know, express their feelings or their experiences

21 with pain control; and he was recommended through

22 basically friends that I had met online.

23 Q.    Okay.  And do you recall when you went to the

24 Madison Pain Clinic -- tell the jury what steps you had

25 to go through in order to get accepted into the program.

A.      It's pretty much everything you would have to do

to a normal doctor.  I mean, you have to submit all your

records from all your previous doctors, documentation of

all your injuries.  Of course, you have to interview with

the doctor and go through the full process of

interviewing with the doctor.  Then they -- after they

review your records, they decide if they want to let you

in or not.

Q.      And, Doug, if I represented to you contained

within your medical record file are certain laboratory

tests, do you recall, Doug, giving those blood or urine

samples for the lab test?

        And I'm showing you an exhibit that's

marked --

A.      I'm sure I did.  I don't specifically remember.

That was quite some time ago; but I'm sure I did, yeah.

Q.      I'm showing you a document that's marked as

Defendant's Exhibit 100.

A.      Right.  Sure, it looks like me.

Q.      Okay.

A.      But yes, I do -- I mean, like I said, they went

through all the steps that any doctor would go through.

Q.      And then, of course, your urine test was tested

for controlled substances, of course.

A.      They regularly tested for other controlled

1598

1  substances, yes.

2  Q.    Okay.  And do you recall ever talking to a

3  psychologist by the name of Dr. Hester?  Do you remember

4  that interview?

5  A.    I think that was when they were still interviewing

6  me for -- to allow me into the clinic.

7  Q.    Okay.

8  A.    So, that was before I actually was allowed in.

9  Q.    Okay.  Tell the jury about your experiences --

10  once you were accepted into the program, what your

11  experiences with the Madison Pain Clinic were like.

12  A.    For me, it was great.  I mean, I still remember

13  Dr. Hoblit well; and out of all the physicians that I've

14  had for pain, he was probably one of the more caring

15  doctors.  He spent probably more time on the phone with

16  you discussing your problems and ailments than a lot of

17  doctors do now.  I mean, obviously, I'm still in pain

18  management.  But he was very caring and spent a lot of

19  time with his patients to make sure everything was fine

20  with the treatment.

21  Q.    Okay.  One of the things we talked about, I guess,

22  yesterday evening was the dosaging issue.  So the jury

23  understands, explain to them how much hydrocodone a

24  person with chronic pain, particularly in your situation,

25  has to take on a daily basis.

1  A.    Sure, sure.  And I actually didn't even mention

2  the back injury.  I have five injured disks in my back.

3  Sorry.  I got distracted from that.  So, I also have five

4  injured disks in my back.

5        Typical doctors -- even now, with all these

6  injuries, they'll typically give you 3 painkillers a day.

7  Now, those take about 45 minutes to onset, from the time

8  you take them until the time they give you a little

9  relief; but they last maybe 2 hours.  So, you're really

10  talking maybe 6 hours out of a 24-hour period that you

11  get some relief.  Even though Texas has an intractable

12  pain law, no doctor -- doctors are afraid to write more

13  than 3 pills a day.

14  Q.    And does three pills a day work to control your

15  pain, Doug?

16  A.    No.  I mean, if I were to lay in bed and do

17  nothing, in a vegetative state, it would -- it might get

18  me through the day; but I surely wouldn't be able to get

19  up, go to work, do normal things, much less have any fun

20  or activities, at that level of pain medication, no.

21  Q.    Okay.  When you were treating with the Madison

22  Pain Clinic, I'm assuming you were dosing pretty high?

23  A.    Dr. Hoblit is the only doctor I've had that's

24  actually given me enough to allow me to do just normal

25  things, just go out and walk around or walk with my

1600

1 friends or -- we're not talking power walking.  We're

2 just talking walking around.

3 Q.    Sure.

4 A.    So, he's the only doctor who has actually given

5 enough pain medicine that you could have a somewhat

6 normal life.

7 Q.    Okay.  And tell the jury, once the Madison Pain

8 Clinic was shut down, what has been your experience since

9 then with obtaining your medication?

10 A.    Yeah.  Well, I mean, the laws seem to get stricter

11 and stricter every year and as an IT professional, I tend

12 to travel sometimes worldwide and the problem is now

13 doctors won't even -- won't even -- they won't prescribe

14 across state lines, that sort of thing.  So, for example,

15 if I'm in New York and it's that time of the month where

16 I have to get my pain meds, basically I have to miss

17 work.  Being a contractor, I don't get paid for those

18 days.  I have to miss work, pay for a flight to fly back

19 to Texas to see my doctor to get my pain meds refilled,

20 and then fly back to my client site.  So, my client is

21 mad.  I'm out of a lot of money out-of-pocket for the

22 airfare, rental cars, hotels, that sort of thing.

23         If I'm lucky enough to find a doctor in the

24 state that I'm working in, it's very difficult to even

25 get in because the doctors don't want to see you because

1  you're out of state.  Sometimes -- I was lucky enough to

2  recently find one in Atlanta; but then there's the

3  problem of they accuse you of doctor shopping because you

4  have a doctor in both states, even though it's very clear

5  that the medicine is every 30 days.  So, it's an issue.

6  I mean, basically you have to find a doctor in every

7  state that you might be in or arrange to fly home every

8  month to see your doctor.  And if you're talking 12 times

9  a year, that's 2 weeks of vacation basically you have to

10 eat to go see your doctor just to get your prescriptions

11 filled.

12 Q.    Have you had problems with pharmacies also, Doug?

13 A.    Absolutely.  Typically, any pharmacy that you walk

14 up to and you hand them pain scripts -- I've had people

15 laugh at me.  I've had people call me a drug head.  I've

16 had people say, you know, "That's a cocktail" or -- just

17 really demeaning.  It's demeaning, yeah.

18 Q.    You came down here because you wanted this jury to

19 hear your story, correct?

20 A.    Absolutely.  I mean, like I said, I've had pain

21 for 15 years; and it's just -- the situation is just

22 horrible and it's just getting worse.

23 Q.    Okay.

24 A.    So, it's -- you can't have a normal life and have

25 pain anymore.  So...

1602

1  Q.     Okay.  Thank you, Doug.

2          MR. BRETT SMITH:  I'll pass the witness.

3          CROSS-EXAMINATION OF DOUGLAS CUMMINS

4  BY MR. BUYS:

5  Q.     Sir, is it Mr. Cummins or Cummings?

6  A.     Cummins, no "G."

7  Q.     With no "G"?

8  A.     Correct.

9  Q.     Mr. Cummins, I may not have heard; but did you

10 ever physically go to MPC?

11 A.     For the tests, yeah.

12 Q.     For which tests?

13 A.     The blood and urine.

14 Q.     So, you went to MPC's facility to give blood and

15 urine?

16 A.     Right.

17 Q.     And did you see a doctor when you were there?

18 A.     They took blood and urine tests.  I don't remember

19 who I saw there actually it was such a long time ago.

20 Q.     But you don't recall being physically examined by

21 a doctor; is that right?

22 A.     Well, I was examined; but I don't remember who it

23 was.  I don't remember if it was Dr. Hoblit or who it --

24 if the person was a nurse or a physician.  I assumed they

25 were a doctor.  So...

1603

1  Q.    Thank you, sir.

2  A.    It was one time.

3  Q.    Thank you.  Good luck with your recovery.

4        MR. BRETT SMITH:  No further questions, your

5  Honor.  May this witness be excused?

6        THE COURT:  Yes.  Thank you.  You're excused.

7        MR. SCOTT SMITH:  Douglas Grover.

8        (Oath administered)

9        DIRECT EXAMINATION OF DOUGLAS GROVER

10       CALLED ON BEHALF OF THE DEFENDANT

11 BY MR. SCOTT SMITH:

12 Q.    Can you state your name for us, please?

13 A.    My name is Douglas Grover.

14 Q.    Mr. Grover, how are you employed?

15 A.    I'm an attorney.

16 Q.    Where?

17 A.    I work in New York City.  I'm with a law firm

18 named Thompson Hine.  It's a Cleveland-based firm with

19 offices in the Midwest and the East.

20 Q.    Tell us about your educational background, please.

21 A.    My undergraduate education was at Colgate

22 University.  I received a BA in political science.  My

23 law school degree was from Brooklyn Law School, which is

24 in Brooklyn, New York.

25 Q.    After you graduated from law school, what sort of

1604

1  practice did you enter into?

2  A.    Well, I spent several years as an intern in the

3  Brooklyn District Attorney's Office, which is the local

4  prosecutor in Kings County, which is Brooklyn.  I joined

5  the office when I graduated from law school and I took

6  the bar.  I worked for several years as an appellate

7  attorney in that office.  For two years I handled briefs

8  and appellate records for the appellate division and the

9  court of appeals in the State of New York.

10          I then moved on to a trial bureau; and I tried

11  cases, approximately a dozen, in a Supreme Court trial

12  bureau.  In Brooklyn, the Supreme Court is the court of

13  primary jurisdiction.  And I handled cases such as

14  robberies and rapes and typical street crime cases.

15          In my last year in the District Attorney's

16  Office, I was assigned to the homicide bureau.  In the

17  homicide bureau I handled strictly murder cases as

18  defined under the New York Penal Law; and I tried 12

19  murder cases to verdict in front of a jury.

20  Q.    So, at this point in your career, you had been a

21  prosecutor.

22  A.    I was a state court prosecutor.

23  Q.    And when we talk about "appellate," that's a term

24  that we may not all be familiar with.  What does it mean

25  to be in the appellate system?

A.     After there is a conviction or if there is a

ruling that one of the parties disagrees with, one of the

parties will file an appeal to contest that ruling or

that conviction.  And my first two years of the four and

a half years I spent in the Brooklyn District Attorney's

Office, I handled strictly appeals.

Q.     After you left the District Attorney's Office

there in Brooklyn, what did you then do?

A.     In approximately April of 1979, I believe it

was -- 1980, I joined the -- excuse me.  I think it was

'79.  I joined the United States Department of Justice,

Organized Crime Strike Force.  Much like the U.S.

Attorney's Office, the strike force is consisted of

federal prosecutors.

       In this instance, the strike forces had

originally been created by Robert Kennedy in the Sixties;

and there were strike force units throughout the country

in various large cities.  Our mission was organized

crime, labor racketeering; and over time it expanded.

When I joined the strike force, I ended up working on the

Abscam prosecutions, which involved the prosecutions of

congressmen and senators -- or one senator.

       I worked in the strike force for approximately

ten years.  I rose to become deputy chief of the Brooklyn

strike force.  During the course, I prosecuted the acting

1606

1   boss of the Colombo family, the acting boss of the

2   Gambino family.  I say "acting" because at those times

3   the bosses would have been in jail.  I prosecuted various

4   members of the various unions, including the president

5   and vice-president of the carpenters union in New York

6   City, and businessmen in various tax and other related

7   crimes.

8   Q.    So, I guess in your career as a mob fighter,

9   that's some pretty high-profile cases.  Wouldn't you

10  agree?

11  A.    Yes.

12  Q.    I mean, those names are even familiar to us here

13  in Beaumont, I suspect, the Gambino and Colombos.

14          How long did you stay with the task force?

15  A.    Well, it's a strike force.  We have a state task

16  force in New York, and I was with the Organized Crime

17  Strike Force.  I stayed until, I believe it was, October

18  of 1989.  And for a brief period, I was asked to stay

19  on -- and I did -- as a special prosecutor to handle the

20  prosecution against Thomas Gambino, who was the son of

21  Carlos Gambino, the deceased boss of the Gambino family.

22  Q.    And thereafter what did you do?

23  A.    Well, I opened my own practice with another

24  colleague of mine, Norman Bloch; and I practiced in my

25  own practice for approximately 13 years.  Most of my

1 practice involved what we would call "white-collar

2 criminal defense." We did not do street crime. We did

3 not do drug cases. We also did civil litigation, meaning

4 litigation involving disputes between parties. And that

5 lasted for 13 years.

6           And in approximately 2002, through a series of

7 events, a colleague of mine from college had joined the

8 firm of Thompson Hine in Cleveland. We had some

9 communication and several months later my partner and I

10 joined Thompson Hine to head up their white-collar unit,

11 but I'm head of civil litigation right now.

12 Q.    And when you talk about white-collar, what sort of

13 things are we talking about?

14 A.    Generally tax cases, environmental cases, cases

15 involving large corporations; but more often than not,

16 our role is representing corporations during internal

17 investigations, representing corporations that have been

18 victimized by various schemes, or simply advising clients

19 with respect to subpoenas and other contacts with the

20 government, in particular the U.S. Attorney's Office.

21 Q.    And Thompson Hine, how many attorneys are involved

22 with that firm?

23 A.    Well, it's been a tough year and I can't give you

24 an exact number, but we're approximately 380 lawyers.

25 Q.    Spread out across how many cities?

1608

1  A.     Primarily in Cleveland, Columbus, Cincinnati, and

2  Dayton, 35 lawyers in New York, 30 or 35 lawyers in

3  Washington, and 30 lawyers in Atlanta.  We have a small

4  office in Brussels.

5  Q.     Do you know David Vogel?

6  A.     I do.

7  Q.     How did you first come to meet David Vogel?

8  A.     I believe that the year was 2000 and I was

9  representing a rare coin dealer by the name of Robert

10  Dupurton.  Mr. Dupurton had been charged by the

11  government in a fraud involving the sale of rare coins.

12  And we were searching -- we, Mr. Dupurton and I -- were

13  searching for expert witnesses and we were led to a

14  number of names that were prominent in the industry,

15  either dealers or people who had previously testified,

16  and I don't recall specifically how David Vogel's name

17  ended up on my desk, but he was one of three or four

18  experts that I met with first by phone and then in person

19  to assist us in the defense of the Dupurton prosecution.

20  Q.     So, you got to know him initially as a potential

21  expert witness in this coin case?

22  A.     Yes.

23  Q.     Did he end up testifying for you in that case?

24  A.     No, he did not.

25  Q.     Why?

1609

A.    We did not use David as a witness.  David -- we

had one expert that became our testifying witness; and

frankly, it was just a demeanor thing.  I liked his

demeanor; I liked the way he presented himself.  I

thought that he was, frankly, very plainspoken; and I

decided to use him.  I thought that David had tremendous

knowledge about rare coins and I thought it would be very

helpful to have somebody advise me in my preparation for

trial and I could not use the testifying expert because

he was a witness in the case.  So, I had to have someone

simply to advise me; and David took that role.

Q.    Okay.  Did you later have contact with David after

the coin case?

A.    After the coin case, we had, I think, no contact.

If there was interim contact, I don't recall it.

Sometime -- I joined Thompson Hine on January 30th, or

something like that, in 2003; and within a month I

received a phone call from David Vogel who asked to come

see me.

Q.    Now, let me stop you here because as an attorney,

your stock in trade, what you have to sell, is your time,

right?

A.    Yes.

Q.    And it's only fair that you charge for your time,

correct?

1610

1  A.     Yes.

2  Q.     And in New York City, the rates that you charge

3  are going to be somewhat higher than what we might

4  experience in rural Texas.  Would you understand that?

5  A.     I do.  In our firm at Thompson Hine, our rates in

6  Dayton and Columbus are much lower than the rates in

7  New York.

8  Q.     But today you're not being paid for your time, are

9  you?

10  A.     No, I'm not.  I'm here testifying pursuant to a

11  subpoena.

12  Q.     Okay.  And you get the witness fee, which I think

13  may be $40 a day.

14  A.     Whatever it is, it's going to go to Thompson Hine.

15  Q.     Okay.  So, you're not being paid for your

16  testimony today, correct?

17  A.     No, I'm not.

18  Q.     We were starting to talk about David coming to

19  your attention again in '03.  And what was the reason

20  that he came to you?

21  A.     He had indicated to me that he had a new business,

22  and it involved the sale of pharmaceuticals or pain

23  medications.  It was an area that I was unfamiliar with.

24  I was also surprised because that wasn't how I knew

25  David.  So, I suggested that we get together and discuss

1611

1  it.  He was, at the time, extremely thorough in wanting

2  to get me prepared for a meeting and he began emailing me

3  various articles and literature that related to the

4  distribution of pharmaceuticals over the Internet and,

5  you know, I started to go through the material and I also

6  assigned -- we had a summer associate -- I'm thinking I

7  had a summer associate at the time; but I guess given the

8  timing, at that point I didn't have an associate assigned

9  with me.

10  Q.    What were the concerns he expressed to you

11  initially?

12  A.    Well, frankly, he was insistent that he was --

13  what he was doing was legal and different than other

14  situations; but he was particularly concerned because he

15  had seen an emphasis in prosecutions against other

16  pharmacies or entities that were involved in the

17  distribution of pharmaceuticals that he described to me

18  as being very slipshod and very careless and frankly

19  inappropriate.  And at least in that first discussion and

20  before I really knew what the facts are, he certainly was

21  indicating to me that what his firm was doing was very

22  different and much more thorough.

23  Q.    And he wanted your -- he wanted to talk to you

24  about making sure that what he was doing was within the

25  bounds of the law?

1612

1 A.    I think he wanted an exploration into the area of

2 the law to give him some definitive guidance on whether

3 his business operation was legal and whether there were

4 any issues.

5 Q.    So, you had some initial meetings with him, I take

6 it?

7 A.    I have a recollection of a first meeting in my

8 office and I know that we did review some materials that

9 he provided to us, but there was more -- there were

10 articles I think from the DEA and also from other

11 entities that I remember reviewing.

12 Q.    Did you and your firm undertake to -- a task for

13 David?

14 A.    We did.  We were engaged and I prepared a retainer

15 letter and I believe David, but maybe David and Madison

16 Pain Clinic, became clients of the firm.

17 Q.    And what was the task that you were charged with

18 doing?

19 A.    Analyzing his business and trying to give him an

20 opinion as to its legality.

21 Q.    Did you have concern or -- excuse me --

22 discussions with him about -- and I guess your background

23 is white-collar and criminal law, right?

24 A.    I'm a litigator, but most of the work I do is

25 criminal.

1613

1  Q.    Okay.  Did you talk to him about your

2  understanding of the parameters of the criminal aspect of

3  the business he was in?

4  A.    I did, because I came to the project with a basic

5  understanding that the law needed to be clear in order

6  for a prosecution to take place.  In other words, you

7  can't just prosecute someone and say, "You've broken the

8  law" if there is no law.  And, so, I needed to understand

9  what the law was; and if I could understand what the law

10 was, then I could advise the client what was legal and

11 what wasn't.  And, so, my exploration essentially was an

12 effort to determine what the state of the law was that

13 either would require or -- him to shut down or to allow

14 him to continue.

15 Q.    Were you able to reach a conclusion in that

16 regard?

17 A.    Well, if I jump ahead, the answer is I never

18 reached an absolute conclusion because I thought that the

19 law was unclear and I advised David as much.  We had

20 endless conferences and correspondences.  I even

21 consulted with other counsel in my firm.  I continued to

22 do research.  I assigned a summer associate to assist me

23 in it.

24          And ultimately I reached the conclusion that

25 while the firm was not in a position to provide an

opinion letter, the reason we couldn't is that we felt

that the law was unclear.  I also advised David that I

felt that a prosecution would be very difficult simply

because -- because the law was unclear, there would be no

notice; and the constitutional requirements of due

process require that someone knows what they're doing

wrong.

Q.    And these are concepts you discussed with David?

A.    I did.

Q.    Now, to get yourself familiar with what the

Madison Pain Clinic was doing, what did you and your firm

do?

A.    Discussions and correspondence with David Vogel,

follow-up discussions with a number of employees of

Madison Pain Clinic.  I have a recollection of speaking

to Tyra, I think it's Barnett.  I believe that I spoke to

at least one other individual; and I have a recollection

of speaking to an M.D. on the premises, all by phone.  I

did not pay a visit to the premises.

Q.    What was your purpose in doing those sort of

interviews?

A.    Well, I didn't want to rely solely on David.  I

wanted to get the picture from multiple individuals who

were working there.  I wanted to ask questions that

weren't necessarily prepared for.  I wanted to get a

1615

1  sense if I was really getting a straight story.  In this

2  process, I wanted to make sure that I understood the

3  facts carefully because if we gave an opinion, it had to

4  be based on the real facts.  And as it turned out,

5  although we didn't provide an opinion, what we did do is

6  gather those facts; and I was satisfied that I was

7  getting an accurate picture.

8  Q.     And when you got a satisfactory picture of the

9  facts, you still came to the conclusion that the law was

10 unclear?

11 A.     I did.

12 Q.     And, so, was there a -- did somebody come up with

13 an idea to try to get some clarity?

14 A.     Well, we made a decision that we were going to

15 write a letter to the DEA.

16 Q.     Who came up with that idea?

17 A.     I think that the original idea came from David.

18 Q.     Okay.

19 A.     I'm not sure.

20 Q.     And what -- had you done this before?

21 A.     I had never done this before.  As I told you, my

22 practice, with one small exception, had never dealt with

23 anything relating to pharmaceuticals or narcotics,

24 anything like that.

25            But David had suggested why don't we ask the

1616

1   DEA because they have a part of the agency that dedicates

2   itself to responding to citizen requests.  I was

3   unfamiliar with it.  So, I asked my associate to research

4   it and to review what it is that the DEA does and what

5   this entity was about.  I had concerns about that because

6   it is not generally the habit of criminal lawyers to take

7   their client's business, analyze it, and then submit a

8   letter to the government and say, "What do you think?"

9   But David was very insistent that he wanted to get an

10  opinion, and I was insistent that I wanted to make sure I

11  did it in a way that I was careful.

12  Q.    So, did you ultimately write a letter to the DEA?

13  A.    We ultimately did.  I think that occurred -- well,

14  it occurred in the summer of 2003, approximately August;

15  but I think that the process was approximately a

16  four-to-six-week process of drafting and correcting and

17  getting various opinions before we finalized it.

18  Q.    You wanted to make sure what you were submitting

19  was correct.

20  A.    That's right.

21  Q.    And that would have entailed, I guess, these

22  discussions you had with various Madison employees to

23  make sure you had the scenario down correctly?

24  A.    I would like to think so, yes, both David and the

25  employees.

1617

1    MR. SCOTT SMITH:  May I approach the witness,

2  your Honor?

3    THE COURT:  Yes.

4  BY MR. SCOTT SMITH:

5  Q.    I'm going to show you what's been marked as

6  Defendant's Exhibit No. 3.  Can you identity that for us,

7  please?

8  A.    Yes, I can.  This appears to be a photocopy of the

9  letter that we sent to the DEA.  It's dated August 4th,

10  2003.  It's signed by me on the third page.  And I was

11  reviewing some records, and I know that this was sent by

12  FedEx on or about the 3rd or 4th.

13    MR. SCOTT SMITH:  We'll offer Exhibit 3.

14    MS. SMITH:  No objection.

15    THE COURT:  It's received.

16  BY MR. SCOTT SMITH:

17  Q.    Okay.  Now we've got Exhibit 3 into evidence.

18  This is addressed to a Patricia Good.  Who is that, based

19  on your understanding?

20  A.    My associate had determined that she was the chief

21  of the Office of Diversion and Liaison; and, so, we

22  decided to address it to her.

23  Q.    And the first sentence says, "Please accept this

24  letter as a formal request for an advisory opinion."  Is

25  that the procedure that you learned was necessary to

1618

1  submit a request by a citizen to the DEA?

2  A.    I believe that we found written rules and

3  regulations that we followed.

4  Q.    And you advised the DEA that (reading) the

5  proposed entity will operate as an Internet-based pain

6  relief clinic to prescribe and deliver Schedule III pain

7  relief medications.

8        That's what you learned from your

9  investigation, correct?

10 A.    I did.  And I should point out that I -- as you go

11 through the letter, you'll see the words "proposed

12 entity" and it was done in the hypothetical and I had

13 intended not to identify who my client was in order to

14 seek this opinion.

15 Q.    Why was that?

16 A.    Because I was protecting the attorney-client

17 privilege and as I said, I was laying out the business to

18 the government and I wanted to be careful.

19 Q.    And before I scroll down too far, the date of this

20 letter is what?

21 A.    August 4, '03.

22 Q.    Okay.  You advised them (reading) although the

23 clinic itself will be located in one state, it will

24 operate, through its Web site, in all 50 states.

25        You learned that through your investigation?

1619

1  A.     Yes.

2  Q.     (Reading) the clinic will utilize independent

3  medical service units, with trained nurses and/or

4  phlebotomists, across the nation for examinations and

5  drawing blood.

6             That's again something you learned from the

7  clinic?

8  A.     Yes.

9  Q.     You know what the protocol is, don't you, sir, the

10 Madison Pain Clinic protocol?

11 A.     At the time that this letter was drafted, I'm not

12 sure that there was a formal protocol reduced to writing;

13 and at a later time there may have been.

14 Q.     But you understood this -- what you were

15 describing in the letter was actually the practice of the

16 Madison Pain Clinic at that time?

17 A.     Yes, as I understood it from being told.

18 Q.     By various -- well, let's talk about that just

19 briefly.  How much information came from David versus

20 what you learned from the other employees?

21 A.     I think that the original or initial description

22 of the business and how it operated came from David; but

23 when we wanted to drill down and determine some of the

24 fine points, we made phone calls to various people there.

25 Q.     To verify?

1  A.    Yes.

2  Q.    You talk about (reading) the patient will complete

3  a comprehensive multipage online questionnaire about his

4  or her medical history and current medical conditions.

5         Something you learned from your investigation?

6  A.    Yeah.  Yes.  I'm sorry.

7  Q.    (Reading) the questionnaire will ask about

8  substance abuse history with both illegal and prescribed,

9  correct?

10 A.    Yes.

11 Q.    (Reading) the patient must submit names and

12 contact information of his principal care physician.

13        Again, that's something you learned from your

14 discussions with Madison Pain Clinic?

15 A.    Yes.

16 Q.    (Reading) the clinic will try to get records; but

17 the patient will be required to provide the clinic with

18 copies of his photo identification, previous MRI,

19 CAT scans, and principal diagnosis.

20        Again, information you gleaned from the

21 Madison Pain Clinic?

22 A.    Yes.

23 Q.    You advised the DEA, did you not, that they would

24 have a patient coordinator who would prescreen the

25 information based on the questionnaire, correct?

1621

1  A.     Yes.

2  Q.     (Reading) the purpose of that is to review the

3  applications so that obviously inappropriate candidates

4  for opiate therapy are rejected.

5          That's what you were advised, correct?

6  A.     Yes.

7  Q.     (Reading) otherwise, the application will be

8  forwarded to the doctor, who will order an examination by

9  a nurse, the taking of blood, and lab work, correct?

10 A.     Yes.

11 Q.     And then you tell the DEA (reading) the

12 examination will consist of a nurse practitioner or a

13 phlebotomist taking the patient's vital signs, his

14 medical history, taking blood and urine samples.

15         Again, what you learned from the clinic?

16 A.     Yes.

17 Q.     You learned, as well, that a licensed substance

18 abuse counselor will review the application?

19 A.     I did.

20 Q.     You advised the DEA that (reading) once they

21 receive the results of the lab work, the doctor will

22 review the results in conjunction with the medical

23 records and mental health status report.

24         Again, information your investigation revealed

25 was happening at the Madison Pain Clinic?

1622

1  A.    Yes.

2  Q.    (Reading) if the doctor finds it appropriate, he

3  or she will provide the patient with a prescription to

4  cover a 30-day period, plus five refills, covering a

5  total of six months.

6        You understood that was the practice?

7  A.    Yes.

8  Q.    (Reading) the clinic will then send the

9  prescription to a pharmacy with which it has a

10 contractual arrangement.

11       You learned that was the practice as well?

12 A.    Yes.

13 Q.    (Reading) the patient must complete monthly status

14 reports describing his reactions.

15       You understood that was going on, from what

16 you investigated?

17 A.    Yes, yes.

18 Q.    Then you asked questions of the DEA.

19 A.    I did.

20 Q.    No. 1:  Is the initial medical examination

21 sufficient for the purpose of prescribing a course of

22 opiate therapy, correct?

23 A.    Correct.

24 Q.    You ask them:  May a physician prescribe opiates

25 without personally conducting a physical examination of

1623

1 the patient?  In other words, may he practice

2 telemedicine in conjunction with a licensed RN or

3 phlebotomist actually meeting with the patient and taking

4 blood and urine samples, correct?

5 A.    Right.

6 Q.    3:  Is a telephone discussion with the prescribing

7 doctor sufficient basis for increasing or decreasing the

8 dosage of pain medication?

9        You asked that of the DEA, correct?

10 A.    I did.

11 Q.    And finally:  Overall, is this manner of doing

12 business appropriate under applicable federal law?

13        You asked that of the DEA?

14 A.    I did.

15 Q.    Did you get an answer?

16 A.    No, I didn't.

17 Q.    We have stipulated, Mr. Grover -- I don't know

18 that you were aware of this -- I'm going to go ahead and

19 show you Government's Exhibit 171, which are joint agreed

20 trial stipulations between the defense and the

21 government.  Some of these were conditioned upon the

22 admission of your letter we just walked through.  And can

23 you read No. 1(A) for us out loud, please?

24 A.    1(A), (reading) in August, 2003, the Drug

25 Enforcement Administration received an inquiry from

1624

1 Douglas Grover requesting an advisory opinion about

2 whether it is appropriate under applicable DEA rules and

3 regulations for an entity to conduct business in the

4 manner described in his letter, which letter is included

5 as Defendant David Vogel's Exhibit No. 3.

6 Q.    Okay.  So, that's a stipulation that they received

7 your letter.

8 A.    I subsequently learned from the DEA that they

9 received my letter.

10 Q.    We'll talk about that briefly.  I want to go

11 through these stipulations a little bit first.

12        Can you read the highlighted information for

13 us, please?

14 A.    No. B -- Letter B, (reading) the Drug Enforcement

15 Administration made no response to the inquiry received

16 from Douglas Grover in August of 2003.

17 Q.    And No. C?

18 A.    (Reading) defendant David A. Vogel's Exhibit

19 No. 136 is a copy of a Drug Enforcement Administration

20 record showing that an inquiry was received from Douglas

21 Grover in 2003.

22        MR. SCOTT SMITH:  Your Honor, we'll offer 136

23 at this time.

24        MS. SMITH:  No objection, your Honor.

25        THE COURT:  All right.  That's received.

1625

1  BY MR. SCOTT SMITH:

2  Q.    I know you haven't seen this.  This is Exhibit

3  No. 136, which is this DEA record showing that an inquiry

4  was received from you in 2003.  And you see it right

5  there (indicating)?

6  A.    I do.

7  Q.    (Reading) ODL-2003-0229, advisory opinion on an

8  Internet-based pain relief clinic, Douglas Grover.

9  A.    I see it.

10  Q.    Okay.  Thank you.  Now, you sent your letter in

11  August of 2003.  Did you just close the book and forget

12  about it?

13  A.    There was some follow-up inquiry.  I believe that

14  the next event that occurred was that I received a

15  telephone call from someone in that office telling me

16  that they had lost the last page of the letter with the

17  signature on it.  I was somewhat skeptical of all of that

18  and certainly disappointed; but nevertheless, I

19  immediately prepared a copy of the letter that we had

20  sent in August and we sent it in I think by fax.

21  Q.    Did you thereafter, you or someone in your firm,

22  follow up with the DEA?

23  A.    I did.  I -- I think that either one of my

24  associates or my paralegal confirmed that the fax was

25  received and that the DEA -- and made inquiry as to

1626

1 whether or not they would act on it and how long we

2 should expect to hear from them.

3 Q.    And what was the response?

4 A.    They said -- I believe we were told that there was

5 a backlog but that they would eventually get to it.

6 Q.    Is this the Tina Lee message?

7 A.    Well, I think there was a subsequent follow-up by

8 Tina Lee.

9 Q.    Okay.  Tell me about that.

10 A.    Tina Lee also -- she was a paralegal at the firm

11 at the time and she probably was maintaining the file for

12 me and I asked her at some point later on, I think a

13 month or two months or three months after the lost page

14 had occurred, if she could follow up and see what was

15 going on with the DEA.

16 Q.    And did she advise you what the message was?

17 A.    She did.  She sent me an email.

18 Q.    Okay.  Let me show you --

19 A.    Which is our way of communicating with each other

20 in the office.

21         MR. SCOTT SMITH:  May I approach the witness,

22 your Honor?

23         THE COURT:  Yes.

24 BY MR. SCOTT SMITH:

25 Q.    I'll show you what's marked as Defendant's

1627

1  Exhibit 144.  Can you identify that for us?

2  A.     I can.

3  Q.     What is it, please?

4  A.     This is an email dated December 10, 2003, at

5  1:29 p.m.  It's from Tina Lee.  I might add that her real

6  name is Juwin (phonetical) Le but she uses the name

7  "Tina" and I don't know how to spell "Juwin."  It was

8  regarding the advisory opinion, and it -- do you want me

9  to read it yet?

10 Q.     Not yet.  Let's go ahead and get it offered.

11 A.     Okay.

12 Q.     And before I do, this is someone who is under your

13 employ?

14 A.     At the time she was, yes.

15 Q.     Okay.  And this was an interoffice communication

16 in Thompson Hine, where you work?

17 A.     Yes, it is.

18         MR. SCOTT SMITH:  We would go ahead and offer

19 Exhibit 144.

20         THE COURT:  Is there an objection?

21         MS. SMITH:  I was just reading it, your Honor.

22         THE COURT:  Okay.

23         MS. SMITH:  No objection.

24         THE COURT:  All right.  That's received.

25                         **

1628

1 BY MR. SCOTT SMITH:

2 Q.    Now you can read it.

3 A.    Starting with the subject line?

4 Q.    That's fine.  Yes.

5 A.    (Reading) telephone -- T/C DEA Re:  Advisory

6 opinion.  The liaison and policy section at the DEA has

7 our 8/4/03 letter to Patricia Good on file.  The office

8 is currently, quote, working on the issue, unquote.  So,

9 we can expect a reply.  But because they are, quote,

10 working on several Internet related issues, unquote, at

11 this time, they could not provide us with a time frame

12 for an answer.

13 Q.    Was that frustrating to get that kind of response?

14 A.    I worked for the government for 15 years.  It was

15 not frustrating to me.  I expected it.

16 Q.    Well, not surprising perhaps, but still

17 frustrating?  Is that a better way to put it?

18 A.    I -- we wanted to get a response.  The client was

19 looking for a response.  He was a lot less patient than I

20 was.  That's probably the best way I could answer it.

21          MR. SCOTT SMITH:  And, your Honor, for the

22 record, we're going to go ahead and offer Defendant's

23 Exhibit No. 4, which is the subject of the stipulations.

24          THE COURT:  All right.

25          MS. SMITH:  No objection.

1629

1  THE COURT:  All right.  It's received.
2 BY MR. SCOTT SMITH:
3 Q.    Now, do you -- you indicated that "the client."
4 That would be Mr. Vogel?  Is that who you were talking
5 about?
6 A.    Yes, I was referring to David, David Vogel.
7 Q.    He was eager to get an answer?
8 A.    He was.
9 Q.    And you couldn't provide him with one?
10 A.    No, I could not.
11 Q.    What did you tell him about the status, then?
12 A.    I told him exactly what I had told him before,
13 that I thought, from a criminal lawyer's perspective and
14 my understanding, there was inadequate notice and a lack
15 of clarity for the government to take criminal action,
16 given all of the information I had been provided about
17 the manner in which the business was conducted.
18       I also told him that we had witnessed other
19 prosecutions in Texas and that whether the government's
20 right or wrong, he could get indicted.  And I said,
21 "That's a risk that you would take because the government
22 can test it."  And I said while I disagree that it's
23 appropriate, I couldn't give him a firm answer.
24 Q.    Now, did there come up a discussion about, in the
25 course of your representation of Madison, not being able

1  to work in certain states?

2  A.    It did.  I don't recall the timing on it.  It

3  would have been after this letter was drafted.  But there

4  had been some discussions about whether or not all

5  patients should see a doctor face-to-face, how that could

6  be accomplished even in other states.  There were some

7  discussions about the requirement, which is what we

8  attempted to research, of whether or not any state had a

9  particular requirement, a specific requirement, that a

10 doctor meet a patient face-to-face.

11        From what I could determine in that time

12 period and what I remember, most states had no specific

13 requirement that there be a face-to-face meeting; but

14 they did require a patient/doctor relationship.

15        There were a handful of states -- and Nevada

16 and California stand out for me -- as being states that

17 required that the doctor actually meet the patient

18 face-to-face.

19 Q.    I'm going to show you what's been marked as

20 Defendant's Exhibit No. 22.  It's been admitted.  I doubt

21 you've seen this, but if you will look here.  It's a

22 communication from the Madison Pain Clinic to a lady

23 named perhaps Eileen Pruitt; and they say, "We regret to

24 inform you that Madison Pain Clinic can no longer provide

25 services to residents of the State of Nevada."

1631

1    Is that consistent with what you recall?  You

2 mentioned Nevada earlier.

3 A.    That is consistent because I know I had a specific

4 telephone conversation with Tyra Barnett about not being

5 able to do business in Nevada.

6 Q.    So, when you told them that they couldn't do

7 business in Nevada, it appears, at least based on Exhibit

8 No. 22, that they complied with what you told them,

9 correct?

10 A.    It certainly appears that way.

11        MR. SCOTT SMITH:  One moment, your Honor.

12        We'll pass the witness.

13        THE COURT:  All right.  We'll take a recess,

14 then.

15        (Recess, 10:53 a.m. to 11:20 a.m.)

16        (Open court, defendant present, jury not

17 present)

18        THE COURT:  During the break, Tonya went

19 through her transcript having to do with Dr. Venegas; and

20 I'll just have her read to you what she found.  Now,

21 don't say anything when she's doing this because she

22 can't record what you're saying when she's reading; and

23 then we give her some time after we finish to let her get

24 back into a new file before we start talking.

25        (The requested portion of the record was read

1632

1  back by the court reporter)

2            THE COURT:  Okay.

3            MR. BUYS:  So, your Honor, based on that, I

4  think the government would re-urge that that's fair game,

5  that's a fair topic.

6            MR. BRETT SMITH:  Your Honor, we have to -- a

7  couple of things first.  The question was:  What about

8  Dr. Venegas?

9            The response was:  He's practicing internal

10 medicine.

11           And then the other question was:  Do you know

12 anything about Dr. Venegas in regards to his practice?

13           And then he said that he believed he's back in

14 Grand Prairie.

15           And the question was:  So, in reference to the

16 government's statements on direct about David hiring

17 shoddy doctors, did you know anything in regards to

18 Dr. Venegas?

19           His answer was:  No.

20           I don't believe the door has been opened.

21           THE COURT:  I don't either.

22           All right.  Let's continue.  We'll bring the

23 jury back.

24           What's the situation there?

25           MR. GROVE:  Your Honor, I'm David Grove.  I

1633

1 was appointed by the court to speak with Joanna *[sic]*

2 Stuckmeyer.  She has informed me that she wishes to

3 invoke her Fifth Amendment privilege against

4 self-incrimination.

5          THE COURT:  Very well.

6          MR. GROVE:  Jana.

7          THE COURT:  Jana Stuckmeyer?

8          MR. GROVE:  Yes.  Yes, your Honor.  That's the

9 only one I have spoken with, and I informed counsel of

10 her wishes.

11          THE COURT:  Okay.  Counsel, do you want to

12 have her come in and do that; or do you agree to that

13 representation from --

14          MR. SCOTT SMITH:  Certainly from the defense

15 we're going to take Mr. Grove at his word that if she was

16 called, she would take the Fifth and we certainly agree

17 with that, your Honor.

18          MS. SMITH:  We agree with that, your Honor.

19          THE COURT:  All right.  Very well.  So,

20 Mr. Grove is excused now, too?

21          Is there anybody else you were advising?

22          MR. GROVE:  There's no one else I've been

23 advising or been told that I will be advising, your

24 Honor.  So, if there's not, I would ask the court's

25 permission to leave.

1634

1  THE COURT:  Okay.  Granted.  Thank you very

2  much.

3  MR. SCOTT SMITH:  And his client may be

4  excused?

5  THE COURT:  Yes, she may be excused as well.

6  MR. GROVE:  I will inform her that she is also

7  excused, your Honor.

8  THE COURT:  Okay.  Thank you.

9  (Jury enters courtroom, 11:24 a.m.)

10  CROSS-EXAMINATION OF DOUGLAS GROVER

11 BY MS. SMITH:

12 Q.    Good morning, Mr. Grover.

13 A.    Morning.

14 Q.    Now, you talked about this letter.  I would like

15 to start with the letter that you sent to DEA --

16 A.    Yes.

17 Q.    -- at Mr. Vogel's request?

18 A.    Yes.

19 Q.    Now, you said that you used a hypothetical

20 entity --

21 A.    Yes.

22 Q.    -- because you wanted to protect your

23 attorney-client privilege.

24 A.    Yes, that's correct.

25 Q.    Were you aware at the time that Madison Pain

1635

1 Clinic had, in fact, been operating already for two

2 years?

3 A.    I knew that it had been operating.  I'm not sure

4 if I knew exactly how long.

5 Q.    Okay.  And you indicated that you -- everything

6 you put in that letter was based on what Mr. Vogel or

7 other employees of the Madison Pain Clinic told you.

8 A.    Yes.

9 Q.    Okay.  And in this letter you're, of course,

10 describing what you were told was the protocol of the

11 Madison Pain Clinic.

12 A.    Yes.

13 Q.    Okay.  And one of the things that you talked about

14 was that the clinic -- down here in this paragraph,

15 (reading) the clinic will endeavor to obtain the

16 patient's medical records from the doctor who most

17 recently evaluated him or her for chronic pain.

18 A.    That's correct.

19 Q.    Was that your understanding of what was happening

20 at Madison Pain Clinic?

21 A.    It was.  If I wrote it in the letter, it's because

22 that was my understanding.

23 Q.    Okay.  And have you found out since 2003, when you

24 wrote this letter, that, in fact, no primary care

25 physicians were being contacted?

1636

1   A.    No, I have not heard that until you said that

2   today.

3   Q.    Okay.  And then on page 2, it talks about -- up

4   here at the top -- and you had talked about this before,

5   (reading) how a phlebotomist or a nurse practitioner will

6   take the patient's vital signs, review his or her medical

7   history, obtain identification from the patient, and take

8   blood and urine samples from the patient.

9         Now, a phlebotomist is just simply someone who

10  takes your blood, correct?

11  A.    I believe that's what a phlebotomist is.

12  Q.    Okay.  Do you know what a nurse practitioner is?

13  A.    I'm not sure that I could give the medical

14  definition.  My understanding --

15  Q.    Are you aware that -- I'm sorry.  Go ahead.

16  A.    My understanding is it would be some form of

17  nurse, but I could not tell you precisely what their

18  medical role is.

19  Q.    Okay.  So, did you know that a nurse practitioner

20  actually has the authority to write prescriptions?

21  A.    No, I didn't know that.

22  Q.    Okay.  And were you ever informed that there was

23  never a nurse practitioner employed by the Madison Pain

24  Clinic?

25  A.    No, I was not.

1  Q.    Now, at some point in your dealings with

2  Mr. Vogel, you informed him that compliance with his

3  protocol was key to him being in compliance with the law.

4  Do you recall that?

5  A.    I'm not sure that I would phrase it that way.

6  Q.    Okay.  Well, how would you phrase it?

7  A.    I would say that it was key for us to have his

8  protocol correct so that I could present the letter

9  correctly.

10  Q.    Okay.

11  A.    I think that's what our discussion would have

12  been.

13  Q.    All right.  Well, let me talk to you about -- you

14  wrote this letter to the DEA in August of 2003.

15  A.    Yes.

16  Q.    You never got a response, correct?

17  A.    No, I did not.

18  Q.    Do you recall telling Mr. Vogel that he needed to

19  have -- either Mr. Vogel telling you or you telling

20  Mr. Vogel that he needed to have a face-to-face

21  doctor/patient relationship?

22  A.    We had discussions like that in the context of

23  that would absolutely -- I was going to say "obviate" the

24  issue, but let me -- that would resolve the issue if

25  there were face-to-face meetings, and I told him that.

1638

1 Q.    Okay.  So, Mr. Vogel would be correct in an email

2 to you on -- in December of 2003 where he said (reading)

3 at your suggestion, I'm going to implement face-to-face

4 visits?

5 A.    I'm not sure what your question is, but he did

6 send me that email.

7 Q.    Okay.  So, from -- was your understanding from

8 that point that Madison Pain Clinic was going to start

9 face-to-face visits?

10 A.    At some point -- and I don't recall if it was

11 December of 2003 or sometime in the year 2004, I was

12 under the impression there was a transition going on in

13 which the business would be changing, in whole or in

14 part.

15 Q.    Okay.  And there seems to be sort of a break in

16 emails.  There's some emails and correspondence in the

17 year 2003, around this opinion; and then it sort of goes

18 to 2007.  Were you re-engaged, or had you been engaged

19 that whole time and --

20 A.    My firm performed a variety of different services

21 for Madison Pain and for David Vogel.  It was not

22 exclusively relating to this issue.  There were some

23 employment-related matters which I assigned to an

24 associate from our Cincinnati office.  There were some

25 other issues that had arisen in the interim, and our firm

1639

1  handled it.  And I believe that David also had a -- there

2  was a litigation involving Madison Pain that was actually

3  in Ohio that my firm handled as well, all of which had

4  nothing to do with the issues that are before us today.

5  So, there was a continual relationship, if I can use that

6  word, but not on these issues.

7  Q.    Okay.  Now, were you aware that you were not the

8  first attorney that Mr. Vogel sought out for a legal

9  opinion of whether or not Madison Pain Clinic was

10 operating under the law?

11 A.    I was.

12 Q.    Did you know that he, in fact, sought the advice

13 of Michael Cooper in 2001?

14 A.    I'm aware of that name, and I know that David had

15 some legal relationship with Mr. Cooper.

16 Q.    Well, you saw part of the opinion that Mr. Cooper

17 issued, didn't you?

18 A.    I saw a part of a letter, and I was never able to

19 get a full copy of the letter.

20 Q.    Right.  In fact, you asked Mr. Vogel for a full

21 copy of the letter because you were missing pages out of

22 those opinions?

23 A.    That's correct.

24 Q.    All right.  And would it surprise you to know that

25 the page you were missing was the list of assumptions

1 that Mr. Cooper had to make his opinion?

2 A.    I don't know if I'd be surprised.  I just --

3 Q.    Do you recall --

4 A.    It is what it is.

5 Q.    Do you recall seeing --

6 A.    I did not see that, and I haven't seen it as I sit

7 here today.

8 Q.    Okay.  You have not seen the assumptions?

9 A.    No, I have not.

10 Q.    So, you didn't know that one of the assumptions

11 Mr. Cooper made was -- in forming his legal opinion is

12 that customers of Madison Pain Clinic were being seen

13 face-to-face?

14 A.    You're telling me now for the first time.

15 Q.    Okay.  And did you also know that Mr. Cooper -- or

16 were you informed by Mr. Vogel that Mr. Cooper, in fact,

17 withdrew his legal opinion when he found out that, in

18 fact, customers were not being seen face-to-face?

19 A.    I was not aware of that.

20 Q.    Okay.  And, so, Mr. Vogel didn't tell you that

21 he's the one who told Mr. Cooper they weren't being seen

22 face-to-face and Mr. Cooper said he could not use his

23 legal opinion?

24 A.    I'm not aware of that.

25 Q.    Okay.  And you're also aware later, in 2007, that

1 Mr. Mike Millsap from Lubbock was asked to give an

2 opinion, Lubbock, Texas?  Did you see that?

3 A.    I have seen the letter written by Mike Millsap.

4 Q.    Okay.  And you would agree with me that that

5 letter really applied to civil liability and not criminal

6 liability?

7 A.    I recall that the letter had a different focus.

8 Q.    Okay.  Well, the focus of civil law is what the

9 focus was.

10 A.    I couldn't be that specific.  I remember that it

11 had a different focus and that it did not specifically

12 answer the question that I would have liked answered.

13 Q.    Okay.  Now, back to this DEA letter, were you

14 concerned -- do you recall if Mr. Vogel was asking you,

15 when you didn't hear back from the DEA, to try to contact

16 them again and try to get an opinion?

17 A.    I recall that there was some discussion about that

18 at the end of '03 and perhaps in the beginning of '04.  I

19 think that it became a dormant issue after that because I

20 don't recall following up after, say, January or February

21 of '04; and then the issue did not arise again until

22 sometime around September of 2007.

23 Q.    Okay.  Well, do you recall in July of 2003, after

24 you wrote the letter --

25 A.    No, I'm sorry.  I wrote the letter on August 4th,

1642

1  2003.

2  Q.     August 4th, 2003.  I'm sorry.

3        Before you wrote the letter, do you remember

4  expressing your concerns to Mr. Vogel about either civil

5  liability or criminal implications that the DEA might be

6  made aware of by sending that letter to the DEA?

7  A.     I'd like to see what you're referring to; but I

8  have a recollection of being concerned, as an attorney,

9  of disclosing a lot of facts and not knowing how it would

10 be used.  And, of course, that would be whether it could

11 or would be used criminally or civilly; and that's in the

12 context of not being sure what the law is.  That's the

13 precise reason I'm writing the letter.

14        As you yourself know, sometimes someone will

15 contact the government in an effort to determine whether

16 or not conduct is appropriate; and you certainly don't

17 want that to come back and hurt you.  So, I did have

18 those kinds of concerns as an attorney; and I had a

19 client who, frankly, was very interested in getting that

20 information and in my view didn't fully comprehend my

21 desire to be careful in pursuing any relationship with

22 the government.

23 Q.     All right.

24        MS. SMITH:  Your Honor --

25                   **

1643

1 BY MS. SMITH:

2 Q.    And I just want to refresh your memory so you'll

3 feel more comfortable.

4 A.    Absolutely.  I have no --

5         MS. SMITH:  May I approach, your Honor?

6         THE COURT:  Yes.

7 BY MS. SMITH:

8 Q.    Let me show you this email, which I guess I'll

9 mark as Government's Exhibit 300.  If you could just look

10 at the top page, just to refresh your memory.

11 A.    Do you want me to identify it first?

12 Q.    Sure, identify it.

13 A.    Okay.  It does appear to be an email

14 correspondence between me and David Vogel which took

15 place on July 28th in the days preceding the submission

16 of the letter.

17 Q.    Okay.  Just silently read it and refresh your

18 memory.

19 A.    Okay.  How far should I read down?

20 Q.    Just the blue.

21 A.    Okay.

22 Q.    Thank you.

23 A.    Okay.

24 Q.    And that's essentially what you just said.  You

25 had some concerns that there could be some type of civil

1  proceeding initiated by -- if you divulged too much to

2  the DEA?

3  A.    Well, we understood that the DEA and the justice

4  department had both criminal and civil authority so that

5  if I did something that was not in the client's interest,

6  like divulge information without thinking it through,

7  that it might be usable against him.  And, in particular,

8  I think I'm referring to the fact that it might be usable

9  in a civil proceeding; and I think that's what I wrote

10 about in the blue writing you're referring to.

11 Q.    Okay.  And you also said -- you also had some

12 concerns about criminal, what if they find that there's

13 some criminal aspect here.  You found it troublesome.

14 A.    Well, my concern there was if I lay this out and

15 the DEA comes back and says this is criminal, well, we

16 can advise the client going forward; but we've now made a

17 statement which the government could then use in a

18 criminal proceeding.  And my concern was whether or not

19 that was a protected communication with the government.

20 And since this was an area that I had not practiced in --

21 I'm not sure that anybody has done this -- but it was an

22 area that I had not seen, I just was exercising care.

23         And as you can see, it's July 28th.  It's on

24 the eve of sending the letter; and it was -- as we all

25 do, you'll have a last-minute concern before you send

1645

1  something out that you consider very significant.

2  Q.     And, now, before even that, David Vogel had

3  expressed concerns to you that he might be charged.  He

4  was afraid he might be charged with something; is that

5  correct?

6  A.     Well, do you have a time frame on that?  Because

7  he certainly didn't on July 28th.

8  Q.     April of 2003.

9  A.     Well, when he originally came to me, his concern

10 was there had been notorious prosecutions of people that

11 were running clinics that were run in a much more

12 slipshod fashion.  The fact pattern with David's clinic

13 was very different and David expressed concerns and

14 that's why he wanted us to get involved and, as I

15 testified on direct, that's what we did.

16 Q.     And he asked if he could pay you an excessive

17 retainer fee in case he was ever charged with anything,

18 didn't he?

19 A.     I recall that there was a time that he wanted to

20 give us a large retainer fee, and I take it he meant for

21 us to put in escrow and hold.  It's not an uncommon

22 thing.  At that point there was nothing on the horizon

23 specifically, and I did not suggest it.  But very often

24 where I see the possibility of extended representation,

25 it's something that we will do; and it will go into an

1646

1  escrow account, as I'm sure you're aware.

2  Q.    Okay.  Now, do you recall following this letter,

3  in December of 2003 -- we talked about how Mr. Vogel --

4  you already talked about how Mr. Vogel said that he

5  knew -- or at your request, he thought he should initiate

6  face-to-face doctor visits.  Do you recall telling him

7  that a phone conversation with a doctor is not enough to

8  create the doctor/patient relationship?

9  A.    Not standing alone in those words.  Could you show

10 me what you're referring to?

11 Q.    I will.

12        MS. SMITH:  May I approach, your Honor?

13        THE COURT:  Yes.

14 BY MS. SMITH:

15 Q.    And just to refresh your memory, I'm going to show

16 you -- I'm going to mark this as Government's Exhibit

17 301.  Do you recognize that as an email from you to David

18 Vogel?

19 A.    Yes.

20 Q.    Okay.  And could you just refresh your memory

21 silently?

22 A.    Yes.

23 Q.    So, it sounds like you were reviewing some things

24 that Mr. Vogel sent to you.

25 A.    I think that that email refers to looking at a

1647

1 Web site or a memorandum and an opinion expressed either

2 in the Web site or the memorandum and it raised a

3 question and it specifically said that a phone conference

4 was not adequate and I think my response was that we need

5 to look into this.

6 Q.    Right.  And it says that a phone call cannot --

7 what you reviewed seemed to say to you that a phone call

8 could not take the place of a doctor/patient

9 relationship.

10 A.    Actually, I think I said it suggested that and I

11 had my concerns and it certainly called into question

12 that practice and I wanted to look at it further.

13 Q.    Okay.  Now, you had talked a little bit on direct

14 about letting somebody at Madison Pain Clinic know that

15 you could not distribute pharmaceuticals in the State of

16 Nevada.  Do you recall that testimony?

17 A.    Yes.  I don't know if I used those words, but yes.

18 Q.    Right.

19 A.    I mean, definitely I had a conversation with Tyra;

20 and I think there's some correspondence that indicates

21 that they could not do business with patients in Nevada.

22 Q.    Okay.  And, in fact, do you recall sending the law

23 on that to the Madison Pain Clinic?

24 A.    I don't have a specific recollection, but either

25 me or one of my associates or a paralegal might have done

1648

1 that.

2 Q.     Okay.  Or actually to David Vogel.

3           MS. SMITH:  May I approach, your Honor?

4           THE COURT:  Yes.

5 BY MS. SMITH:

6 Q.     Let me show you what I will mark as Government's

7 Exhibit 302 and ask you first if you recognize that top

8 sheet.

9 A.     Yes.  The top sheet is a fax cover page.  It's

10 from my law firm and...

11 Q.     Okay.  And is there a date where you can tell --

12 A.     I can see we're missing a page but -- well, it

13 appears that this would have been a document sent at the

14 same time.  Whether or not there were other pages, I

15 don't know.

16 Q.     Is the date at the top the same?

17 A.     It is.  They're both dated April 14th, 2003; and

18 it looks like what we sent was a -- something that came

19 out of the Bureau of National Affairs *Health Law Reporter*

20 that somebody in my law firm must have received.

21           MS. SMITH:  Your Honor, at this time I'd offer

22 Government's Exhibit 302.

23           THE COURT:  Any objection?

24           MR. SCOTT SMITH:  I haven't seen it yet.

25           No objection.

1649

1  THE COURT:  It's received.

2  BY MS. SMITH:

3  Q.    Okay.  There are two pages, and I'm going to show

4  you what -- actually what you sent.

5        But first I'll show you -- this is the cover

6  page we were talking about?

7  A.    Yes.

8  Q.    And it looks like it's dated April 14th of 2003?

9  A.    Yes.

10  Q.    From you, at your law firm, to David Vogel.

11  A.    That's correct.

12  Q.    And then if -- it's very small; but if you can see

13  here (indicating), it talks about how Nevada's -- here

14  (indicating), (reading) Nevada's Illegal Internet

15  Pharmacy statute bans in-state dispensing of prescription

16  drugs by online pharmacies that are not licensed and

17  certified by the state regulatory board, correct?

18  A.    That's correct what you just read, yeah.

19  Q.    Okay.  Now, would you be surprised to find out

20  that it wasn't until January of 2004 that David Vogel

21  informed people at Madison Pain Clinic to stop sending --

22  stop filling prescriptions in Nevada, eight months later?

23  A.    In Nevada?

24  Q.    In Nevada.

25  A.    Well, what we just looked at had to do with

1  dispensing.  I have a recollection of a communication

2  with Tyra Barnett involving the specific issue with

3  face-to-face meetings.  I thought that that conversation

4  or that email correspondence took place much later, in

5  something like November or December of 2003.  If I'm

6  incorrect, I'm sure the documents will reflect it.

7          But this one was one -- if it's in April of

8  2003, is one of the initial correspondences between my

9  firm and David when he had just became a client.

10 Q.     Because you're --

11 A.     I'm not sure if we had the discussion about

12 face-to-face in Nevada and being illegal because I'm not

13 sure that I learned that until much later.  It wouldn't

14 have been January.  My guess is it would have been

15 November or December; and if you're telling me that they

16 didn't take steps on that until January, I would not be

17 surprised.

18 Q.     Okay.  Now, because after Mr. Vogel hired you, of

19 course, you were -- part of what you did was research the

20 law to the best of your ability.

21 A.     I had people working with me who were researching;

22 and things were presented to me by attorneys and by

23 Mr. Vogel that I read myself, yes.

24 Q.     Did you check Texas law?

25 A.     I did not.  In fact, there were discussions about

1651

1  getting a Texas lawyer on board; and I remember having

2  conversations with a Texas lawyer by the name of Susan

3  Henricks.

4  Q.    Okay.  But you never -- you said earlier, on

5  direct, you never issued a written opinion?

6  A.    No, I did not.

7  Q.    Okay.  And do you know if Susan Henricks ever

8  issued a written opinion?

9  A.    I never saw a written opinion.

10  Q.    Okay.  But you did see at least part of a written

11  opinion from Michael Cooper?

12  A.    That's correct.

13  Q.    Okay.  Did you ever see any opinions by a Daniel

14  Frier?

15  A.    I don't recall that name.

16  Q.    Okay.  Do you recall telling David Vogel that if

17  the protocol of Madison Pain Clinic is not followed, it

18  becomes Exhibit A for the government?

19  A.    I don't remember telling him that, but it is the

20  way I speak.

21         MS. SMITH:  May I approach, your Honor?

22         THE COURT:  Yes.

23         MS. SMITH:  I think I'm up to Exhibit 303,

24  which I'll mark just for identification purposes.

25                          **

1  BY MS. SMITH:

2  Q.    I'll ask if you can identify this as a -- some

3  email exchange between you and Susan Henricks.

4  A.    It looks like email exchange, but it starts in the

5  middle of the exchange.  So, I don't know what the full

6  context is; but if you want to show me something to

7  refresh my recollection, I'd be glad to --

8  Q.    Yeah, just from -- this one -- this email, and it

9  looks like this is from you -- actually, this one that

10  starts from you that you wrote.  If you can just refresh

11  your memory there.

12  A.    Okay.  Well, you're showing me that a leopard

13  doesn't change its spots.  I certainly -- I wrote what I

14  just said, that if you don't follow your protocol, it

15  becomes Exhibit A.

16  Q.    Now, let's move to 2007.  There were some issues

17  that arose in 2007.  Do you recall that?

18  A.    I do.

19  Q.    Okay.  And one of the big issues was that the

20  Compounding Rx Apothecary in Pennsylvania stopped filling

21  prescriptions for Madison Pain Clinic.

22  A.    I recall the incident.  I don't recall whether

23  they stopped filling or whether an issue had arisen.

24  There were multiple issues at the time; and, frankly, I

25  was preparing for a trial at the time.  So, it was a

1653

1 difficult time for me.

2 Q. And do you recall that one of those issues was

3 that the pharmacy Compounding Rx Apothecary could not

4 confirm that Madison Pain Clinic was having a sufficient

5 doctor/patient relationship?

6 A. I think that may have been one of the discussions

7 I had with counsel for the apothecary.

8 Q. Okay.

9 A. Along with numerous discussions about them wanting

10 to collect money.

11 Q. Right. Now, did you know -- early on in your

12 meetings with Mr. Vogel, did you know that Mr. Vogel was

13 getting hydrocodone from Madison Pain Clinic?

14 A. No, I didn't.

15 Q. Okay. Did you even know he used hydrocodone

16 regularly?

17 A. Not when I first met him.

18 Q. You learned that later?

19 A. I did.

20 Q. Did you ever learn that where he was getting it

21 was Madison Pain Clinic?

22 A. No, I didn't.

23 Q. And did you know that he was never examined by one

24 of his doctors at his clinic?

25 A. No, I was not aware of that.

1654

1    MS. SMITH:  May I have just a moment, your

2  Honor?

3    THE COURT:  Yes.

4    MS. SMITH:  I'll pass the witness, your Honor.

5    REDIRECT EXAMINATION OF DOUGLAS GROVER

6  BY MR. SCOTT SMITH:

7  Q.    Mr. Grover, you understood that David Vogel lived

8  in New York and New Hampshire?

9  A.    At different times.

10  Q.    And he was not --

11  A.    It depends what year we're talking about.

12  Q.    Certainly.  He did not stay in Dallas where the

13  clinic was located.  You understood that?

14  A.    I believed that from the time period that I dealt

15  with David from 2003 until probably early 2008, that he

16  did not live in Texas and hadn't lived there in some

17  years.

18  Q.    Okay.  And with respect to Michael Cooper, you

19  understood that David couldn't get Michael Cooper to

20  answer the 64,000-dollar question, right?

21  A.    I know I didn't get an answer from him, and I

22  didn't see a letter.

23  Q.    And the 64,000-dollar question is this question

24  about face-to-face, right?

25  A.    Right.

1  Q.    And that was the very question that you gave to
2  the DEA, right?
3  A.    Yes, it was.
4  Q.    Because you knew that nobody had quite -- had yet
5  answered that question, right?
6  A.    I also believe that no one could answer that
7  question.
8  Q.    And when you talked with Susan Henricks, did you
9  get an understanding about what her opinion about the
10 face-to-face was?
11 A.    My understanding, as I recall, from Susan Henricks
12 is that it was permissible under Texas health law; but
13 Susan Henricks could not address DEA issues.
14 Q.    Okay.  So, your understanding was, from Susan
15 Henricks, the lawyer who testified yesterday -- you
16 weren't here -- was that it was permissible under Texas
17 health law for them to delegate responsibility to a third
18 party?
19 A.    Right.
20 Q.    And do you know who the outfit Mobile Medical is?
21 Have you heard that?
22 A.    I think I've heard it, but I don't recall the
23 context.
24 Q.    Now, the question that we've been talking about,
25 you said if they did a face-to-face it would resolve the

1656

1  issue, right?

2  A.      That's right.

3  Q.      But the issue is not resolved if they don't have a

4  face-to-face.  In other words, it's still an unanswered

5  question.  The reverse is not necessarily true, right?

6  A.      That's right.

7  Q.      And did you entertain the idea of filing a

8  declaratory judgment?

9  A.      It was an idea that David had.

10  Q.      Okay.  And tell us what a declaratory judgment is.

11  A.      Basically asking a lawyer to bring an action in

12  federal district court addressing the statute and trying

13  to get a court to rule on whether or not there is a clear

14  statement of the law.  In particular, he wanted to have

15  us ask a court to tell him whether or not this

16  doctor/patient relationship required a face-to-face

17  meeting.  And I didn't see this as something that you

18  could get a declaratory judgment for as a matter of law;

19  and, so, I dissuaded him from doing it.

20  Q.      That issue was raised by David?

21  A.      Yeah.

22  Q.      Researched by you?

23  A.      By my associate, as I recall.

24  Q.      And based upon your research, you concluded that

25  it just wasn't something that was permissible under civil

1657

1  law?

2  A.    Procedurally I didn't think we could get anywhere,

3  and I didn't want to waste time.

4  Q.    Okay.  So, that never happened.

5  A.    That's right.

6  Q.    And that was your call basically as a lawyer?

7  A.    That was my call, yeah.

8  Q.    You said your conversations with Compounding Rx

9  pharmacy were -- you mentioned collecting money.  Was

10  somebody trying to collect some money?

11  A.    Well, the situation was that they were refusing to

12  do business.  They had asked for some business records in

13  an effort to do -- or perform their due diligence.  We

14  agreed to provide them with, I believe, 10 or 20 patient

15  files.  I don't recall the exact numbers.  We had HIPAA

16  concerns; we had concerns about privacy.  But since this

17  was the compounding entity and since they were the ones

18  preparing the pharmaceuticals for the individuals, we

19  overcame that; and we did, in fact, provide them records.

20  At the same time, I was receiving phone calls and

21  basically pressure from the lawyer in Pennsylvania

22  wanting me to see that their outstanding bills were paid.

23  Q.    Now, you were shown the letter you wrote to the

24  DEA by counsel; and she said would it surprise you that

25  something didn't happen.  Now, you understand -- and I

1  think what you're trying to tell us today is -- that

2  there's a difference between a doctor making a mistake

3  and not following the protocol and David Vogel

4  intentionally violating the law, right?

5  A.    Yes.

6  Q.    There may be mistakes in the files; but that

7  doesn't necessarily mean he intended to violate the law,

8  right?

9  A.    Right.

10 Q.    That's why he came to you, so he could avoid

11 violating the law, correct?

12 A.    That's correct.

13 Q.    And you knew what the Ryan Haight Act is, right?

14 A.    I think that enters the picture later on in the

15 representation.

16 Q.    And David and you consulted about that, right?

17 A.    At some point David became very focused on that

18 and thought that maybe once that passed things would be

19 easier to understand what you could and couldn't do.

20 Q.    The bottom line is what you told David Vogel and

21 what is in his head is that you told him you felt like

22 the law was too unclear for there to be criminal

23 liability?

24 A.    That's correct.

25 Q.    And you told him that on one or more occasions?

1659

1  A.    I did.

2  Q.    Okay.  Thank you.

3          MR. SCOTT SMITH:  I'll pass the witness.

4          RECROSS-EXAMINATION OF DOUGLAS GROVER

5  BY MS. SMITH:

6  Q.    Now, Mr. Smith just asked you the

7  26-million-dollar question or something that

8  Mr. Cooper --

9  A.    I think it's sixty-four.

10 Q.    Oh, 64-million-dollar question?

11 A.    You're obviously much younger than we are.

12          THE COURT:  It's only thousand.

13 BY MS. SMITH:

14 Q.    That Mr. Cooper never answered that question about

15 doctor/patient relationship?

16 A.    As far as I know, he didn't -- well, let's put it

17 this way.  I didn't see it in writing.

18 Q.    Okay.

19          MS. SMITH:  Can I have Government's Exhibit

20 183-2?

21 BY MS. SMITH:

22 Q.    And, in fairness, Mr. Grover, you may have not

23 seen this whole letter.  You said you only got portions

24 of it.

25          MS. SMITH:  Can we go to page 1 of that?  I'm

1660

1 sorry.  I didn't know it was split up by page.

2 BY MS. SMITH:

3 Q.      So, this is the letter -- this is the letter -- it

4 looks like, right -- to Mr. David Vogel at The Hamilton

5 Agency.  And The Hamilton Agency, of course, was one of

6 the corporate names for Madison Pain Clinic.

7 A.      Yes.

8 Q.      Okay.  And it is from --

9             MS. SMITH:  If you can go to the last page of

10 that, Mr. Reetz, just to show who the letter is from.

11 BY MS. SMITH:

12 Q.      -- Michael Cooper at McManemin & Smith.

13             MS. SMITH:  And go to page 2, then.

14 BY MS. SMITH:

15 Q.      And here at the top you see this talks about the

16 assumptions that Mr. Cooper makes in giving his opinion.

17 A.      Right.

18 Q.      Okay.  Which we talked about you form assumptions

19 as well before you give an opinion.  You have to base it

20 on assumptions.

21 A.      Right.

22 Q.      And if we look at No. 4, one of the assumptions

23 that Mr. Cooper makes is that (reading) all patients

24 shall be seen for their initial consultation by a

25 physician in the facility, correct?  That's what that

1661

1  says?

2  A.      That's what that says.

3  Q.      Did you ever see that letter?

4  A.      No, I -- I don't recall seeing this paragraph.

5  Q.      Okay.

6          MS. SMITH:  And if I could then go to 184.

7  BY MS. SMITH:

8  Q.      Okay.  And this letter is dated November 8th of

9  2001 to Mr. Vogel at The Hamilton Agency and signed --

10         MS. SMITH:  If you could go to the next page.

11 BY MS. SMITH:

12 Q.      -- signed by Mr. Cooper again.

13         MS. SMITH:  Okay.  And then back to page 1,

14 the second paragraph.

15 BY MS. SMITH:

16 Q.      This informs Mr. Vogel (reading) as a result of

17 our recent discussions regarding the problems with the

18 credit card processing entity, I became aware that the

19 current operations are not in compliance with certain

20 assumptions as defined in the letter.  More specifically,

21 but without limiting the possible matters that are out of

22 compliance with the assumptions, the second sentence of

23 numbered paragraph 4 of the assumptions set forth on

24 page 2 of the letter says that all patients shall be seen

25 for their initial consultation by a physician in the

1662

1  facility.  It is my understanding that a substantial

2  number of patients are not seen by a physician in the

3  facility.  You have stated to me that the patients are

4  seen by a mobile paramedic service with the results then

5  sent to a physician for review.  It is my further

6  understanding that any prescriptions for those patients

7  not seen by a physician in the facility are filled via

8  telephone order, mail order, and/or Internet

9  transactions.

10              MS. SMITH:  Can we go to page 2?

11  BY MS. SMITH:

12  Q.    And then the -- that second to last paragraph,

13  (reading) based upon the foregoing, you may not rely upon

14  the guidance expressed in the letter so long as you

15  operate out of compliance with any of the assumptions.

16              That's what that says, correct?

17  A.    Yes.

18              MS. SMITH:  Pass the witness.

19      FURTHER REDIRECT EXAMINATION OF DOUGLAS GROVER

20  BY MR. SCOTT SMITH:

21  Q.    I'm going to show you what's been marked as

22  Exhibit No. 137, which is a second letter written by

23  Mr. Cooper on the same day.  Do you see the second

24  sentence of the first paragraph?

25  A.    Yes, I do.

1663

1   Q.    (Reading) there are other questions that you have

2   posed but that are not addressed in the enclosed letter.

3           The other questions he posed, your

4   understanding, was the 64,000-dollar question, "What

5   about non-face-to-face?"  Is that what you understood it

6   to be?

7   A.    I don't know.

8   Q.    Okay.  And that's fair.

9           And in the second paragraph, he says,

10  (reading) however, we can provide you with informal

11  guidance regarding each question; but we will advise you

12  that the informal guidance may, and in all likelihood

13  will, change based on the facts and circumstances of each

14  case.

15  A.    I don't recall seeing this letter; but as I'm

16  looking -- I mean, if you want my interpretation of the

17  letter, he's saying --

18          MS. SMITH:  Your Honor, I'm going to object to

19  that.  That would be speculation on what Mr. Cooper

20  was --

21          THE COURT:  Sustained.

22  BY MR. SCOTT SMITH:

23  Q.    Suffice it to say, there was another letter; and

24  you understood Mr. Vogel came to you and said, "I need an

25  answer to the question about non-face-to-face," right?

1664

1   A.      Yes.

2   Q.      And he wanted to comply with the law, correct?

3   A.      Yes, he did.

4           MR. SCOTT SMITH:  Pass the witness.

5           MS. SMITH:  Nothing further, your Honor.

6           THE COURT:  All right.  May this witness be

7   excused?

8           MR. SCOTT SMITH:  Please.

9           THE COURT:  All right.  Thank you.  You may

10  step down, and you're excused.

11          MR. SCOTT SMITH:  Your Honor, we have a matter

12  to take up outside the presence.

13          THE COURT:  All right.  The jury can then be

14  excused as well for the time being.

15          (Jury exits courtroom, 12:01 p.m.)

16          MR. SCOTT SMITH:  Your Honor, I just briefly

17  want to put -- ask Mr. Vogel some questions about his

18  Fifth Amendment rights and put that on the record.

19          THE COURT:  Very well.

20          MR. SCOTT SMITH:  Could I have him come to the

21  podium?

22          THE COURT:  Yes.

23          MR. SCOTT SMITH:  Okay.  Mr. Vogel, I want to

24  ask you some questions about your Fifth Amendment rights.

25  We've gone over those, haven't we, sir?

1665

1    THE DEFENDANT:  Yes, sir.

2    MR. SCOTT SMITH:  And you understand you have

3  an absolute right --

4    THE COURT:  Wait, wait.

5    MR. SCOTT SMITH:  Do you want him sworn?

6    THE COURT:  Well, whatever you think is

7  appropriate.

8    MR. SCOTT SMITH:  Let's go ahead.

9    (Oath administered)

10    EXAMINATION OF DAVID A. VOGEL

11    (Outside the presence of the jury)

12  BY MR. SCOTT SMITH:

13  Q.    So, once again, you're David A. Vogel; is that

14  correct?

15  A.    Yes, sir.

16  Q.    And you're the defendant in this criminal case; is

17  that right?

18  A.    Yes, sir.

19  Q.    We were getting ready to talk about your

20  understanding is that you have a Fifth Amendment right

21  not to testify in a case against you, right?

22  A.    Yes, sir.

23  Q.    You understand that is your decision, not my

24  decision, not Brett Smith's decision?

25  A.    Yes, sir.

1666

```
 1  Q.    Although you're certainly entitled to consult with
 2  us and we've given you opinions about the validity or the
 3  invalidity of whether you ought to testify, you
 4  understand the decision is yours, correct?
 5  A.    Yes, sir.
 6  Q.    And you've made the decision not to testify in
 7  this case; is that correct?
 8  A.    Yes, sir.
 9  Q.    Do you have any questions about your Fifth
10  Amendment rights?
11  A.    No, sir.
12        MR. SCOTT SMITH:  Okay.  That's all I have,
13  your Honor.
14        THE COURT:  All right.  So, now we have a --
15        MR. SCOTT SMITH:  We're going to rest.
16        THE COURT:  Okay.  We aren't going to have
17  Dr. DeLuca?
18        MR. SCOTT SMITH:  No, your Honor.
19        THE COURT:  Okay.  Well, let's just bring the
20  jury in and then you can rest; but then we have a lot of
21  work to do on the charge.
22        I don't know if we're going to have any
23  rebuttal by the government.
24        MR. BUYS:  No, your Honor.
25        THE COURT:  Okay.  Well, we have a lot of work
```

1  to do on the charge.  I mean, we can wait on that; but

2  I'm just trying to figure out the plan for the day.

3            MR. BUYS:  Well, your Honor, if we could just

4  have a few minutes to confer and then --

5            THE COURT:  Sure.  But let me bring the jury

6  in and let them rest and then -- but you need to decide

7  what you want to do.  I mean, we can go to lunch then, I

8  guess, or something.

9            Let's bring the jury in at least to let the

10  defense rest.

11            MR. BUYS:  Your Honor, before Mr. Grover

12  leaves the building, perhaps -- I wonder if we could make

13  arrangements to have him stand by.  I think there may be

14  a need to re-call him, and we didn't --

15            THE COURT:  Okay.  I excused him, but then we

16  need to -- you're going to unexcuse him?

17            MR. BUYS:  Yes, your Honor, if we could.

18            THE COURT:  Okay.  Ms. Miller will deal with

19  that issue.

20            (Jury re-enters courtroom, 12:06 p.m.)

21            MR. SCOTT SMITH:  Your Honor, on behalf of

22  Mr. David A. Vogel, the defense rests.

23            THE COURT:  Very well.  So, I think we'll go

24  ahead and break for lunch early and then, unless --

25  you're not ready to proceed at this point; is that

1668

1  correct?

2         MR. BUYS:  That's correct, your Honor.  I

3  think it would make most sense to break for lunch, and we

4  can take that up after lunch.

5         THE COURT:  Okay.  We'll break for lunch,

6  then, 75 minutes.

7         (Jury exits courtroom, 12:07 p.m.)

8         THE COURT:  Okay.  Well, we'll go to lunch;

9  but then when we get back, you need to tell me what's

10  going on basically because -- I mean, the first part of

11  the charge, it will take some time, to where we can do it

12  late this afternoon or we could do it all tomorrow; but I

13  guess you need to be thinking about that.  The jury will

14  be back for a little while at least.  I mean, we still

15  haven't put in -- you had some inserts.  We haven't done

16  that yet.

17         MR. BUYS:  Maybe -- your Honor, maybe it makes

18  most sense, after the jury comes back -- and to the

19  extent that we re-call Mr. Grover, it will be very, very

20  brief; and then maybe they could go home for the day and

21  come back in the morning to be instructed and to

22  deliberate.

23         THE COURT:  That's what I'm thinking.  But

24  what I want to do is work on the charge and then have you

25  come back this afternoon and put objections on the record

1669

1 today or work on it today.

2       MR. SCOTT SMITH:  I guess the word got back to

3 chambers that except for maybe one or two words, we're in

4 agreement on the inserts.

5       THE COURT:  Right, but we haven't done it yet.

6       MR. SCOTT SMITH:  Sure.  And I'm going to

7 re-urge my Ryan Haight instruction because I think there

8 has been testimony.  I think it will be important for the

9 jury to hear from the court what the Ryan Haight Act

10 implication is.  But just for your edification, so you're

11 aware of that.

12       THE COURT:  It's not -- it wasn't law in

13 effect at the time.  It came out they were talking about

14 trying to get ready for it.  That came into evidence.

15 That's okay.  But it's still not the law at the time.

16 And I don't want to give any instructions on anything

17 that was not law at the time.  That's why I was very

18 careful on all these things that you wanted me to take

19 judicial notice of, that they were law at the time.

20 That's what I want in the charge, not some law in the

21 future.

22       MR. SCOTT SMITH:  I understand.  I just -- I'm

23 not making my objection now.

24       THE COURT:  Okay.

25       MR. SCOTT SMITH:  I just wanted you to know

1  that I would be making it at the time so that --

2          THE COURT:  Okay.  Well, it won't be granted

3  then either.  Okay.

4          MR. BUYS:  Your Honor, I --

5          THE COURT:  Unless the government now all of a

6  sudden wants to have that in there, but I -- you know.

7          MR. BUYS:  No, absolutely not, your Honor.

8  But we do have some concern.  We feel like the questions

9  that were posed to Mr. Grover improperly violated the

10 court's pretrial order on discussion of whether or not

11 the law was vague as with regard to Ryan Haight.

12 Mr. Grover specifically testified contrary essentially to

13 what this court ruled in denying the motion to dismiss

14 and held that the law was not vague.  He said the

15 opposite from the witness stand.

16         MR. SCOTT SMITH:  Well, I didn't hear any

17 objections; but that goes straight to his state of mind.

18 That was offered for state of mind.

19         THE COURT:  I think that's okay.  I don't

20 agree with his conclusions but that seems to be his

21 opinion and that's what he was communicating, from what I

22 gather.  So, I think that that's okay.

23         All right.  Let's go to lunch.

24         MR. BUYS:  What time do you want us back, your

25 Honor?

1671

1      THE COURT:  Hour and 15 minutes.

2          (Recess, 12:10 p.m. to 1:46 p.m.)

3          (Open court, defendant and jury present)

4      MS. SMITH:  Your Honor, the government would

5  like to re-call Douglas Grover.

6      THE COURT:  All right.

7          DIRECT EXAMINATION OF DOUGLAS GROVER

8          RE-CALLED ON BEHALF OF THE GOVERNMENT

9  BY MS. SMITH:

10 Q.    Mr. Grover, we talked a little bit earlier this

11 morning about Mr. Vogel getting legal opinions, either

12 oral or written, from other attorneys --

13 A.    Yes.

14 Q.    -- besides yourself?

15 A.    Yes.

16 Q.    Were you aware that he had got a written legal

17 opinion from a Daniel Frier?

18 A.    No.

19 Q.    Did he give you that opinion?

20 A.    No.

21 Q.    And did he tell you that Daniel Frier had told

22 him --

23          MR. SCOTT SMITH:  Objection, your Honor.  This

24 is hearsay.

25          THE COURT:  Do you have a response?

1672

1  MS. SMITH:  No.  I'll move on, your Honor.

2  THE COURT:  All right.

3  BY MS. SMITH:

4  Q.  Now, you mentioned in your earlier testimony this

5  morning that you felt that the law was unclear, which is

6  why you didn't write a legal opinion.

7  A.  That's correct.

8  Q.  You understand, based even on your conversations

9  with Mr. Vogel, that this law has been challenged

10  numerous times in federal court and found clear?  Do you

11  understand that?

12  A.  No, I don't.

13  Q.  Okay.  Well, you know lots of these cases have

14  gone to federal court, correct?

15  A.  What do you mean when you say "these cases"?

16  Q.  Criminal liability for not following the

17  Controlled Substances Act for selling medication over the

18  Internet.

19  A.  Well, as I think you saw in one of the letters --

20  if I remember correctly, it was the letter from the

21  gentleman who I had not received the full five pages; and

22  you referred to that letter several times.  On one of the

23  pages that I had a brief opportunity to read for the

24  first time, he indicated, I think, that there was a

25  certain lack of clarity in the law; and, so, he said each

1673

1  case would have to be taken on a fact-by-fact basis.  And

2  as you know, as an attorney --

3  Q.    Okay.  Well, let me stop you there because that

4  wasn't --

5  A.    Can I finish my answer?

6  Q.    Well, you're not answering my question.

7          MR. SCOTT SMITH:  May he please, your Honor,

8  finish answering?

9          MS. SMITH:  Your Honor, he's not answering my

10  question.

11          THE COURT:  Sustained.

12          MR. SCOTT SMITH:  Which one?

13          THE COURT:  Hers.

14  BY MS. SMITH:

15  Q.    Mr. Grover, all I asked you was:  Are you aware

16  that these cases of selling medication over the Internet

17  have been tried in federal court?

18  A.    I can't answer that question.

19  Q.    Well, you understand that this is being tried in

20  federal court.

21  A.    I certainly do.

22  Q.    Okay.  And you understand that the law has been

23  deemed clear in this case by Judge Crone?

24  A.    I don't know what law you are referring to.

25  Q.    Well, the Controlled Substances Act which makes it

1674

1  illegal to sell a controlled substance over the Internet

2  without a valid prescription.

3  A.    I understand there have been prosecutions and each

4  case is taken on a separate fact-by-fact basis.

5  Q.    Now, if you thought the law was unclear, certainly

6  you would not advise your client to go forward and risk

7  criminal liability --

8  A.    No.

9  Q.    -- is that correct?

10  A.    No.

11  Q.    Okay.  In fact, you don't want to -- you even told

12  David Vogel at some point that "We don't run through

13  the orange lights.  We stop at them."  Do you recall

14  that?

15  A.    No, I don't.

16  Q.    All right.

17        MS. SMITH:  Your Honor, may I approach?

18        THE COURT:  All right.

19  BY MS. SMITH:

20  Q.    I'm going to show you what has been marked as

21  Government's Exhibit 207, and ask you if that looks like

22  an email from you to --

23  A.    Well, it certainly looks like an email from David

24  to me, responding to an email from me to him.

25  Q.    Right.  And can you refresh your memory with

1 that?

2 A.    Sure.  (Perusing document).  Yes, I do recall

3 that.

4        MS. SMITH:  Your Honor, at this time I'd offer

5 Government's Exhibit 207.

6        I'll move on while we're finding the rest of

7 that, your Honor.

8        THE COURT:  All right.

9 BY MS. SMITH:

10 Q.    Now, Mr. Grover, at some point did David Vogel ask

11 you to test some of the pills that he was given by a

12 certain pharmacy?

13 A.    Yes.

14 Q.    Okay.  And what was the purpose of that?

15 A.    Well, let me correct that.  I can't say that he

16 asked me to test the pills that he was given by the

17 pharmacy; but he asked me to test pills because of

18 concerns he had about the quality of the pills.

19 Q.    Okay.  And, so, how did that happen?  How did you

20 get those pills tested?

21        I mean, obviously you didn't test them

22 yourself.

23 A.    No, I did not.  I contacted some retired FBI

24 agents that I normally work with in investigations, and

25 I told him -- actually "them" my problem.  I was

1676

1 concerned that we could not simply take pills from

2 Madison Pain. I didn't think that was appropriate. And

3 we didn't have a prescription; and I wasn't about to get

4 a prescription, not that I could. I'm not suffering from

5 anything.

6          And I specifically instructed -- I believe I

7 dealt with David. I specifically instructed him that I

8 wanted someone who had their own pills that were willing

9 to allow us to test them to provide them to us. And that

10 was arranged, and then my investigator sent them to a

11 lab.

12 Q.    Who was that? Do you recall?

13 A.    Who was what?

14 Q.    That sent their pills to you.

15 A.    No, I don't.

16 Q.    Whose pills you got?

17 A.    No, I don't know.

18 Q.    Okay. But they weren't yours?

19 A.    No, they were not.

20 Q.    And you did not have a prescription. You just

21 said that, right?

22 A.    I absolutely did not.

23 Q.    Okay. So, they came to your office; is that

24 right? Is that where they came?

25 A.    No, I don't -- I'm not sure about that. I don't

1677

1  think that they came to my office.

2  Q.     Okay.  Did they go to your investigator?

3  A.     I believe they may have gone to the

4  investigator's --

5  Q.     Okay.  Do you know whether your investigator was

6  licensed by the DEA to handle controlled substances?

7  A.     I'm sure they're not licensed to handle controlled

8  substances.

9  Q.     And you're aware of the controlled substances law

10  that makes it a crime to handle controlled substances

11  without a prescription?

12  A.     I was concerned about it; but I felt that in

13  handling an investigation of this nature, it was

14  appropriate to have the substances tested by a lab.

15  Q.     Okay.

16         MS. SMITH:  Your Honor, may I approach?

17         THE COURT:  Yes.

18  BY MS. SMITH:

19  Q.     Let me show you what I'm going to mark as

20  Government's Exhibit 208 and ask you if you can refresh

21  your memory about whether or not those pills came to your

22  office.

23  A.     These were delivered to my office.

24  Q.     Okay.  And are you aware that that would be both

25  a violation of Title 841 -- you used to be an AUSA,

1 right?

2 A.    Not exactly.

3 Q.    Well, you were on the strike force.

4 A.    I was a --

5 Q.    You were a special prosecutor.

6 A.    -- special attorney with the justice department.

7 Q.    Okay.  And you were not prosecuting drug

8 crimes.

9 A.    Never.

10 Q.    Okay.  But you are aware that Title 841 is the

11 Controlled Substances Act in the federal law?

12 A.    I am aware of that.

13 Q.    Okay.  And possessing those drugs in your office

14 is prescription fraud and an 841 violation of the --

15 A.    I was not aware of that, and I can't believe that

16 today.

17 Q.    Okay.  Now, you had said earlier that you had --

18 when you and I talked before, that you had not seen the

19 assumptions of Michael Cooper that said all patients

20 should be seen for their initial consultation by a

21 physician in the facility.

22          Do you recall that?

23 A.    I don't -- that's correct, yes.

24 Q.    Okay.

25          MS. SMITH:  Your Honor, may I approach?

1679

1    THE COURT:  Yes.

2  BY MS. SMITH:

3  Q.    Let me show you Government's 205 and 206 and ask

4  you if you recognize those.

5  A.    Well, these are more emails that look like

6  correspondence with me.

7  Q.    Right.  I believe I showed you something similar

8  to that this morning maybe.  I can't remember.

9  A.    Oh, these are the same thing.

10  Q.    All right.

11  A.    Sure, I recognize this.

12  Q.    Okay.

13            MS. SMITH:  Your Honor, I would offer 205 and

14  206.

15            MR. SCOTT SMITH:  No objection.

16            THE COURT:  All right.  Those are received.

17            MS. SMITH:  May I publish 205?

18            THE COURT:  Yes.

19            MS. SMITH:  Okay.  Can we highlight the date

20  there?

21  BY MS. SMITH:

22  Q.    Okay.  So, this looks like it's from you to David

23  Vogel, Friday, January 30th, 2004.

24  A.    Yes, it is.

25  Q.    And the subject is "Michael Cooper letters,"

1  right?

2  A.     Yes.

3  Q.     Okay.

4         MS. SMITH:  If we can go to the body of it.

5  BY MS. SMITH:

6  Q.     Okay.  And it says (reading) I was reviewing my

7  copies of the Michael Cooper documents before writing to

8  Susan.

9         And I think "Susan" refers to Susan Henricks,

10 the Texas lawyer, possibly?

11 A.     That's correct, yes.

12 Q.     Okay.  (Reading) and I found that I never received

13 the following:  One, there is a five-page letter dated

14 5/20/01 missing page 5; two, there is a three-page letter

15 dated 4/20/01 missing page 2.

16         (Reading) I do note that Cooper indicated at

17 page 3 of his 4/20/01 five-page letter, paragraph 4, that

18 all patients shall be seen for their initial consultation

19 by a physician at the facility.

20         So, this seems to indicate that you did know

21 that back then, correct?

22 A.     Having now seen this document -- it doesn't

23 refresh my recollection, but I'm sure this document is

24 correct.

25 Q.     Okay.

1681

1         MS. SMITH:  And then may we publish 206?

2         THE COURT:  Yes.

3  BY MS. SMITH:

4  Q.    Now, if you'll note, the bottom part of that is

5  the same email we just talked about, right?

6  A.    Correct.

7  Q.    Okay.  And at the top, who is that from?  From

8  David Vogel to you?

9  A.    It looks like it's from David Vogel to me.

10  Q.    Right.  But it looks like it's forwarded.

11  (Reading) Tyra, note Doug's email to me below.  Please

12  forward him the missing pages.

13         Correct?

14  A.    That's what it says.  I have no recollection of

15  receiving any missing pages.

16  Q.    Okay.  But he's instructing Tyra to do so in

17  that --

18  A.    That's what it appears to be, and I assume that

19  that's what he did.

20  Q.    Okay.  It's signed "Warmly, David"; and that's how

21  he normally signed things, correct?

22  A.    That was characteristic of David, yes.

23  Q.    Okay.

24         MS. SMITH:  Mr. Reetz, can you focus on the

25  body of the letter?

1682

1 BY MS. SMITH:

2 Q.    If you notice there, that in forwarding that, the

3 part about the patient being seen by a physician at the

4 facility is taken out before being forwarded.

5 A.    I do notice that now, yes.

6            MS. SMITH:  Pass the witness.

7            CROSS-EXAMINATION OF DOUGLAS GROVER

8 BY MR. SCOTT SMITH:

9 Q.    You were asked about previous prosecutions.  You

10 understand that there were some prosecutions of folks who

11 were running very abbreviated versions of what Madison

12 was doing, right?

13 A.    I wouldn't even characterize them as abbreviated.

14 From what I could read from newspaper articles and DEA

15 press releases, they were giving away drugs.

16 Q.    We've used the terms "click-and-pop."  Does that

17 sound familiar to you?

18 A.    No.

19 Q.    Okay.  And whatever the law is, the real question

20 that we have to answer in this case, you understand, is

21 what David Vogel intended, right?

22 A.    Correct.

23 Q.    So, if you made a mistake about the law, if Susan

24 Henricks made a mistake about the law and communicated to

25 him, that goes to his intent, doesn't it?

1683

1  A.     That's what I would say, yes.

2  Q.     And, in fact, that's why we're asking the

3  questions what did you two talk about and you've told

4  this jury he came to you saying, "I want to comply with

5  the law" and you said, "The law is unclear."  And that's

6  what his intent was, right, was to comply?

7  A.     In every conversation I had with him, he wanted to

8  be compliant.

9  Q.     And we've gone over this again this morning; but

10 the Cooper letters, he never answered the question,

11 correct?

12 A.     I'm sorry?

13 Q.     The question about face-to-face, he did not answer

14 that, did he?  The question about is it lawful if you

15 don't do a face-to-face, the question you asked the DEA.

16 A.     I don't think that, from what I could see, he

17 addressed the specific facts.

18 Q.     And while Susan Henricks could give you a verbal

19 approval of that process, she wasn't able to put it in

20 writing.  Is that your understanding?

21 A.     She did not do it for me.

22 Q.     Okay.

23        MR. SCOTT SMITH:  Pass the witness.

24        MS. SMITH:  Nothing further, your Honor.

25        THE COURT:  What about that exhibit you

1684

1 were --

2         COURTROOM DEPUTY:  207.

3         THE COURT:  207 is hanging out there.  Are you

4 going to --

5         MS. SMITH:  Your Honor, that's how it -- we

6 offered it, but we didn't have the -- there's a part on

7 the bottom that we don't have, and that's how we got that

8 document.  So, I don't know what the rest is.  We would

9 offer it, but his objection was that he didn't see the

10 rest of it.  So, we can offer just that section of the

11 email.

12        MR. SCOTT SMITH:  Well, I didn't make an

13 objection.  I noted to counsel it's incomplete.  We don't

14 have the full document.  So, that is our formal

15 objection.

16        THE COURT:  Okay.  Well, I have no idea what

17 it is.  I don't know if this -- does it have a...

18        MS. SMITH:  We're just going to let it go,

19 your Honor.  It's fine.

20        THE COURT:  Okay.  So, you're going to

21 withdraw that?

22        MS. SMITH:  We'll withdraw it, yes.

23        THE COURT:  Okay.

24        MS. SMITH:  And no further questions.

25        THE COURT:  Okay.

1685

1    MR. SCOTT SMITH:  No additional questions.
2  May this witness be finally finally excused, then?
3         MS. SMITH:  Yes, your Honor.
4         THE COURT:  Okay.  Thank you.  Yes, you are
5  finally finally excused.
6         MS. SMITH:  Your Honor, at this time the
7  government rests and closes.
8         MR. SCOTT SMITH:  On behalf of David A. Vogel,
9  we close as well.
10         THE COURT:  All right.  We'll let you go home
11  early today.  Come back in the morning at 9:00 o'clock,
12  please.  We'll have final closing arguments.
13         (Jury exits courtroom, 2:02 p.m.)
14         THE COURT:  All right.  Have you given us
15  everything that you have on the charge?  We're going to
16  go work on that, the law clerks and I.
17         MR. BUYS:  Yes, your Honor.  I have one more
18  thing to email to your law clerk, and I think you've got
19  everything.
20         THE COURT:  Okay.
21         MR. SCOTT SMITH:  I believe that's correct.
22         THE COURT:  If you will come back, then, at
23  4:00 o'clock, we will put something together for you to
24  look at.  You can make more comments then, and we'll
25  continue to work on it.  But I don't even have

1686

1  anything right now to give you to work on, but come

2  back at 4:00.

3          MR. BUYS:  Yes, ma'am.

4          MR. SCOTT SMITH:  Will do.

5          THE COURT:  All right.

6          (Proceedings adjourned, 2:03 p.m.)

7

8  COURT REPORTER'S CERTIFICATION

9          I HEREBY CERTIFY THAT ON THIS DATE, MARCH 7TH,

10  2011, THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE

11  RECORD OF PROCEEDINGS.

12

13              /s/ Tonya Jackson
              TONYA JACKSON, RPR-CRR
14

15

16

17

18

19

20

21

22

23

24

25