1687

1       UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF TEXAS
2              SHERMAN DIVISION

3
    UNITED STATES OF AMERICA  | DOCKET NO. 4:08CR224
4                             |
                              | JUNE 30, 2010
5   VS.                       |
                              | 9:07 A.M.
6                             |
    DAVID A. VOGEL            | BEAUMONT, TEXAS
7   -------------------------------------------------------

8

9        VOLUME 8 OF 8, PAGES 1687 THROUGH 1858

10          REPORTER'S TRANSCRIPT OF JURY TRIAL

11        BEFORE THE HONORABLE MARCIA A. CRONE,
         UNITED STATES DISTRICT JUDGE, AND A JURY
12  -------------------------------------------------------

13

14

15  APPEARANCES:

16  FOR THE GOVERNMENT:    MAUREEN E. SMITH
                           STEVAN ADAM BUYS
17                         KEVIN DOW COLLINS
                           U.S. ATTORNEY'S OFFICE
18                         1800 TEAGUE DRIVE
                           SUITE 500
19                         SHERMAN, TEXAS 75090

20

21  FOR DAVID A. VOGEL:    THOMAS SCOTT SMITH
                           JAMES BRETT SMITH
22                         SMITH & SMITH
                           120 SOUTH CROCKETT
23                         POST OFFICE BOX 354
                           SHERMAN, TEXAS 75091-0354

24

25

1688

1  COURT REPORTER:          TONYA B. JACKSON, RPR-CRR
                           FEDERAL OFFICIAL REPORTER
2                          300 WILLOW, SUITE 239
                           BEAUMONT, TEXAS  77701
3

4
     PROCEEDINGS REPORTED USING COMPUTERIZED STENOTYPE;
5    TRANSCRIPT PRODUCED VIA COMPUTER-AIDED TRANSCRIPTION.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# TABLE OF CONTENTS

PAGE

COURT'S INSTRUCTIONS TO THE JURY          1703

CLOSING ARGUMENT BY THE GOVERNMENT        1755
  (MR. COLLINS)

CLOSING ARGUMENT BY THE DEFENDANT         1780
  (MR. BRETT SMITH)

CLOSING ARGUMENT BY THE DEFENDANT         1792
  (MR. SCOTT SMITH)

REBUTTAL ARGUMENT BY THE GOVERNMENT       1812
  (MS. SMITH)


JURY NOTE                                 1821

VERDICT                                   1824


FORFEITURE PROCEEDING:

COURT'S SUPPLEMENTAL INSTRUCTIONS         1829

ARGUMENT BY THE GOVERNMENT (MR. COLLINS)  1841

ARGUMENT BY THE DEFENDANT (MR. BRETT SMITH)  1847

JURY NOTE                                 1849

VERDICT                                   1851

# INDEX OF EXHIBITS

GOVERNMENT'S EXHIBIT 210                   1827

1690

1        (Open court, defendant present, jury not

2    present, 9:07 a.m.)

3        THE COURT:  All right.  She is handing out

4    copies of the charge, based on our discussions this last

5    evening; and I want to know if there are any objections

6    to the charge.  Now is the time to put them on the

7    record.

8        MR. BUYS:  Yes, your Honor.  As discussed

9    previously with the court and counsel in chambers, the

10   government, for the reasons stated in the government's

11   objections to Mr. Vogel's proposed special jury

12   instruction, Docket Nos. 287 and 289, the government

13   believes that *United States versus Santos* does not apply

14   to this case and that "proceeds" should not be defined to

15   require any degree of profits.  The official position of

16   the United States Department of Justice is that

17   "proceeds" means "gross receipts" unless the SUA pertains

18   to the payment of the expense of an illegal gambling

19   operation under 18, United States Code, 1955.  Since no

20   such violation is charged in this case, the government

21   believes that a *Santos* profits instruction is

22   inapplicable.

23        THE COURT:  Do you want to respond to that?

24        MR. SCOTT SMITH:  Well, we, of course, believe

25   that the *Santos* instruction is appropriate and that the

1  court has got it correctly when it stated that "proceeds"

2  means "profits" because that's what *Santos* says; and any

3  instruction that does not include that, we would object

4  to.

5       THE COURT:  All right.  That objection is

6  overruled.  I think the *Santos* decision is broader than

7  the government reads.  And looking at the Fifth Circuit

8  cases, they looked at things and saying, "Well, there

9  wasn't plain error"; but they're not saying it wasn't

10  error.  They just didn't find it to be plain error

11  because at that time Santos hadn't been announced.

12       At this time it has been announced, and the

13  court feels obligated to follow the Supreme Court's

14  direction in defining "proceeds" as "profits" in the

15  context of a money laundering statute.  It's the same

16  statute, the money laundering statute, as is involved in

17  *Santos*.  So, I feel that that's appropriate.  So, it's

18  overruled.

19       MR. SCOTT SMITH:  From the defense, your

20  Honor, we believe that since Mr. Vogel was indicted in

21  the conjunctive, outside the usual course of professional

22  practice and not for a legitimate medical --

23       THE COURT:  Wait a moment.  I have a case.  I

24  have to go get that.

25       MR. SCOTT SMITH:  Okay.

1   (Recess, 9:09 a.m. to 9:10 a.m.)

2   THE COURT:  Okay.  Go ahead.

3   MR. SCOTT SMITH:  We believe that since he was

4   indicted in the conjunctive, it should be -- the charge

5   should also be in the conjunctive.  That is our objection

6   to the offenses charged and the description of the

7   substantive count relating to the Controlled Substances

8   Act.

9   THE COURT:  Well, that's overruled because

10  Fifth Circuit authority is clear that a disjunctive

11  statute may be pleaded in the conjunctive and proved in

12  the disjunctive.  That's been well recognized for

13  decades.  One example is *United States versus Fagan*,

14  4 F.3rd 991, Fifth Circuit, 1993.  Also, there's *United*

15  *States versus Haymes*, 610 F.2d 309; and that is Fifth

16  Circuit, 1980.  That's without merit.

17  MR. SCOTT SMITH:  May I continue?

18  THE COURT:  Yes.

19  MR. SCOTT SMITH:  We also object to what was

20  on page 15 of the draft, what we were referring to as the

21  "*Rothenberg* instruction."  As you know, the *Rothenberg*

22  case out of the Fifth Circuit instructs the district

23  courts to be careful to advise the jury so that they

24  don't confuse civil standards with criminal standards.

25  And we believe the *Rothenberg* instruction as

1  we submit it should state as follows:  If it is shown

2  that a physician or a pharmacist has violated a rule or

3  regulation of the Texas Board of Medical Examiners or

4  Pharmacy Examiners or if the medical professional's

5  conduct is shown to have differed from that of other

6  medical professionals under a like or similar

7  circumstances, such does not necessarily establish that

8  he or she issued prescriptions outside of professional

9  medical practice or not for a legitimate medical purpose.

10         The instruction that is in this charge is

11  different from what we were requesting and it also uses

12  the term "co-conspirators" and we believe the term

13  "co-conspirators" is suggestive that everybody associated

14  with the Madison Pain Clinic is, in fact, a

15  co-conspirator, when, in fact, we don't believe they are.

16         THE COURT:  Does the government want to

17  respond to that one?

18         MR. BUYS:  Yes, your Honor.  The government

19  disagrees that the *Rothenberg* instruction is applicable

20  in this case.  That was not a case involving a CSA

21  violation such as this case.  That case involved a

22  doctor.  The limiting instruction in that case was given

23  in a completely different context, where the doctor was

24  being charged with a non-drug violation.  And the civil

25  Texas statutes that were used in that case were being

1694

1 used for a different purpose, completely unrelated to

2 their use in this case, which goes directly to the

3 standard of care that's applicable to the ultimate

4 decision by the jury. For that reason, we feel that

5 *Rothenberg* does not apply appropriately in this context

6 and would concur with the court's instruction of the

7 limiting instruction here.

8         THE COURT: Well, the court has given a

9 limiting instruction to address some of those concerns.

10 Obviously here the defendant is not a physician; so, it

11 has to be tailored somewhat.

12         Also, the other people are called "alleged

13 co-conspirators," not "co-conspirators." But the court

14 believes that the instruction as stated, which reads:

15 You cannot find the defendant guilty of the charged drug

16 conspiracy solely on the ground that his acts or the acts

17 of alleged co-conspirators violate Texas laws,

18 regulations, or rules governing the practice of medicine

19 or the practice of pharmacy unless you also believe that

20 those acts violate the federal drug laws; namely, that

21 the defendant conspired to distribute hydrocodone outside

22 the usual course of professional practice or not for a

23 legitimate medical purpose.

24         I believe that that's sufficient limiting

25 instruction to accomplish what was set forth in

1  *Rothenberg*.  So, the objection is overruled.

2         MR. SCOTT SMITH:  Your Honor, additionally, we

3  requested that the court submit definitions taken from

4  21 USC, Sections 802(21), (2), (10), and (11) referring

5  to "practitioner," "administer," "dispense," and

6  "distribute," which I don't believe are contained within

7  the court's charge.  We think that would assist the jury

8  in understanding the various roles played in this case.

9         MR. BUYS:  Your Honor, the government would

10  disagree with that objection.  Those are commonly known

11  terms.  They've been defined throughout the trial I think

12  by the experts.  To the extent that they are in need of

13  any definition, the court rarely, if ever, provides

14  definitions in a drug case of those types of definitions;

15  and we don't think they're necessary here.

16         THE COURT:  I find no need for that.  I think

17  the jury can understand what that means.  I think there's

18  testimony that clearly defines what that's about, and

19  clearly in your closing arguments you can discuss that.

20         MR. SCOTT SMITH:  Overruled?

21         THE COURT:  Overruled.

22         MR. SCOTT SMITH:  Your Honor, we also

23  requested a judicial notice and that the jury be

24  instructed on the differing drug schedules.  There's been

25  testimony in this case about Schedule II substances and

1696

1  Schedule III substances.  We believe it would assist the

2  jury to have an instruction as we submitted in our

3  Document No. 266 relating to drug schedules.

4        THE COURT:  I think there's been testimony

5  about drug schedules.  Here the jury is instructed that

6  hydrocodone is a Schedule III controlled substance.

7  That's the only substance we're really discussing.  So, I

8  don't see the need to complicate the instructions with

9  reference to other schedules that are not applicable in

10  this instance.

11        I don't know if the government has any further

12  comment on that.

13        MR. BUYS:  No.

14        THE COURT:  That's overruled.

15        MR. SCOTT SMITH:  Your Honor, we also think --

16  and this is quite critical to us -- that the jury needs

17  to be instructed about a doctor's good faith.  We've

18  addressed with the government and agreed to the reference

19  to the attorney's good faith, but we didn't talk about

20  the doctor's good faith.  And we requested an

21  instruction, on page 3 of our proposed instructions,

22  relating to a doctor's good faith based upon *United*

23  *States versus Moore*, the Supreme Court authority.  And we

24  believe that it is important for the jury to understand

25  that if a doctor makes a mistake, it doesn't necessarily

1 mean it's a crime.

2         MR. BUYS:  The government opposes that

3 request, your Honor.  There are no doctors on trial in

4 this case.  I think that would just simply confuse the

5 jury.

6         THE COURT:  I agree.  That's overruled.

7         MR. SCOTT SMITH:  Your Honor, we additionally

8 requested, on page 3 of Document No. 266, an instruction

9 that there is no national consensus on the treatment of

10 chronic pain management, based upon *Armstrong*, the

11 district court opinion, and *Skinner*, a Fifth Circuit --

12 excuse me; I'm sorry -- a Federal Register opinion.

13         MR. BUYS:  And, your Honor, the government

14 would oppose that request.  I think the evidence has come

15 in this case through experts that there is a general

16 standard applicable to physicians across the nation, a

17 general standard of care.  *Armstrong* does not stand for

18 the proposition that there is no such thing as a national

19 standard.

20         THE COURT:  I agree.  The court did not give

21 such an instruction.  That's overruled.

22         MR. SCOTT SMITH:  Your Honor, again, I --

23 excuse me.  We also request an instruction relating to

24 the Ryan Haight Act, as described on page 5 of

25 Document 266.  We believe there has been testimony --

1 there are certainly documents that have been admitted

2 referring to compliance with the Ryan Haight Act.  While

3 I certainly understand the court's concern that it was

4 not enacted until after this conspiracy was alleged to

5 have closed, I think it's important for the jury to know

6 that fact, that it was not the law, since it's been

7 referred to here in their presence.

8            THE COURT:  Does the government have a

9 response?

10            MR. BUYS:  The government would oppose that

11 request as well, your Honor.  The Ryan Haight Act is --

12 it was not law.  It's not retroactive.  It would confuse

13 the jury.  The law that is applicable in this case, which

14 is that a -- that a prescription, to be valid, must be

15 issued within the usual course of professional practice

16 and not -- for a legitimate medical purpose has been the

17 law for decades.

18            THE COURT:  I think there was testimony that

19 the Ryan Haight Act did not pass until later.  That's in

20 the record.  I see no need to state what the Ryan Haight

21 Act is because it didn't apply at the time of this

22 incident.  So, I find it irrelevant.  That's overruled.

23            MR. SCOTT SMITH:  Your Honor, we also

24 requested on page 6 of our proposed instructions an

25 instruction on venue and the government's responsibility

1  to prove up venue in this case.  That's certainly a fact

2  finding the jury must make, and it's not in this charge.

3  We request that it be included.

4          MR. BUYS:  Your Honor, Fifth Circuit authority

5  is clear on this point that there's no instruction

6  necessary when venue is not at issue, as it is not in

7  this case.

8          THE COURT:  Venue is not at issue.  The court

9  has already ruled on that matter.  There are clearly acts

10 committed by various co-conspirators in the Eastern

11 District of Texas, and venue is appropriate in this

12 district.

13         MR. SCOTT SMITH:  With respect to the 21 USC,

14 841, your Honor, we believe the court needs to

15 additionally define "usual course" -- or the term

16 "professional practice."  We've given the court a

17 proposed instruction from the *United States versus*

18 *Feingold* case, 454 F.3rd 1001, on pages 7 and 8 of our

19 proposed instructions.

20         We believe that the jury should be instructed

21 that the term "professional practice" means "at least

22 there exists a reputable group of people in the medical

23 profession who agree that a given approach of prescribing

24 controlled substances is consistent with legitimate

25 medical treatment and in making medical judgment

1700

1  concerning the right treatment for an individual patient.

2  Physicians have discretion to choose among a wide range

3  of available options.  Therefore, in determining whether

4  physicians acted without a legitimate medical purpose,

5  you should examine all the physician's actions and

6  circumstances surrounding them."

7       THE COURT:  Response on that?

8       MR. BUYS:  Yes, your Honor.  For the reasons

9  stated in the government's objections to the special

10  requested instructions by Mr. Vogel, the government

11  opposes that request.  The court has adopted, after a

12  considerable discussion among counsel, an instruction

13  that covers a definition of "usual course of professional

14  practice and legitimate medical purpose" and that is

15  adequately covered already within the court's charge.

16       THE COURT:  The court agrees.  That objection

17  is overruled.

18       MR. SCOTT SMITH:  Similarly, your Honor, we

19  would request that the court instruct the jury consistent

20  with *United States versus Armstrong*, Fifth Circuit,

21  550 F.3d at 382, that a -- the instruction from that case

22  be given to the jury on what "usual course of medical

23  practice" is.

24       THE COURT:  Does the government have a

25  response on that one?

1    MR. BUYS:  The government would object to that

2  request unless the court wants to also include the

3  laundry list of other factors that cases such as *Fuchs*

4  have held that show that conduct is outside the usual

5  course of professional practice and not for a legitimate

6  medical purpose.

7    THE COURT:  The court finds that instruction

8  not necessary.  It would be confusing.  It would be

9  adding to -- it would be required to add even more

10  information to a charge that's already 40 pages long, and

11  the court is not going to do that.  The objection is

12  overruled.

13    MR. SCOTT SMITH:  May I have one second, your

14  Honor?

15    THE COURT:  Yes.

16    MR. SCOTT SMITH:  That concludes the defense

17  objections.

18    THE COURT:  All right.

19    MR. BUYS:  There are no other objections with

20  respect to the jury charge by the government, your Honor.

21  The government had a motion to withdraw certain exhibits.

22  Would the court like to hear that now?

23    THE COURT:  Yes.

24    MR. BUYS:  Okay.  There are a number of

25  exhibits, your Honor, that the government did not use or

1702

1  submit and has no intention of going back to the jury.

2  That would include Government's Exhibit 14 and 14a.  It's

3  a transcript and audio recording of a telephone call.

4           There are voluminous records, bank records,

5  set out -- identified as Government's Exhibits 160

6  through 170.

7           And the government would move, as well, to

8  substitute photos of drug evidence that are set out in

9  Government's Exhibits 2, 3, 5 through 10, 138, and 146,

10 and any others that I may have failed to mention.  I

11 believe that's all of them.

12          THE COURT:  Any objection to that?

13          MR. SCOTT SMITH:  No, your Honor.

14          THE COURT:  All right.  That's granted.

15          MR. SCOTT SMITH:  Your Honor, at this time the

16 defense would re-urge its Rule 29 motion to dismiss on

17 the insufficiency of evidence and on the basis that the

18 statute as applied to Mr. Vogel is vague and unclear.

19          THE COURT:  It's denied for the reasons stated

20 previously.

21          Okay.  Are we ready to have the jury?

22          MR. BUYS:  I believe we're ready, your Honor.

23          THE COURT:  Okay.  Let's get the jury, and

24 I'll read the charge.

25          MR. SCOTT SMITH:  There were two defense

1 exhibits that were not used.

2          THE COURT:  Oh, okay.  Go ahead.

3          MR. SCOTT SMITH:  That was Exhibit 59, which

4 was a recording, and Exhibit 39, which was a recording.

5 We would ask the court to withdraw those at this time.

6          THE COURT:  Any objection?

7          MR. BUYS:  No, your Honor.  I just wondered if

8 there were transcripts associated with those at all.

9          MR. SCOTT SMITH:  No.

10          MR. BUYS:  Okay.  No objection.

11          THE COURT:  All right.  That's granted.

12          Anything else?  Because I'm going to read the

13 charge, and then we'll do the closing arguments.

14          Have you told Ms. Leger the time that you're

15 going to use and how you're going to divide it up and

16 everything?

17          MR. COLLINS:  Yes.

18          THE COURT:  Okay.  Let's get the jury.

19          (Jury enters courtroom, 9:25 a.m.)

20          THE COURT:  These are the court's instructions

21 to the jury.  You can read along with the copy that you

22 have been provided.  The official copy is the copy that's

23 on bond paper; and that's what you'll ultimately have and

24 your foreperson will have, along with the verdict form

25 that's also on bond paper.  That's the one that needs to

1704

1  be filled out.  But you can read along as I read.

2          Court's instructions to the jury.  Members of

3  the jury, now that you have heard all the evidence in the

4  case, it becomes my duty to give you the instructions of

5  the court as to the law applicable to this case.

6          In any jury trial there are, in effect, two

7  judges.  I am one of the judges; the other is the jury.

8  It is my duty to preside over the trial and to decide

9  what testimony and evidence is proper for your

10 consideration.  It is also my duty at the end of the

11 trial to explain to you the rules of law that you must

12 follow and apply in arriving at your verdict.

13         First, I will give you some general

14 instructions which apply in every case.  For example,

15 instructions about burden of proof and how to judge the

16 believability of witnesses.  Then I will give you some

17 specific rules of law about this particular case.  And,

18 finally, I will explain to you the procedures you should

19 follow in your deliberations.

20         Duty to follow instructions.  You as jurors

21 are the judges of the facts.  But in determining what

22 actually happened -- that is, in reaching your decision

23 as to the facts -- it is your sworn duty to follow all

24 the rules of law as I explain them to you.

25         You have no right to disregard or give special

1 attention to any one instruction or to question the

2 wisdom or correctness of any rule I may state to you.

3 You must not substitute or follow your own notion or

4 opinion as to what the law is or ought to be.  It is your

5 duty to apply the law as I explain it to you, regardless

6 of the consequences.

7          It is also your duty to base your verdict

8 solely upon the evidence, without prejudice or sympathy.

9 That was the promise you made and the oath you took

10 before being accepted by the parties as jurors, and they

11 have the right to expect nothing less.

12          Presumption of innocence, burden of proof,

13 reasonable doubt.  The first superseding indictment or

14 formal charge against the defendant is not evidence of

15 guilt.  Indeed, the defendant is presumed by the law to

16 be innocent.  The law does not require the defendant to

17 prove his innocence or produce any evidence at all, and

18 no inference whatever may be drawn from the election of

19 the defendant not to testify.  The government has the

20 burden of proving the defendant guilty beyond a

21 reasonable doubt; and if it fails to do so, you must

22 acquit the defendant.

23          While the government's burden of proof is a

24 strict or heavy burden, it is not necessary that the

25 defendant's guilt be proved beyond all possible doubt.

1  It is only required that the government's proof exclude

2  any reasonable doubt concerning the defendant's guilt.

3        A reasonable doubt is a doubt based upon

4  reason and common sense after careful and impartial

5  consideration of all the evidence in the case.  Proof

6  beyond a reasonable doubt, therefore, is proof of such a

7  convincing character that you would be willing to rely

8  and act upon it without hesitation in the most important

9  of your own affairs.

10       Evidence, excluding what is not evidence.  As

11  I told you earlier, it is your duty to determine the

12  facts.  In doing so, you must consider only the evidence

13  presented during the trial, including the sworn testimony

14  of the witnesses and the exhibits.  Remember that any

15  statements, objections, or arguments made by the lawyers

16  are not evidence.  The function of the lawyers is to

17  point out those things that are most significant or most

18  helpful to their side of the case and in so doing to call

19  your attention to certain facts or inferences that might

20  otherwise escape your notice.  In the final analysis,

21  however, it is your own recollection and interpretation

22  of the evidence that controls in the case.  What the

23  lawyers say is not binding upon you.

24       During the trial I sustained objections to

25  certain questions and exhibits.  You must disregard those

1 questions and exhibits entirely.  Do not speculate as to

2 what the witness would have said if permitted to answer

3 the question or as to the contents of an exhibit.  Your

4 verdict must be based solely on the legally admissible

5 evidence and testimony.

6           Also, do not assume from anything I may have

7 done or said during the trial that I have any opinion

8 concerning any of the issues in this case.  Except for

9 the instructions to you on the law, you should disregard

10 anything I may have said during the trial in arriving at

11 your own findings as to the facts.

12           Evidence, inferences, direct and

13 circumstantial.  While you should consider only the

14 evidence, you are permitted to draw such reasonable

15 inferences from the testimony and exhibits as you feel

16 are justified in the light of common experience.  In

17 other words, you may make deductions and reach

18 conclusions that reason and common sense lead you to draw

19 from the facts which have been established by the

20 evidence.

21           In considering the evidence, you should not be

22 concerned about whether the evidence is direct or

23 circumstantial.  Direct evidence is the testimony of one

24 who asserts actual knowledge of a fact, such as an

25 eyewitness.  Circumstantial evidence is proof of a chain

1  of events and circumstances indicating that something is

2  or is not a fact.  The law makes no distinction between

3  the weight you may give to either direct or

4  circumstantial evidence.

5       Credibility of witnesses.  I remind you that

6  it is your job to decide whether the government has

7  proved the guilt of the defendant beyond a reasonable

8  doubt.  In doing so, you must consider all of the

9  evidence.  This does not mean, however, that you must

10  accept all of the evidence as true or accurate.

11       You are the sole judges of the credibility or

12  believability of each witness and the weight to be given

13  the witness' testimony.  An important part of your job

14  will be making judgments about the testimony of the

15  witnesses who testified in this case.  You should decide

16  whether you believe all or any part of what each person

17  had to say and how important that testimony was.  In

18  making that decision, I suggest that you ask yourself a

19  few questions:  Did the person impress you as honest?

20  Did the witness have any particular reason not to tell

21  the truth?  Did the witness have a personal interest in

22  the outcome of the case?  Did the witness have any

23  relationship with either the government or the defense?

24  Did the witness seem to have a good memory?  Did the

25  witness clearly see or hear the things about which he or

1  she testified?  Did the witness have the opportunity and

2  ability to understand the questions clearly and answer

3  them directly?  Did the witness' testimony differ from

4  the testimony of other witnesses?  These are a few of the

5  considerations that will help you determine the accuracy

6  of what each witness said.

7          Your job is to think about the testimony of

8  each witness you have heard and decide how much you

9  believe of what each witness had to say.  In making up

10 your mind and reaching a verdict, do not make any

11 decision simply because there were more witnesses on one

12 side than on the other.  Do not reach a conclusion on a

13 particular point just because there were more witnesses

14 testifying for one side on that point.

15          Impeachment by prior inconsistencies.  The

16 testimony of a witness may be discredited by showing that

17 the witness testified falsely concerning a material

18 matter or by evidence that at some other time the witness

19 said or did something or failed to say or do something

20 which is inconsistent with the testimony the witness gave

21 at this trial.

22          Earlier statements of a witness were not

23 admitted in evidence to prove that the contents of those

24 statements are true.  You may consider the earlier

25 statements only to determine whether you think they are

1  consistent or inconsistent with the trial testimony of

2  the witness and therefore whether they affect the

3  credibility of that witness.

4          If you believe that a witness has been

5  discredited in this manner, it is your exclusive right to

6  give the testimony of that witness whatever weight you

7  think it deserves.

8          Impeachment by prior convictions.  You have

9  been told that the witnesses Dr. David Hoblit, Kristine

10 Ward, and Ray Robinson have been convicted of various

11 offenses.  A conviction is a factor you may consider in

12 deciding whether to believe that witness, but it does not

13 necessarily destroy the witness' credibility.  The

14 convictions have been brought to your attention only

15 because you may wish to consider them when you decide

16 whether you believe the witness' testimony.  They are not

17 evidence of anything else.

18         Accomplice, informer.  The testimony of an

19 alleged accomplice and the testimony of one who provides

20 evidence against a defendant for personal advantage or

21 vindication must always be examined and weighed by the

22 jury with greater care and caution than the testimony of

23 ordinary witnesses.  You the jury must decide whether the

24 witness' testimony has been affected by any of those

25 circumstances or by the witness' interest in the outcome

1  of the case or by prejudice against the defendant or by

2  the benefits that the witness has or may receive.  You

3  should keep in mind that such testimony is always to be

4  received with caution and weighed with great care.

5          You should never convict a defendant upon the

6  unsupported testimony of such a witness unless you

7  believe that testimony beyond a reasonable doubt.

8          Accomplice, co-defendant, plea agreement.  In

9  this case the government called as witnesses alleged

10  accomplices, named as defendants in the first superseding

11  indictment or in a related Criminal Information, with

12  whom the government has entered into plea agreements

13  providing for the dismissal of some charges and a lesser

14  sentence than they would otherwise be exposed to for the

15  offenses to which they pleaded guilty.  Such plea

16  bargaining, as it is called, has been approved as lawful

17  and proper and is expressly provided for in the rules of

18  this court.

19          An alleged accomplice, including one who has

20  entered into a plea agreement with the government, is not

21  prohibited from testifying.  On the contrary, the

22  testimony of such a witness may alone be of sufficient

23  weight to sustain a verdict of guilty.  You should keep

24  in mind that such testimony is always to be received with

25  caution and weighed with great care.  You should never

1  convict a defendant upon the unsupported testimony of an

2  alleged accomplice unless you believe that testimony

3  beyond a reasonable doubt.  The fact that an accomplice

4  has entered a plea of guilty to the offense charged is

5  not evidence of the guilt of any other person.

6          Witness' use of addictive drugs.  The

7  testimony of someone who is shown to have used addictive

8  drugs during the period of time about which the witness

9  testified must always be examined and weighed by the jury

10 with greater care and caution than the testimony of

11 ordinary witnesses.

12         You should never convict any defendant upon

13 the unsupported testimony of such a witness unless you

14 believe that testimony beyond a reasonable doubt.

15         Expert witnesses.  During the trial, you heard

16 the testimony of Dr. John C. Nelson and Dr. Jon-Paul

17 Harmer, who expressed opinions concerning the proper

18 standard for determining when conduct is in the usual

19 course of professional medical practice and what

20 constitutes a legitimate medical purpose.  If scientific,

21 technical, or other specialized knowledge might assist

22 the jury in understanding the evidence or in determining

23 a fact in issue, a witness qualified by knowledge, skill,

24 experience, training, or education may testify and state

25 an opinion concerning such matters.

1    Merely because such a witness has expressed an

2  opinion does not mean, however, that you must accept this

3  opinion.  You should judge such testimony like any other

4  testimony.  You may accept it or reject it and give it as

5  much weight as you think it deserves considering the

6  witness' education and experience, the soundness of the

7  reasons given for the opinion, and all other evidence in

8  this case.

9    On or about.  You will note that the first

10 superseding indictment charges that the offenses were

11 committed on or about specified months or years.  The

12 government does not have to prove that the crimes were

13 committed on those exact dates, so long as the government

14 proves beyond a reasonable doubt that the defendant

15 committed the crimes on dates reasonably near the dates

16 stated in the first superseding indictment.

17    Caution, consider only crimes charged.  You

18 are here to decide whether the government has proved

19 beyond a reasonable doubt that the defendant is guilty of

20 the crimes charged.  The defendant is not on trial for

21 any act, conduct, or offense not alleged in the first

22 superseding indictment.  Neither are you concerned with

23 the guilt of any other person or persons not on trial as

24 a defendant in this case, except as you are otherwise

25 instructed.

1    Caution, punishment.  If the defendant is
2    found guilty, it will be my duty to decide what the
3    punishment will be.  You should not be concerned with
4    punishment in any way.  It should not enter your
5    consideration or discussion.

6    Single defendant, multiple counts.  A separate
7    crime is charged in each count of the first superseding
8    indictment.  Each count and the evidence pertaining to it
9    should be considered separately.  The fact that you may
10   find the defendant guilty or not guilty as to one of the
11   crimes charged should not control your verdict as to any
12   other.

13   Statement, voluntariness.  In determining
14   whether any statement claimed to have been made by a
15   defendant outside of court and after an alleged crime has
16   been committed was knowingly and voluntarily made, you
17   should consider the evidence concerning such a statement
18   with caution and great care and should give such weight
19   to the statement that you feel it deserves under all the
20   circumstances.

21   You may consider in that regard such factors
22   as the age, sex, training, education, occupation, and
23   physical and mental condition of the defendant and all
24   the other circumstances in evidence surrounding the
25   making of the statement.

1      Knowingly, to act.  The word "knowingly," as

2  that term has been used from time to time in these

3  instructions, means that the act was done voluntarily and

4  intentionally, not because of mistake or accident.  You

5  may find that the defendant had knowledge of a fact if

6  you find that the defendant deliberately closed his eyes

7  to what would otherwise have been obvious to him.  While

8  knowledge on the part of the defendant cannot be

9  established merely by demonstrating that the defendant

10  was negligent, careless, or foolish, knowledge can be

11  inferred if the defendant deliberately blinded himself to

12  the existence of a fact.

13      Willfully, to act.  The word "willfully," as

14  that term has been used from time to time in these

15  instructions, means that the act was committed

16  voluntarily and purposely, with the specific intent to do

17  something the law forbids; that is to say, with bad

18  purpose either to disobey or disregard the law.

19      Summaries and charts received in evidence.

20  Certain charts and summaries have been received into

21  evidence.  Charts and summaries are valid only to the

22  extent that they accurately reflect the underlying

23  supporting evidence.  You should give them only such

24  weight as you think they deserve.

25      Transcripts of tape-recorded conversations.

1 Exhibits 1a and 4a have been identified as typewritten

2 transcripts of oral conversations which can be heard on

3 the tape recordings received in evidence as Exhibits 1

4 and 4. The transcripts also purport to identify the

5 speakers engaged in such conversations.

6 I have admitted the transcripts for the

7 limited and secondary purpose of aiding you in following

8 the contents of the conversations as you listen to the

9 tape recordings and also to aid you in identifying the

10 speakers.

11 You are specifically instructed that whether

12 the transcripts correctly or incorrectly reflect the

13 contents of the conversations or the identities of the

14 speakers is entirely for you to determine based upon your

15 own evaluation of the testimony you have heard concerning

16 the preparation of the transcripts and from your own

17 examination of the transcripts in relation to your

18 hearing of the tape recordings themselves as the primary

19 evidence of their own contents; and if you should

20 determine that the transcripts are in any respect

21 incorrect or unreliable, you should disregard them to

22 that extent.

23 Stipulations. During the presentation of the

24 evidence, you were told that the parties had agreed or

25 stipulated to certain facts. That simply means that you

1  should treat these facts as having been proved.  There is

2  no disagreement over these facts.  So, there is no need

3  for evidence beyond the stipulation itself by any party

4  on these points.  You must accept these stipulations as

5  fact, even if nothing more was said about them one way or

6  the other.

7             Judicial notice.  The court has taken judicial

8  notice of certain facts or events.  When the court

9  declares that it has taken judicial notice of some fact

10  or event, you may accept the court's declaration as

11  evidence and regard as proved the fact or event which has

12  been judicially noticed.

13             Offenses charged.  At this time I will explain

14  the first superseding indictment, which charges four

15  separate criminal offenses called "counts."  I will not

16  read the first superseding indictment to you at length

17  because you will be given a copy of it for reference

18  during your deliberations.

19             In summary, Count 1 charges that Defendant

20  David A. Vogel knowingly and willfully conspired together

21  and with others to distribute or dispense hydrocodone, a

22  Schedule III controlled substance, outside the usual

23  course of professional practice or not for a legitimate

24  medical purpose.

25             Count 2 charges that David A. Vogel conspired

1  with others to launder proceeds obtained from the illegal

2  distribution of dispensing of hydrocodone.

3           Counts 3 and 4 charge that David A. Vogel

4  committed or attempted to commit money laundering through

5  the purchase of a condominium at Trump Tower in New York

6  City and the purchase of a certain rare coin.

7           I will now explain the law governing each of

8  these offenses.

9           First superseding indictment, Count 1.

10  Title 21, United States Code, Section 846 makes it a

11  crime for anyone to conspire with someone else to commit

12  a violation of certain controlled substances laws of the

13  United States.  In this case, Count 1 of the first

14  superseding indictment charges that the defendant,

15  David A. Vogel, did knowingly and intentionally conspire,

16  combine, and agree to manufacture, distribute, dispense,

17  and possess with the intent to manufacture, distribute,

18  or dispense, outside the scope of professional practice

19  and not for a legitimate medical purpose, a controlled

20  substance, hydrocodone, a violation of Title 21, United

21  States Code, Sections 841(a)(1) and 841(b)(1)(D).

22           A conspiracy is an agreement between two or

23  more persons to join together to accomplish some unlawful

24  purpose.  It is a kind of partnership in crime in which

25  each member becomes the agent of every other member.

1    For you to find the defendant guilty of this

2  crime, you must be convinced that the government has

3  proved each of the following beyond a reasonable doubt:

4    One, that two or more persons directly or

5  indirectly reached an agreement to distribute or dispense

6  hydrocodone outside the usual course of professional

7  practice or not for a legitimate medical purpose;

8    Two, that the defendant knew of the unlawful

9  purpose of the agreement; and

10    Three, that the defendant joined in the

11  agreement willfully; that is, with the intent to further

12  its unlawful purpose.

13    One may become a member of a conspiracy

14  without knowing all the details of the unlawful scheme or

15  the identities of all the other alleged conspirators.  If

16  the defendant understands the unlawful nature of a plan

17  or scheme and knowingly and intentionally joins in that

18  plan or scheme on one occasion, that is sufficient to

19  convict him for conspiracy even though the defendant had

20  not participated before and even though the defendant

21  played only a minor part.

22    The government need not prove that the alleged

23  conspirators entered into any formal agreement, nor that

24  they directly stated between themselves all the details

25  of the scheme.  Similarly, the government need not prove

1 that all the details of the scheme alleged in the first

2 superseding indictment were actually agreed upon or

3 carried out.  Nor must it prove that all of the persons

4 alleged to have been members of the conspiracy were such

5 or that the alleged conspirators actually succeeded in

6 accomplishing their unlawful objectives.

7         Mere presence at the scene of an event, even

8 with knowledge that a crime is being committed, or the

9 mere fact that certain persons may have associated with

10 each other and may have assembled together and discussed

11 common aims and interests, does not necessarily establish

12 proof of the existence of a conspiracy.  Also, a person

13 who has no knowledge of a conspiracy but who happens to

14 act in a way which advances some purpose of a conspiracy

15 does not thereby become a conspirator.

16         Hydrocodone, a Schedule III controlled

17 substance.  You are instructed as a matter of law that,

18 for purposes of this trial, hydrocodone is a Schedule III

19 controlled substance.

20         Legitimate medical purpose, usual course of

21 professional practice.  In this case the defendant is

22 charged with conspiring to illegally distribute or

23 dispense hydrocodone through the use of invalid

24 prescriptions.  The Federal Controlled Substances Act,

25 Title 21, United States Code, Section 841(a)(1), makes it

1  a crime for anyone to knowingly or intentionally

2  manufacture, distribute, or dispense a controlled

3  substance.  Medical practitioners registered with the

4  Attorney General and properly licensed under state law,

5  such as physicians and pharmacists, are excepted from

6  this general prohibition but only to the extent that they

7  distribute or dispense a controlled substance pursuant to

8  a valid prescription.

9         For a prescription to be valid, the law

10  requires that it be issued for a legitimate medical

11  purpose by an individual practitioner acting in the usual

12  course of his professional practice.  To demonstrate that

13  a prescription is not valid, the government need only

14  prove either that it was not issued for a legitimate

15  medical purpose or that it was issued outside the usual

16  course of professional practice.  The term "usual course

17  of professional practice" means acting in accordance with

18  a standard of medical practice generally recognized and

19  accepted in the United States.  This is an objective

20  standard that considers what is generally recognized in

21  the medical profession, not what an individual

22  practitioner subjectively believes the standard should

23  be.

24         The practice of medicine is primarily governed

25  by state law.  Texas laws and regulations, including the

1    rules of the Texas Medical Board and the Texas State

2    Board of Pharmacy, establishes standards of care for

3    Texas medical practitioners.  While it is not your role

4    to decide whether the defendant is subject to liability

5    for the violation of any Texas law, regulation, or board

6    rule, the laws, regulations, and rules governing the

7    practice of medicine and pharmacy are relevant to your

8    determination of whether the defendant conspired to

9    distribute hydrocodone outside the usual course of

10   professional practice or not for a legitimate medical

11   purpose in violation of the Federal Controlled Substances

12   Act, as charged.

13          You cannot find the defendant guilty of the

14   charged drug conspiracy solely on the ground that his

15   acts or the acts of alleged co-conspirators violate Texas

16   laws, regulations, or rules governing the practice of

17   medicine or the practice of pharmacy unless you also

18   believe that those acts violate the federal drug laws;

19   namely, that the defendant conspired to distribute

20   hydrocodone outside the usual course of professional

21   practice or not for a legitimate medical purpose.

22          I will now describe some of the applicable

23   Texas laws, rules, and regulations in effect during the

24   relevant time period that may guide your determination on

25   that issue.

1  Texas Health and Safety Code, Section

2  481.071(a). The Texas Controlled Substances Act

3  provides: A practitioner may not prescribe, dispense,

4  deliver, or administer a controlled substance or cause a

5  controlled substance to be administered under the

6  practitioner's direction and supervision except for a

7  valid medical purpose and in the course of medical

8  practice.

9  Texas Administrative Code, Section 190.8. The

10 Texas Medical Practice Act provides: Practice

11 inconsistent with public health and welfare. Failure to

12 practice in an acceptable professional manner consistent

13 with public health and welfare within the meaning of the

14 act includes, but is not limited to:

15  (A) failure to treat a patient according to

16 the generally accepted standard of care;

17  (H) failure to disclose reasonable alternative

18 treatments to a proposed procedure or treatment;

19  (L) prescription of any dangerous drug or

20 controlled substance without first establishing a proper

21 professional relationship with the patient.

22  (i) a proper relationship, at a minimum

23 requires:

24  (I) establishing that the person requesting

25 the medication is in fact who the person claims to be;

1724

1          (II) establishing a diagnosis through the use

2   of acceptable medical practices such as patient history,

3   mental status examination, physical examination, and

4   appropriate diagnostic and laboratory testing.  An online

5   or telephonic evaluation by questionnaire is inadequate;

6          (III) discussing with the patient the

7   diagnosis and the evidence for it, the risks and benefits

8   of various treatment options; and

9          (IV) ensuring the availability of the licensee

10  or coverage of the patient for appropriate follow-up

11  care.

12          Texas State Board of Medical Examiners policy

13  statement on Internet prescribing.  At the December 8th

14  through 11th, 1999, Texas Medical Board meeting, the

15  board established the following policy regarding Internet

16  prescribing:

17          Section 164.053 of the Texas Occupations Code

18  authorizes the board to discipline a licensed Texas

19  physician for unprofessional conduct that is likely to

20  deceive or defraud the public or injure the public.

21  Section 3.08(4)(E) defines unprofessional or dishonorable

22  conduct to include prescribing or administering a drug or

23  treatment that is nontherapeutic in nature or

24  nontherapeutic in the manner the drug or treatment is

25  administered or prescribed.  Section 164.0353(a)(5)

1  defines unprofessional or dishonorable conduct to include

2  prescribing, administering, or dispensing in a manner not

3  consistent with public health and welfare dangerous drugs

4  as defined by Chapter 483, Health & Safety Code.

5          Section 3.08(18) authorizes the board to

6  discipline a licensed Texas physician for professional

7  failure to practice medicine in an acceptable manner

8  consistent with public health and welfare.

9          It is unprofessional conduct for a physician

10  to initially prescribe any dangerous drugs or controlled

11  substances without first establishing a proper

12  physician/patient relationship.  A proper

13  physician/patient relationship, at a minimum, requires:

14          (1) verifying that the person requesting the

15  medicine is in fact who they claim to be;

16          (2) establishing a diagnosis through the use

17  of accepted medical practices such as patient history,

18  mental status exam, physical examination, and appropriate

19  diagnostic and laboratory testing;

20          (3) discussing with the patient the diagnosis

21  and the evidence for it, the risks and benefits of

22  various treatment options; and

23          (4) ensuring the availability of the physician

24  or coverage of the patient for appropriate follow-up

25  care.

1726

1    An online or telephonic evaluation by
2  questionnaire is inadequate.
3    Texas State Board of Pharmacy statement on
4  Internet prescribing.  The Texas State Board of Medical
5  Examiners policy statement on Internet prescribing is
6  important to pharmacists because a prescription issued
7  without a proper physician/patient relationship is not a
8  valid prescription.  Board rules in Section 281.7(a)(2)
9  specify that unprofessional conduct includes dispensing a
10 prescription drug order not issued for a legitimate
11 medical purpose or in the usual course of professional
12 practice.  Your pharmacist and/or pharmacy license could
13 be the subject of disciplinary action if you are
14 dispensing dangerous drugs or controlled substances
15 pursuant to prescriptions from physicians who have not
16 established a proper physician/patient relationship.
17    Texas Administrative Code, Section 174.4.  The
18 Texas Administrative Code provides:
19    (a) Evaluation of the patient.  Physicians who
20 utilize the Internet must ensure a proper
21 physician/patient relationship is established that at a
22 minimum includes:
23    (1) establishing that the person requesting
24 the treatment is in fact who the person claims to be;
25    (2) establishing a diagnosis through the use

1  of acceptable medical practices such as patient history,

2  mental status examination, physical examination, and

3  appropriate diagnostic and laboratory testing to

4  establish diagnoses and identify underlying conditions

5  and/or contraindications to treatment

6  recommended/provided;

7           (3) discussing with the patient the diagnosis

8  and the evidence for it, the risks and benefits of

9  various treatment options; and

10          (4) ensuring the availability of the physician

11 or coverage of the patient for appropriate follow-up

12 care.

13          (b) Treatment.  Treatment and consultation

14 recommendations made in an online setting, including

15 issuing a prescription via electronic means, will be held

16 to the same standards of appropriate practice as those in

17 traditional face-to-face settings.  An online or

18 telephonic evaluation by questionnaire does not

19 constitute an acceptable standard of care.

20          (c) State licensure.  Physicians who treat and

21 prescribe through the Internet are practicing medicine

22 and must possess appropriate licensure in all

23 jurisdictions where patients reside.

24          (d) Electronic communications.

25          (1) written policies and procedures must be

1  maintained when using electronic mail for

2  physician/patient communications.  Policies must be

3  evaluated periodically for currency.  Such policies and

4  procedures must address:

5          (A) privacy to assure confidentiality and

6  integrity of patient-identifiable information;

7          (B) health care personnel, in addition to the

8  physician, who will process messages;

9          (C) hours of operation and availability;

10          (D) types of transactions that will be

11  permitted electronically;

12          (E) required patient information to be

13  included in the communication, such as patient name,

14  identification number, and type of transaction;

15          (F) archival and retrieval; and

16          (G) quality oversight mechanisms.

17          (2) all patient/physician email, as well as

18  other patient-related electronic communications, must be

19  stored and filed in the patient's medical record.

20          (3) patients must be informed of alternative

21  forms of communication for urgent matters.

22          (e) Medical records.

23          (1) medical records must include copies of all

24  patient-related electronic communications, including

25  patient/physician email, prescriptions, laboratory and

1  test results, evaluations and consultations, records of

2  past care and instructions.

3           (2) notice of privacy practices related to the

4  use of email must be filed in the medical record.

5           (f) Disclosure.  Physician medical practice

6  sites must clearly disclose:

7           (1) ownership of the Web site;

8           (2) specific services provided;

9           (3) office address and contact information;

10          (4) licensure and qualifications of physicians

11  and associated health care providers;

12          (5) fees for online consultation and services

13  and how payment is to be made;

14          (6) financial interest in any information,

15  products, or services;

16          (7) appropriate uses and limitations of the

17  site, including providing health advice and emergency

18  health situations;

19          (8) uses and response times for emails,

20  electronic messages, and other communications transmitted

21  via the site;

22          (9) to whom patient health information may be

23  disclosed and for what purpose;

24          (10) rights of patients with respect to

25  patient health information; and

1            (11) information collected and any passive
2 tracking mechanisms utilized.
3            (g) Accountability.  Medical practice sites
4 must provide patients with a clear mechanism to:
5            (1) access, supplement, and amend
6 patient-provided personal health information;
7            (2) provide feedback regarding the site and
8 the quality of information and services; and
9            (3) register claimants, including information
10 regarding filing a complaint, with the Texas State Board
11 of Medical Examiners as provided for in Chapter 178 of
12 this title relating to complaints.
13            (h) Advertising/Promotion of goods or
14 products.  Advertising or promotion of goods or products
15 from which the physician receives direct remuneration or
16 incentives is prohibited.
17            Texas Occupations Code, Section 562.056(a).
18 The Texas Occupations Code provides:
19            Before dispensing a prescription, a pharmacist
20 shall determine, in the exercise of sound professional
21 judgment, that the prescription is a valid prescription.
22 A pharmacist may not dispense a prescription drug if the
23 pharmacist knows or should know that the prescription was
24 issued on the basis of an Internet-based or telephonic
25 consultation without a valid practitioner/patient

1731

1  relationship.

2          Texas Occupations Code, Section 562.111(a).

3  The Texas Occupations Code provides:

4          A pharmacy shall ensure that its agent and

5  employees, before dispensing a prescription, determine in

6  the exercise of sound professional judgment that the

7  prescription is a valid prescription.  A pharmacy may not

8  dispense a prescription drug if an agent or employee of

9  the pharmacy knows or should know that the prescription

10  was issued on the basis of an Internet-based or

11  telephonic consultation without a valid

12  practitioner/patient relationship.

13          Texas Occupations Code, Section 164.053.  The

14  Texas Occupations Code provides:

15          (a) unprofessional or dishonorable conduct

16  likely to deceive or defraud the public includes conduct

17  in which a physician:

18          (1) commits an act that violates any state or

19  federal law if the act is connected with the physician's

20  practice of medicine;

21          (3) writes prescriptions for or dispenses to a

22  person who:

23          (A) is known to be an abuser of narcotic

24  drugs, controlled substances, or dangerous drugs; or

25          (B) the physician should have known was an

1 abuser of narcotic drugs, controlled substances, or

2 dangerous drugs.

3        (4) writes false or fictitious prescriptions

4 for:

5        (A) dangerous drugs as defined by Chapter 483,

6 Health & Safety Code; or

7        (B) controlled substances scheduled in

8 Chapter 481, Health & Safety Code, or the Comprehensive

9 Drug Abuse Prevention and Control Act of 1970, 21 U.S.C.,

10 Section 801 et seq.

11        (5) prescribes or administers a drug or

12 treatment that is nontherapeutic in nature or

13 nontherapeutic in the manner the drug or treatment is

14 administered or prescribed;

15        (6) prescribes, administers, or dispenses in a

16 manner inconsistent with public health and welfare:

17        (A) dangerous drugs as defined by Chapter 483,

18 Health & Safety Code; or

19        (B) controlled substances scheduled in

20 Chapter 481, Health & Safety Code, or the Comprehensive

21 Drug Abuse Prevention and Control Act of 1970, 21 U.S.C.,

22 Section 801 et seq.

23        (8) fails to supervise adequately the

24 activities of those acting under the supervision of the

25 physician; or

1733

1           (9) delegates professional medical

2  responsibility or acts to a person if the delegating

3  physician knows or has reason to know that the person is

4  not qualified by training, experience or licensure to

5  perform the responsibility or acts.

6           Texas Occupations Code, Chapter 107,

7  Intractable Pain Treatment Act.  Prior to September 1st,

8  2003, the Texas Intractable Pain Treatment Act provided:

9           (3) intractable pain means a pain state in

10  which the cause of the pain cannot be removed or

11  otherwise treated and which in the generally accepted

12  course of medical practice no relief or cure of the cause

13  of the pain is possibly or none has been found after

14  reasonable efforts.

15           Section 3, notwithstanding any other provision

16  of law, a physician may prescribe or administer dangerous

17  drugs or controlled substances to a person in the course

18  of the physician's treatment of a person for intractable

19  pain.

20           Section 5, no physician may be subject to

21  disciplinary action by the board for prescribing or

22  administering dangerous drugs or controlled substances in

23  the course of treatment of a person for intractable pain.

24           Section 6(a), except as provided in

25  Subsection C of this section, the provisions of this act

1  shall not apply to those persons being treated by the

2  physician for chemical dependency because of their use of

3  dangerous drugs or controlled substances.

4          (b) the provisions of this act provide no

5  authority to a physician to prescribe or administer

6  dangerous drugs or controlled substances to a person for

7  other than legitimate medical purposes as defined by the

8  board and who the physician knows or should know to be

9  using drugs for nontherapeutic purposes.

10          (c) the provisions of this act authorize a

11  physician to treat a patient who develops an acute or

12  chronic painful medical condition with a dangerous drug

13  or a controlled substance to relieve the patient's pain

14  using appropriate doses, for an appropriate length of

15  time, and for as long as the pain persists.  A patient

16  under this subsection includes a person who:

17          (1) is a current drug abuser;

18          (2) is not currently abusing drugs but has a

19  history of drug abuse; or

20          (3) lives in an environment that poses a risk

21  for drug misuse or diversion of the drug to illegitimate

22  use.

23          (d) a physician who treats a patient under

24  Subsection C of this section shall monitor the patient to

25  ensure the prescribed dangerous drug or controlled

1  substance is used only for the treatment of the patient's

2  painful medical condition.  To ensure that the prescribed

3  dangerous drug or controlled substance is not being

4  diverted to another use and the appropriateness of the

5  treatment of the patient's targeted symptoms, the

6  physician shall:

7            (1) specifically document:

8            (A) the understanding between the physician

9  and patient about the patient's prescribed treatment;

10           (B) the name of the drug prescribed;

11           (C) the dosage and method of taking the

12  prescribed drug.

13           (D) the number of dose units prescribed; and

14           (E) the frequency of prescribing and

15  dispensing the drug.

16           (2) consult with a psychologist, psychiatrist,

17  expert in the treatment of addictions, or other health

18  care professional, as appropriate.

19           Section 7, nothing in this act shall deny the

20  right of the Texas State Board of Medical Examiners to

21  cancel, revoke, or suspend the license of any physician

22  who:

23           (1) prescribes, administers, or dispenses a

24  drug or treatment for other than legitimate medical

25  purposes as defined by the board and that is

1  nontherapeutic in nature or nontherapeutic in the manner

2  the drug or treatment is administered or prescribed;

3          (2) fails to keep complete and accurate

4  records of purchases and disposals of drugs listed in the

5  Texas Controlled Substances Act, Chapter 481, Health &

6  Safety Code, or of controlled substances scheduled in the

7  Federal Comprehensive Drug Abuse Prevention and Control

8  Act of 1970, 21 U.S.C., Section 801 et seq, Public

9  Law 91-513, including records of:

10          (A) the date of purchase;

11          (B) the sale or disposal of the drugs by the

12  physician;

13          (C) the name and address of the person

14  receiving the drugs; and

15          (D) the reason for the disposal of or the

16  dispensing of the drugs to the person.

17          (3) writes false or fictitious prescriptions

18  for dangerous drugs as defined by Chapter 483, Health &

19  Safety Code, for controlled substances scheduled by the

20  Texas Controlled Substances Act, Chapter 481, Health &

21  Safety Code, or for controlled substances scheduled in

22  the Federal Comprehensive Drug Abuse Prevention and

23  Control Act of 1970, 21 U.S.C., Section 801 et seq,

24  Public Law 91-513; or

25          (4) prescribes, administers, or dispenses in a

1  manner not consistent with public health and welfare

2  dangerous drugs as defined by Chapter 483, Health &

3  Safety Code, controlled substances scheduled in the Texas

4  Controlled Substances Act, Chapter 481, Health & Safety

5  Code, or controlled substances scheduled in the Federal

6  Comprehensive Drug Abuse Prevention and Control Act of

7  1970, 21 U.S.C., Section 801 et seq, Public Law 91-513.

8          Section 8, this act is not intended nor shall

9  it be interpreted to allow for the prescription of any

10 illegal substance to any patient or person at any time in

11 violation of federal law.

12          Beginning on September 1st, 2003, the Texas

13 Intractable Pain Treatment Act provided:

14          (2) "intractable pain" means a state of pain

15 for which:

16          (A) the cause of the pain cannot be removed or

17 otherwise treated; and

18          (B) in the generally accepted course of

19 medical practice, relief or cure of the cause of the

20 pain:

21          (i) is not possible; or

22          (ii) has not been found after reasonable

23 efforts.

24          (3) "physician" means a physician licensed by

25 the board.

1738

1          Except as provided by Subchapter C, this

2   chapter does not apply to a person being treated by a

3   physician for chemical dependency because of the person's

4   use of a dangerous drug or controlled substance.

5          Notwithstanding any other law, a physician may

6   prescribe or administer a dangerous drug or controlled

7   substance to a person in the course of the physician's

8   treatment of the person for intractable pain.

9          This chapter does not authorize a physician to

10  prescribe or administer to a person a dangerous drug or

11  controlled substance:

12          (1) for a purpose that is not a legitimate

13  medical purpose as defined by the board; and

14          (2) if the physician knows or should know the

15  person is using drugs for a nontherapeutic purpose.

16          In this subchapter, "patient" includes a

17  person who:

18          (1) is currently abusing a dangerous drug or

19  controlled substance;

20          (2) is not currently abusing such a drug or

21  substance but has a history of such abuse; or

22          (3) lives in an environment that poses a risk

23  for misuse or diversion to illegitimate use of such a

24  drug or substance.

25          This chapter authorizes a physician to treat a

1  patient with an acute or chronic painful medical

2  condition with a dangerous drug or controlled substance

3  to relieve the patient's pain using appropriate doses,

4  for an appropriate length of time, and for as long as the

5  pain persists.

6        A physician who treats a patient under this

7  subchapter shall monitor the patient to ensure that a

8  prescribed dangerous drug or controlled substance is used

9  only for the treatment of the patient's painful medical

10 condition.

11       To ensure that a prescribed dangerous drug or

12 controlled substance is not diverted to another use and

13 to ensure the appropriateness of the treatment of the

14 patient's targeted symptoms, the physician shall:

15       (1) specifically document:

16       (A) the understanding between the physician

17 and patient about the patient's prescribed treatment;

18       (B) the name of the drug or substance

19 prescribed;

20       (C) the dosage and method of taking the

21 prescribed drug or substance;

22       (D) the number of dose units prescribed; and

23       (E) the frequency of prescribing and

24 dispensing the drug or substance; and

25       (2) consult with a psychologist, psychiatrist,

1740

1 expert in the treatment of addictions, or other health

2 care professional, as appropriate.

3        A physician is not subject to disciplinary

4 action by the board for prescribing or administering a

5 dangerous drug or controlled substance in the course of

6 treatment of a person with intractable pain.

7        This chapter does not affect the authority of

8 the board to revoke or suspend the license of a physician

9 who:

10        (1) prescribes, administers, or dispenses a

11 drug or treatment:

12        (A) for a purpose that is not a legitimate

13 medical purpose as defined by the board; and

14        (B) that is nontherapeutic in nature or

15 nontherapeutic in the manner the drug or treatment is

16 administered or prescribed;

17        (2) fails to keep a complete and accurate

18 record of the purchase and disposal of:

19        (A) a drug listed in Chapter 481, Health &

20 Safety Code; or

21        (B) a controlled substance scheduled in the

22 Comprehensive Drug Abuse Prevention and Control Act of

23 1970, 21 U.S.C., Section 801 et seq;

24        (3) writes a false or fictitious prescription

25 for:

1741

1    (A) a dangerous drug as defined by Chapter

2    483, Health & Safety Code;

3    (B) a controlled substance listed in a

4    schedule under Chapter 481, Health & Safety Code; or

5    (C) a controlled substance scheduled in the

6    Comprehensive Drug Abuse Prevention and Control Act of

7    1970, 21 U.S.C., Section 801 et seq; or

8    (4) prescribes, administers, or dispenses in a

9    manner inconsistent with public health and welfare:

10   (A) a dangerous drug as defined by

11   Chapter 483, Health & Safety Code;

12   (B) a controlled substance listed in a

13   schedule under Chapter 481, Health & Safety Code; or

14   (C) a controlled substance scheduled in the

15   Comprehensive Drug Abuse Prevention and Control Act of

16   1970, 21 U.S.C., Section 801 et seq.

17   (b) for purposes of Subsection (a)(2), the

18   physician's records must include a record of:

19   (1) the date of purchase;

20   (2) the sale or disposal of the drug or

21   substance by the physician;

22   (3) the name and address of the person

23   receiving the drug or substance; and

24   (4) the reason for the disposal or dispensing

25   of the drug or substance to the person.

1          Texas Administrative Code, Section 174.2.  The

2   Texas Administrative Code provides:

3          (5) Telemedicine medical service.  A health

4   care service initiated by a physician or provided by a

5   health professional acting under a physician delegation

6   and supervision, for purposes of assessment by a health

7   professional, diagnosis or consultation by a physician,

8   treatment, or the transfer of medical data, that requires

9   the use of advanced telecommunications other than by

10  telephone or facsimile as described in Section 57.042 of

11  the Utilities Code.

12         Texas Utilities Code, Section 57.042.  The

13  Texas Utilities Code provides:

14         (12) "Telemedicine medical service" means a

15  health care service initiated by a physician or provided

16  by a health professional acting under physician

17  delegation and supervision, for purposes of patient

18  assessment by a health professional, diagnosis or

19  consultation by a physician, treatment, or the transfer

20  of medical data, that requires the use of advanced

21  telecommunications technology, other than by telephone or

22  facsimile, including:

23         (A) compressed digital interactive video,

24  audio, or data transmission;

25         (B) clinical data transmission using computer

1  imaging by way of still-image capture and store and

2  forward; and

3           (C) other technology that facilitates access

4  to health care services or medical specialty expertise.

5           Aiding and abetting, agency.  The guilt of a

6  defendant in a criminal case may be established without

7  proof that the defendant personally did every act

8  constituting the offense alleged.  The law recognizes

9  that ordinarily anything a person can do for himself may

10 also be accomplished by him through the direction of

11 another person as his or her agent or by acting in

12 concert with or under the direction of another person or

13 persons in a joint effort or enterprise.

14          If another person is acting under the

15 direction of the defendant or if the defendant joins

16 another person and performs acts with the intent to

17 commit a crime, then the law holds the defendant

18 responsible for the acts and conduct of such other

19 persons just as though the defendant had committed the

20 acts or engaged in such conduct.

21          Before the defendant may be held criminally

22 responsible for the acts of others, it is necessary that

23 the accused deliberately associate himself in some way

24 with the crime and participate in it with the intent to

25 bring about the crime.

1744

1    Of course, mere presence at the scene of a

2 crime and knowledge that a crime is being committed are

3 not sufficient to establish that the defendant either

4 directed or aided and abetted the crime unless you find

5 beyond a reasonable doubt that the defendant was a

6 participant and not merely a knowing spectator.

7    In other words, you may not find the defendant

8 guilty unless you find beyond a reasonable doubt that

9 every element of the offense as defined in these

10 instructions was committed by some person or persons and

11 that the defendant voluntarily participated in its

12 commission with the intent to violate the law.

13    First superseding indictment, Count 2.

14 Defendant David A. Vogel is charged in Count 2 of the

15 first superseding indictment with the crime of conspiracy

16 to commit money laundering in violation of Title 18,

17 United States Code, Section 1956(h).  Title 18, United

18 States Code, Section 1956(h) makes it a crime for anyone

19 to conspire with someone else to commit a money

20 laundering offense.  In this case the defendant is

21 charged with conspiring to commit domestic money

22 laundering offenses involving the promotion of a

23 specified unlawful activity.

24    As already explained, a conspiracy is an

25 agreement between two or more persons to join together to

1745

1  accomplish some unlawful purpose.  It is a kind of

2  partnership in crime in which each member becomes the

3  agent of every other member.

4        For you to find the defendant guilty of this

5  crime, you must be convinced that the government has

6  proved each of the following beyond a reasonable doubt:

7        One, that two or more persons made an

8  agreement to commit money laundering, specifically

9  Title 18, United States Code, Section 1956(a)(1)(A)(i),

10  as defined below in these instructions and as charged in

11  the first superseding indictment; and

12        Two, that the defendant knew the unlawful

13  purpose of the agreement and joined in it willfully; that

14  is, with the intent to further the unlawful purpose.

15        One may become a member of a conspiracy

16  without knowing all the details of the unlawful scheme or

17  the identities of all the other alleged conspirators.  If

18  the defendant understands the unlawful nature of a plan

19  or scheme and knowingly and intentionally joins in that

20  plan or scheme on one occasion, that is sufficient to

21  convict him for conspiracy even though the defendant had

22  not participated before and even though the defendant

23  played only a minor part.

24        The government need not prove that the alleged

25  conspirators entered into any formal agreement nor that

1  they directly stated between themselves all the details

2  of the scheme.  Similarly, the government need not prove

3  that all of the details of the scheme alleged in the

4  first superseding indictment were actually agreed upon or

5  carried not.  Nor must it prove that all of the persons

6  alleged to have been members of the conspiracy were such

7  or that the alleged conspirators actually succeeded in

8  accomplishing their unlawful objectives.

9          Mere presence at the scene of an event, even

10  with knowledge that a crime is being committed, or the

11  mere fact that certain persons may have associated with

12  each other and may have assembled together and discussed

13  common aims and interests, does not necessarily establish

14  proof of the existence of a conspiracy.  Also, a person

15  who has no knowledge of a conspiracy but who happens to

16  act in a way which advances some purpose of a conspiracy,

17  does not thereby become a conspirator.

18          The object of the conspiracy is alleged to be

19  money laundering promotion in violation of Title 18,

20  United States Code, Section 1956(a)(1)(A)(i).  In order

21  to prove that the defendant made an agreement to commit

22  the crime of money laundering promotion, as charged, you

23  will need to consider the elements of that crime.  The

24  government does not have to prove that the defendant

25  actually committed that crime, only that there was an

1747

1 agreement to commit the crime.

2          Title 18, United States Code,

3 Section 1956(a)(1)(A)(i) makes it a crime for anyone

4 knowingly to use the proceeds of certain illegal activity

5 to promote the carrying out of certain illegal activity.

6 For you to find the defendant guilty of agreeing to

7 commit money laundering promotion, you must be convinced

8 that the government has proved beyond a reasonable doubt

9 that he agreed to:

10          One, knowingly conduct a financial

11 transaction;

12          Two, that involved proceeds of a specified

13 unlawful activity; namely, distributing or dispensing

14 hydrocodone outside the course of professional practice

15 or not for a legitimate medical purpose;

16          Three, knowing that the property involved in

17 the financial transaction represented the proceeds of

18 some form of unlawful activity; and

19          Four, intending to promote the carrying on of

20 the specified unlawful activity.

21          With respect to the second element, the

22 government must show that in fact the property was the

23 proceeds of the illegal distribution or dispensing of

24 controlled substances in violation of Title 21, United

25 States Code, Sections 846 and 841(a)(1), which is a

1748

1  specified unlawful activity under the statute.  I

2  instruct you that the illegal distribution or dispensing

3  of controlled substances in violation of Title 21, United

4  States Code, Sections 846 and 841(a)(1) is a specified

5  unlawful activity under the statute.

6          With respect to the third element, the

7  government must prove that the defendant knew that the

8  property involved in the transaction was the proceeds of

9  some kind of crime that is a felony under federal or

10  state law, although it is not necessary to show that he

11  knew exactly what crime generated the funds.  I instruct

12  you that the illegal distribution or dispensing of

13  controlled substances in violation of Title 21, United

14  States Code, Sections 846 and 841(a)(1) is a felony.

15          The term "transaction" includes a purchase,

16  sale, loan, pledge, gift, transfer, delivery or other

17  disposition, and with respect to a financial institution

18  includes a deposit, withdrawal, transfer between

19  accounts, exchange of currency, loan, extension of

20  credit, purchase or sale of any stock, bond, certificate

21  of deposit, or other monetary instrument, or any other

22  payment, transfer, or delivery by, through, or to a

23  financial institution, by whatever means effected.

24          The term "financial transaction" includes any

25  transaction, as that term has just been defined, which

involves the movement of funds by wire or other means or

involving one or more monetary instruments, which in any

way or degree affects interstate or foreign commerce, or

a transaction involving the use of a financial

institution which is engaged in, or the activities of

which affect, interstate or foreign commerce in any way

or degree.

It is not necessary for the government to show

that the defendant actually intended or anticipated an

effect on interstate commerce by his actions or that

commerce was actually affected.  All that is necessary is

that the natural and probable consequence of the acts the

defendant agreed to perform would be to affect interstate

commerce.  If you decide that there would be any effect

at all on interstate commerce, then that is enough to

satisfy this element.  The effect can be minimal.

The term "conduct" includes initiating or

concluding or participating in initiating or concluding a

transaction.

In the context of this money laundering

statute, the term "proceeds" is defined as "profits."

First superseding indictment, Counts 3 and 4.

Defendant David A. Vogel is charged in Counts 3 and 4 of

the first superseding indictment with money laundering, a

violation of Title 18, United States Code, Section 1957.

1  Count 3 charges that the defendant engaged in a monetary

2  transaction in property derived from a specified unlawful

3  activity by purchasing a rare coin for approximately

4  $36,000 on or about April 19th, 2005.  Count 4 charges

5  that the defendant engaged in a monetary transaction in

6  property derived from a specified unlawful activity by

7  transferring approximately $200,000 toward the purchase

8  of a residential condominium on or about November 16th,

9  2004.  It is alleged that the funds used in those

10  transactions were derived from the conspiracy to

11  distribute or dispense hydrocodone outside the course of

12  professional practice or not for a legitimate medical

13  purpose as charged in Count 1 of the first superseding

14  indictment.

15          Title 18, United States Code, Section 1957

16  makes it a crime for anyone to engage in certain kinds of

17  financial transactions commonly known as money

18  laundering.  For you to find the defendant guilty of this

19  crime, you should be convinced that the government has

20  proved each of the following beyond a reasonable doubt:

21          One, that the defendant knowingly engaged or

22  attempted to engage in a monetary transaction;

23          Two, that the defendant knew the transaction

24  involved criminally derived property;

25          Three, that the property had a value of

1  greater than $10,000;

2          Four, that the property was, in fact, derived

3  from the distribution or dispensing of hydrocodone

4  outside the course of professional practice or not for a

5  legitimate medical purpose; and

6          Five, that the transaction occurred in the

7  United States.

8          The term "monetary transaction" means the

9  deposit, withdrawal, transfer, or exchange, in or

10  affecting interstate commerce, of funds or a monetary

11  instrument by, through, or to a financial institution.

12          The term "criminally derived property" means

13  any property constituting or derived from proceeds

14  obtained from a criminal offense.  The government must

15  prove only that the defendant knew that the property

16  involved in the monetary transaction constituted or was

17  derived from proceeds obtained by some criminal offense.

18  The government does not have to prove that the defendant

19  knew the precise nature of that criminal offense or that

20  the defendant knew that the property involved in the

21  transaction represented the proceeds of distributing or

22  dispensing hydrocodone outside the course of professional

23  practice or not for a legitimate medical purpose.

24          Although the government must prove that at

25  least $10,000 of the property at issue was criminally

1 derived property, the government does not have to prove

2 that all of the property at issue was criminally derived.

3         Interstate commerce defined.  "Interstate

4 commerce" means commerce or travel between one state,

5 territory, or possession of the United States and another

6 state, territory, or possession of the United States,

7 including the District of Columbia.

8         Commerce defined.  "Commerce" includes travel,

9 trade, transportation, and communication.

10         Duty to deliberate, verdict form.  To reach a

11 verdict, whether it is guilty or not guilty, all of you

12 must agree.  Your verdict must be unanimous on each of

13 the four counts of the first superseding indictment.

14 Your deliberations will be secret.  You will never have

15 to explain your verdict to anyone.

16         It is your duty to consult with one another

17 and to deliberate in an effort to reach agreement if you

18 can do so.  Each of you must decide the case for

19 yourself, but only after an impartial consideration of

20 the evidence with your fellow jurors.  During your

21 deliberations, do not hesitate to reexamine your own

22 opinions and change your mind if convinced that you were

23 wrong.  But do not give up your honest beliefs as to the

24 weight or effect of the evidence solely because of the

25 opinion of your fellow jurors, or for the mere purpose of

1  returning a verdict.

2        Remember at all times you are judges, judges

3  of the facts.  Your duty is to decide whether the

4  government has proved the defendant guilty beyond a

5  reasonable doubt.

6        Any notes that you have taken during this

7  trial are only aids to memory.  If your memory should

8  differ from your notes, then you should rely on your

9  memory and not on the notes.  The notes are not evidence.

10  A juror who has not taken notes should rely on his or her

11  independent recollection of the evidence and should not

12  be unduly influenced by the notes of other jurors.  Notes

13  are not entitled to any greater weight than the

14  recollection or impression of each juror about the

15  testimony.

16        When you go to the jury room, the first thing

17  you should do is select one of your members as your

18  foreperson, who will help to guide your deliberations and

19  will speak for you here in the courtroom.

20        A form of verdict has been prepared for your

21  convenience.  The foreperson will write the unanimous

22  answer of the jury in the space provided, either guilty

23  or not guilty.  At the conclusion of your deliberations,

24  the foreperson should date and sign the verdict form with

25  his or her initials.

1754

1         During your deliberations, you must not

2  communicate with or provide any information to anyone by

3  any means about this case.  You may not use any

4  electronic device or media, such as a telephone, cell

5  phone, smart phone, iPhone, Blackberry, or computer, the

6  Internet, any Internet service, or any text or instant

7  messaging service, or any Internet chat room, blog, or

8  Web site, such as Facebook, MySpace, LinkedIn, YouTube,

9  or Twitter to communicate to anyone any information about

10  this case or to conduct any research about this case

11  until I accept your verdict.

12         If you need to communicate with me during your

13  deliberations, the foreperson should write the message

14  and give it to the court security officer.  I will either

15  reply in writing or bring you back into the courtroom to

16  respond to your inquiry.

17         Bear in mind that you are never to reveal to

18  any person, not even to the court, how the jury stands,

19  numerically or otherwise, until after you have reached a

20  unanimous verdict.

21         Signed at Beaumont, Texas, this 30th day of

22  June, 2010, Marcia A. Crone, United States District

23  Judge.

24         And turning to the verdict form.

25         Verdict of the Jury.  As to Count 1 of the

1755

1  first superseding indictment, we, the jury, find David A.

2  Vogel, guilty or not guilty.

3           As to Count 2 of the first superseding

4  indictment, we, the jury, find David A. Vogel, guilty or

5  not guilty.

6           As to Count 3 of the first superseding

7  indictment, we, the jury, find David A. Vogel, guilty or

8  not guilty.

9           As to Count 4 of the first superseding

10  indictment, we, the jury, find David A. Vogel, guilty or

11  not guilty.

12           And there is a line for the jury foreperson's

13  initials and the date.

14           At this time we'll have closing argument.

15           MR. COLLINS:  Your Honor, before I begin, I

16  just want to confirm with your courtroom deputy which

17  clock she's working from.  There's a five-minute

18  difference between the --

19           THE COURT:  I know.  I have no idea which one.

20           MR. COLLINS:  Which one are you going to use?

21           COURTROOM DEPUTY:  We'll use that one

22  (indicating).

23           MR. COLLINS:  So, it's 10:16?

24           COURTROOM DEPUTY:  Yes.

25           MR. COLLINS:  May it please the court, members

1756

1  of the jury.

2         Defense counsel in opening statement told you

3  that documents don't fade, and that's an important

4  element of the defense in this case.  Well, this is a --

5  it's not often that a defendant maps out his defense

6  strategy seven years before he faces trial, and that

7  document did indeed not fade.

8         Let's look at Exhibit 199, and recall that

9  this is a document that David Vogel wrote to his defense

10 attorney, Doug Grover, about seven years ago about the

11 Clayton Fuchs trial.  Mr. Fuchs was indicted for drug

12 distribution over the Internet and ultimately convicted.

13 These are David Vogel's words.  "I expect Clayton Fuchs

14 will put on a vigorous defense."  And then further, in

15 the middle, "but perhaps a 'Doug Grover' type attorney

16 might make him look like a nice guy that was confused

17 about the law."  Does that sound familiar?

18         "Someone who was taking the advice of doctors

19 and degreed professionals" -- does that sound familiar --

20 "who led this young man into unchartered areas, gray

21 areas of the law."  Does that sound familiar?

22         (Reading) Clayton Fuchs is nothing more than a

23 drug dealer on the street, and the DEA was too confused.

24         Well, make no mistake, ladies and gentlemen,

25 David A. Vogel is a drug dealer.  He's a drug dealer in a

1 lab coat.  He's a drug dealer that hired doctors to write

2 invalid prescriptions and push hydrocodone across the

3 country.  He's a drug dealer that hired pharmacists to

4 manufacture and distribute those drugs.  He's a drug

5 dealer who hired young inexperienced, non-medically

6 trained individuals to work in his operation, the kinds

7 of people that don't ask questions, the kinds of people

8 that follow directions.  Does it make sense that someone

9 who was a tanning salon attendant a few years earlier

10 rises to the level of chief executive officer of a

11 multimillion-dollar drug distribution company?  Does that

12 make sense that he would choose someone like that to run

13 his operation?

14          What he really wanted to do was he wanted to

15 make money.  And he needed doctors and he needed

16 pharmacists to agree with him to distribute hydrocodone

17 over the Internet without a valid doctor/patient

18 relationship; and he said it himself, another document

19 that doesn't fade.

20          Exhibit 51 is an email between Mr. Vogel and

21 Carrie Demers in September of 2006, and this is what he

22 says -- he's talking about a doctor that they should

23 hire -- "This doctor is starving for business and

24 prescribes every opiate imaginable to his pain patients.

25 He is a perfect match for us."  That's the sort of

1758

1  organization he wanted to run.  That's the business that

2  he was in.

3         But now he wants to play the blame game.  He

4  wants to blame everybody.  He wants to point the finger

5  of blame at the doctors for not following the protocol.

6  He wants to point the finger of blame at the pharmacists

7  for not following procedures.  He wants to point the

8  finger of blame at his employees for not following his

9  rules or doing what he asked them to do.  He wants to

10 point the finger of blame at his customers for being

11 addicts.  He wants to point the finger of blame at his

12 customers for not providing medical records or for

13 falsifying medical records.  At one point he even pointed

14 the finger of blame at one of his customer's earlier

15 doctors who prescribed narcotics to that individual,

16 believing that that is what got that individual addicted

17 and then that individual ultimately becomes a customer of

18 Madison Pain Clinic.  He wants to point the finger of

19 blame at his lawyers for their inability to give him a

20 clear written legal opinion that said that he could

21 operate his organization without having his customers

22 come in and see a doctor face-to-face.

23         You heard from a multitude of lawyers, over a

24 ten-year period.  Not one of them put in writing that

25 what his organization did was legal.  If they did, that

1  would be the first document that you would have seen,

2  "Lawyer X said I could do this."  Clearly that didn't

3  happen.  Who is he going to blame next?

4          But who reaped the benefit of all this blame?

5  One person, David A. Vogel.  David A. Vogel reaped the

6  benefit of his drug enterprise.  David A. Vogel reaped

7  the benefit of $26 million in revenues over a seven-year

8  period.  David Vogel reaped the benefit of $8 million

9  taken out of that enterprise and put directly into his

10  pockets.  He took money out of MPC; and he got paid

11  through salaries, he got paid through royalty checks, he

12  got paid through bean count checks.  He got paid for

13  every single pill that the Madison Pain Clinic doctors

14  prescribed, 10 cents a pill; and they prescribed millions

15  of pills.  And he put that money in his pocket.

16          And what did he do with that money?  He bought

17  a 2.2-million-dollar Trump Tower condominium in

18  Manhattan, New York.  He bought an expensive rare coin.

19  And don't be distracted.  Don't be distracted when

20  defense counsel stands up and says, "David A. Vogel paid

21  his taxes.  David A. Vogel had audited financial

22  statements."  We've heard those stories before.  David A.

23  Vogel isn't the first criminal who has paid his taxes,

24  and David A. Vogel won't be the last criminal who stands

25  behind the fact that he paid his taxes or that he had

1 audited financial statements.  That's a distraction.  If

2 the underlying business is illegal, it doesn't matter if

3 he paid his taxes or not.  You can't distribute drugs

4 over the Internet without a face-to-face doctor/patient

5 relationship.

6          The other thing that David Vogel reaped the

7 benefit of with respect to the Madison Pain Clinic is he

8 treated it like his personal medicine chest.  He wore a

9 fanny pack full of drugs; and he popped them like candy,

10 all the time.  He sent in explicit and detailed orders to

11 his staff to get drugs for him and his wife.  He reaped

12 the benefits.

13          Now, what does it take to establish a

14 conspiracy?  You heard the jury instruction.  A

15 conspiracy is formed when two or more people work

16 together toward a common goal.  That's all it is.  And if

17 that common goal is illegal, then the law calls that a

18 conspiracy; and that, in and of itself, is a crime.

19          Recall the newspaper example.  Newspaper

20 owner, paper mill manufacturer, editor, reporters, paper

21 delivery boys, truck drivers, all of those people work

22 together to produce a newspaper.  They -- not all of them

23 know what each of the others are doing.  It's not

24 required that the newspaper boy know exactly what the

25 owner is doing or vice versa, but they're all working

1761

1 together in a concerted action. They're all trying to do

2 the same thing, get that newspaper produced. If the law

3 declared that producing newspapers was illegal, then all

4 those individuals are guilty of conspiracy and they're

5 co-conspirators. It's the same situation you have here.

6 If you decide that sending drugs over the Internet

7 without a face-to-face meeting with doctors is illegal,

8 then the people involved in that organization were

9 illegal.

10          Let's look at -- here are the conspiracy

11 elements from the jury charge.

12          Let's go to the next slide, and let's talk

13 about agreements. You already know that in this case Dr.

14 David Hoblit and Guss Naddaf have agreed that they made

15 an illegal agreement with the defendant to distribute

16 hydrocodone outside the usual course of professional

17 medical practice and not for a legitimate medical reason.

18          In addition to those two agreements, we have

19 these: David Vogel agreed to form the Madison Pain

20 Clinic with Joe Geraci, another individual indicted in

21 this case; but he's fleeing from justice right now.

22          We have David Vogel agrees with pharmacists to

23 distribute compounded hydrocodone, with Eric Fox and Guss

24 Naddaf.

25          David Vogel agrees to recruit starving,

1  down-on-their-luck doctors to write invalid scripts.

2          David Vogel agrees with MPC staff and doctors

3  to disregard the protocol, and David Vogel agrees with

4  the staff not to talk to the DEA.  Remember Exhibit 50

5  where David Vogel had every single employee sign a piece

6  of paper that said "Don't talk to the DEA"?

7          Who does that?  When you go to work, does

8  someone say, "Don't talk to government agencies, and sign

9  your name.  Make a contract with me that you're not going

10 to talk to a government agency."  Who does that?

11 Particularly when you're distributing illegal narcotics.

12         Any of these agreements would meet the

13 agreement prong of the case.

14         Let's move on to the next slide.  Distribute

15 or dispense, that's one of your elements.  Did they

16 distribute or dispense drugs.  That's a nondisputed point

17 in this case.  Madison Pain Clinic had doctors in Dallas.

18 Those doctors wrote prescriptions.  And in the next slide

19 you'll see that not only did you have pharmacists in

20 Houston but you also had pharmacists in Malvern,

21 Pennsylvania, distributing hydrocodone and other

22 narcotics and drugs to essentially every state in the

23 union.  Not an issue in dispute.

24         Next slide, please.

25         Controlled substance.  The court has already

1 told you as a matter of law that you're instructed that

2 for the purposes of this trial, hydrocodone is a

3 Schedule III controlled substance.  So, you don't have to

4 worry whether or not hydrocodone is a drug.  Hydrocodone

5 is a drug.  You don't have to worry whether or not it was

6 distributed or dispensed.  It was distributed and

7 dispensed.  Those facts are clear.

8            Next slide, please.

9            Now let's talk about the standard of care.

10 You'll recall that David Vogel and Doug Grover had a

11 conversation about David Vogel's protocol.  And I learned

12 something in this trial about this case and this

13 investigation that defense counsel has pointed out has

14 gone on for years.

15            I actually learned something in this trial.

16 Doug Grover told David Vogel, "If you don't follow your

17 protocol, your protocol is going to be Exhibit A in any

18 government prosecution of you for the distribution of

19 drugs."  Remember that testimony, "Exhibit A"?  It came

20 on the last day.

21            And then I went back and looked at

22 Government's Exhibit 48; and in the title of the document

23 that David Vogel drafted, it actually says "Exhibit A

24 Protocol."  That's his words, not ours.  I never

25 understood why it said "Exhibit A," but now I do.  Doug

1 Grover told him, "If you don't follow your protocol,

2 that's Exhibit A in the prosecution."

3         Well, let's talk about why Doug Grover felt

4 that that was Exhibit A.  They didn't follow their

5 protocol, for a number of reasons.  They didn't follow

6 the rules with respect to lab results and their urine

7 testing.

8         If you look up at the top, these are just a

9 sampling of documents that came into the case.  There are

10 thousands of customer files.  This is a sampling.  Here's

11 someone who tested positive for marijuana.  20 days

12 later, got the most powerful hydrocodone mix you can get.

13 Here's a person -- Mike Hilbert tested positive for

14 cocaine.  I believe he also tested positive for meth and

15 amphetamines.  Seven days later, he got the most powerful

16 hydrocodone mix you can ever get.  And this guy is from

17 California, never once came in and saw the doctor.  None

18 of these people came in to see a doctor.

19         Bowers tested positive for cocaine.  13 days

20 later, powerful 15 milligrams of hydrocodone.

21         Anderson, marijuana, 5/11.  Again, just a few

22 days -- 8 days later, 15 milligrams of hydrocodone.

23         They didn't follow their protocol.  That's why

24 there's Exhibit A.

25         In addition to that, they didn't follow the

1 rules with respect to mental health status examinations.

2         Remember Kristine Ward and her sister?

3 Kristine Ward was the patient; Kim Ward was the sister.

4 Kim begged MPC in an email not to send drugs to her

5 sister. Her sister was a rising star, a parachutist, a

6 Golden Knight, who ended up going to jail and having lots

7 of subsequent problems because she's admitted she was an

8 addict.

9         Maggie Pepe is their mental health status

10 examiner, a licensed chemical dependency person in

11 New York. Maggie Pepe never saw anyone face-to-face.

12 She talked to about 40 to 50 percent of the candidates on

13 the phone. She never saw anybody face-to-face, and she

14 rarely rejected people. But the one person she did

15 reject, the one person was Kristine Ward. (Reading) seek

16 therapy for her addiction. I would not advise MPC to

17 take this patient. 7 days later, 15 milligram of

18 hydrocodone.

19         And Kristine Ward, the addict, is the same

20 person who prepaid over -- I think she prepaid $2900

21 because she was going to go bankrupt. So, she gave MPC

22 $2900 to put on account so she could draw down that

23 account to continue to get narcotics after her

24 bankruptcy. That is distributing drugs outside of the

25 usual course of professional medical practice. It's

1766

1    plain and simple.  You can't do that.

2              There are lots of other ways that they

3    distributed drugs outside the usual course of medical

4    practice.  Automated refill for narcotics, outside the

5    usual course of professional medical practice.  Early

6    refills.  You can't get a narcotic and then before your

7    prescription is up go back and get more narcotics.

8    That's not allowed.  But we saw testimony that David

9    Vogel himself got almost a thousand pills in a 29-day

10   period.  That one event alone is sufficient.

11             Prewriting scripts.  We heard testimony from

12   Dr. Hoblit that he prewrote scripts.  Not reviewing files

13   and labs, again, outside the usual course of professional

14   medical practice.

15             You had two expert witnesses, two doctors,

16   Dr. Nelson and Dr. Harmer, both of whom came in and

17   unequivocally, beyond a shadow of a doubt, didn't back

18   down from it one bit, in order to establish a standard of

19   care with a patient, a doctor has to see that patient

20   face-to-face.  Bottom line, you got to see the patient

21   face-to-face.

22             And you just heard the jury instructions.

23   Count up the number of times about proper

24   patient/physician relationship, establishing contact with

25   the patient, taking a history, all those things that

1  occur in a usual doctor/patient relationship.  Every

2  single person in this room has seen the doctor.  You're

3  all experts in this.

4          Think about the first time you went to that

5  new doctor.  You went to that doctor's office.  You

6  filled out a form.  You waited, maybe a long time.

7  Finally the doctor came in, and she or he sat down and

8  asked you questions, "How are you doing, how are you

9  feeling, how old are you, what's your family life, what's

10 your social life like, where does it hurt, what's

11 bothering you?"  And then what did they do?  They laid

12 hands on you.  They laid hands on you.

13         No doctor at MPC laid hands on customers

14 before they gave them prescriptions for highly addictive

15 narcotics.  That's the bottom line.  They did not do

16 that.  You had two experts come in here and tell you that

17 that's what was supposed to happen.

18         Now, you'll recall that --

19         Go to the next slide, please.

20         You'll recall that David Vogel's defense is

21 that he was confused, that he doesn't understand the law.

22 He wants you to believe that documents don't fade and he

23 has plenty of emails to his employees saying, "I want to

24 follow the law.  I want to follow the law.  Follow my

25 protocol," which of course they didn't follow.  Well,

1768

1 let's look at David Vogel's own words that prove what he
2 knew and when he knew it; and you'll see that he knows a
3 doctor/patient relationship, face-to-face is what he
4 needs to do.

5        And let's start before Madison Pain Clinic
6 even kicks off.  August, 2000 -- this is Exhibit 140 and
7 if you -- it's Page No. 26 on Exhibit 140.  August, 2000,
8 private placement memorandum.  Let me tell you what a
9 private placement memorandum is.  You know that
10 businesses can raise money in lots of ways.  You hear
11 about stocks; you hear about bonds.  Well, sometimes
12 people will take a new business idea to a group of
13 wealthy people and ask them for money.  That's called a
14 "private placement."  That's what this is.  David Vogel
15 wrote a document, took it to wealthy people and asked
16 them if they would give him money.  This was an important
17 document for David Vogel.  David Vogel has to get this
18 right.  David Vogel is laying on the line what this
19 business is going to be.  Let's see if he gets the law
20 right.

21        "Unfortunately, based on the advice of counsel
22 and other professionals, from a business standpoint, we
23 must operate in a different manner.  Z-Best will require
24 that initially any consumer that gets prescribed
25 medication be evaluated in-person by our affiliate

1  Madison Pain Diagnostic Services," Madison Pain Clinic,

2  MPC.  He got the law right when it mattered.  He got the

3  law right when he needed money.  There's no gray area.

4          (Reading) Z-Best Pharmacy will market in much

5  of the same manner as Pillbox or Friendly -- those are

6  two other Internet-based pharmacies -- except that under

7  no circumstances will patients get an initial

8  prescription without an in-person diagnostic exam with

9  Madison and a consultation with a Madison-affiliated

10 doctor.

11          Again, a Madison doctor, face-to-face physical

12 exam.

13          "Simply speaking, the practice of prescribing

14 narcotics on the telephone without an initial in-person

15 consultation could lead to serious legal trouble for all

16 involved."

17          David Vogel got it right.  He got it right in

18 August, 2000, at the beginning of this whole charade.

19          Exhibit 180, David Vogel's own words.  In a

20 2001 letter from David Vogel to Attorney Mike Cooper --

21 you remember, Attorney Mike Cooper came in.  David Vogel,

22 (Reading) personally, I think the thing to do is to have

23 our doctors see each patient in person.  He put it in all

24 caps.  (Reading) that means the patient will have to

25 travel a long way to see us.

1    Exhibit 141, a May, 2001, eZine.  An eZine is

2  an online magazine.  This is David Vogel advertising to

3  his potential customer base, in his own words, (reading)

4  please note that recently two major Internet pharmacies

5  were closed down.  These pharmacies simply required a

6  five-minute consult with a doctor on the telephone to get

7  usually 100 pain pills per month.  All caps.

8    (Reading) we do not operate that way.  You

9  will be screened.  You will need to see us in person.

10  However, once you come in and get examined by our doctor

11  and psychologist, you can have your meds shipped to you

12  monthly.  The cost of an airline ticket is about $200 or

13  so.

14    Exhibit 145, May, 2001, email from David Vogel

15  to his co-investor Joe Geraci.  (Reading) clients need to

16  come in.  In other words, scare people into coming to

17  Dallas to be a legit client.  A client can come to Dallas

18  in the morning and return in the eve, no big deal.

19    Those are David Vogel's words early, 2000,

20  2001.  He knew what the rules were.  They weren't gray.

21    Let's talk about lawyers' words.  Again, that

22  August, 2000, private placement memorandum, that's early

23  in the process.  We've heard from some lawyers.  There

24  was a lawyer even before the August, 2000, private

25  placement, an unknown lawyer, an unnamed lawyer.  But

1771

1  David Vogel says in this document, (reading) based on the

2  advice of counsel, Z-Best will require that initially any

3  consumer that gets prescribed medications be evaluated in

4  person.  That's one lawyer who told him that.  Prior to

5  the August, 2000, private placement memorandum.  Again,

6  when he had to get it right, when he was raising money,

7  he knew what the rules were.

8          Then he has a conversation with Michael

9  Cooper.  You saw Michael Cooper.  He was in the

10  courtroom.  Exhibit 180 is a January, 2001, letter from

11  David Vogel to Michael Cooper where he poses the

12  question.  Question from David Vogel:  If a patient

13  cannot physically come in, as an alternative, can we have

14  a doctor or RN give a patient a physical at his house out

15  of state; and based on that physical, can the local

16  doctor issue a prescription?

17          So, he's asking his lawyer, "Hey, if they're

18  not in Texas, if they're out of state, if they can't come

19  in, can I have somebody out of state examine that person

20  and then can my doctor in Texas prescribe that

21  prescription, write that prescription?"

22          Here's Michael Cooper's answer in Exhibit 183

23  in paragraph 4:  All patients shall be seen for their

24  initial consultation by a physician in the facility.

25          He hired Michael Cooper to evaluate the

1  business model.  Michael Cooper looked at the law,

2  Michael Cooper told him what the assumptions were.

3  Michael Cooper talked to him.  Michael Cooper told you

4  and other lawyers told you, "Look, we don't know the

5  facts.  We relied upon David Vogel to get the facts.

6  David Vogel told me the facts.  I went and looked at the

7  law and I concluded that the law -- that I'm going to

8  make the assumption that all patients have to be seen in

9  the facility in order to give my opinion and I gave him

10 that opinion."  David Vogel knew in 2001 based on the

11 conversation with Michael Cooper.

12          Let's look at Exhibit 184, November, 2001,

13 letter from Michael Cooper to David Vogel.  Just in case

14 you think David Vogel didn't get it the first time.

15 Michael Cooper writes him and says:  All patients shall

16 be seen for their initial consultation by a physician in

17 the facility.  It is my understanding that a substantial

18 number of patients are not seen by a physician in the

19 facility.  It's my further understanding that any

20 prescriptions for those patients not seen by a physician

21 in the facility are filled via telephone, mail order,

22 and/or Internet transactions.

23          Michael Cooper is putting him on notice right

24 there in 2001.

25          (Reading) based upon the foregoing, you may

1  not rely upon the guidance expressed in the letter so

2  long as you operate out of compliance.

3          Michael Cooper is telling him you got to have

4  a face-to-face.

5          Exhibit 198, December, 2003.  This is a 2003

6  email exchange between David Vogel and Douglas Grover,

7  another lawyer.  In the email, David Vogel admits that

8  Doug Grover told David Vogel that face-to-face exams are

9  required.  Additionally, David Vogel shows that he

10  understands what a real physical exam is.  You may

11  remember this exhibit from testimony.  It's Exhibit 198.

12  This is David Vogel writing (reading) the new protocol

13  that I, David Vogel, suggest is based on your, Doug

14  Grover, recommendation that we add a face-to-face visit

15  to our current protocol.

16          This is 2003.

17          (Reading) then the doctor gets the file and

18  talks with the client.

19          That's what used to happen.

20          Now David suggests (reading) this talk will be

21  replaced with a face-to-face visit.  The doctor, during

22  that visit, would check the patient's eyes, nose, ears,

23  mouth, lungs, heart, stomach, genitals, and do a

24  proctological examination, look at the patient's toes,

25  and also feel around the hurt areas of the patient.

1    David Vogel knows what the standard of care

2 is.  That's how you do it.  Someone lays hands on you and

3 tries to figure out where and why it hurts, in person.

4 David Vogel knew that in 2003; David Vogel didn't do it.

5    You'll recall Doug Grover's testimony from the

6 stand.  He says in -- in December, 2003, Grover responds

7 to David Vogel's emails and links referencing Texas law

8 and DEA regulations.  David Vogel sends Doug Grover some

9 information.  Grover says that Texas law and DEA

10 regulations suggest to him that a phone conference with a

11 doctor is inadequate and that that cannot create a

12 doctor/patient relationship.

13    And, again, Exhibit 2005 *[sic]*, you'll recall

14 that while testifying, Doug Grover repeatedly denied ever

15 seeing Michael Cooper's legal opinion about a

16 face-to-face relationship.  But on cross-examination,

17 Ms. Smith got him to admit that -- Grover stated that "I

18 do remember seeing Cooper's letter from April 20th, 2001,

19 that all patients should be seen for their initial

20 consultation by a physician in the facility."  The

21 doctors *[sic]* are telling him.

22    197, the last lawyer, Susan Henricks -- I'm

23 sorry.  I said "doctors."  I meant "lawyers."  The

24 lawyers are telling him.

25    And our last lawyer, Susan Henricks,

1775

1 Exhibit 197, this is Jonathan Vogel, charged in this case

2 and a co-conspirator in this case with Mr. David Vogel.

3 He's talking about a conversation he had with Susan

4 Henricks. (Reading) I will ask her to give us a written

5 opinion; but from speaking with her earlier, she already

6 stated that her opinion is not law and that her opinion

7 is not necessarily indicative of anything, unfortunately.

8 Very blatantly putting it, after speaking with her, she

9 has no definitive answers for me. She did state that in

10 her opinion if we did have every patient come into our

11 clinic for an examination with our in-house physician,

12 that the in-house examination should establish the

13 doctor/patient relationship. Susan Henricks, 2007.

14         Now, do not be persuaded by deliberate

15 ignorance. You got an instruction on deliberate

16 ignorance, "You may find that the defendant had knowledge

17 of a fact if you find that the defendant deliberately

18 closed his eyes to what would otherwise have been obvious

19 to him." You can't get away with closing your eyes when

20 the truth is right there.

21         We just went through -- David Vogel knew the

22 law, in his own words. The lawyers told him about how

23 important the face-to-face is. Let's look at some other

24 roadblocks or areas in which he learned this information.

25         Why is it if David Vogel is getting it right,

1  if David Vogel -- if the law is so unclear, why is it

2  that everyone who worked with him shot him down?

3          Remember Mark Sullivan from the Good's

4  Pharmacy?  Mark Sullivan came in and said that when he

5  learned that MPC was not doing a face-to-face, that that

6  was the last day that Good's Pharmacy would ever work

7  with him.

8          Remember Warren Craig from Custom Compounding

9  Center in Little Rock, Arkansas, who made a surprise

10 visit to Madison Pain Clinic, showed up one morning,

11 because he had seen a large number of narcotic scripts

12 and started to get worried about it?

13          Well, he walked into the office.  And what did

14 he see?  He saw old Dr. Sam sitting in the back room with

15 a stack of files, a prescription pad, and a glass of

16 Scotch at 9:30 in the morning.

17          What did Warren Craig do?  "Can I borrow your

18 phone?"

19          "I called my partners and said, 'Stop right

20 now.  We're cutting them off.'"

21          Why is it that everyone who is affiliated with

22 Madison Pain Clinic feels the need to lie?

23          PayPal drops them.  PayPal gives them three

24 letters -- November, 2003; August, 2004; and January,

25 2005 -- every single time saying, "Hey, hey, tell us

1  about the doctor/patient relationship. We need

2  documentation. And give us the license for your

3  pharmacy." Three different times in letters. PayPal was

4  important to Madison Pain Clinic. $11 million worth of

5  payments were processed through PayPal.

6        What did Madison Pain Clinic do? Nothing.

7  They allowed themselves to be dropped.

8        I asked Tyra Barnett why? She said, "We

9  didn't have documentation. We didn't see patients.

10 Dr. Sam didn't see anybody in the year I was there.

11 Dr. Fabi didn't see really anybody, maybe one.

12 Dr. Watson, she saw maybe five in a year." And they

13 wrote maybe 750 prescriptions. They didn't have the

14 documentation.

15       What about CTS Holdings? Once PayPal dropped

16 Madison Pain Clinic, they have to figure out a way to get

17 paid. So, they go to CTS Holdings. CTS Holdings has an

18 application. Madison Pain Clinic lies on it, says, "We

19 do zero percent Internet business. Zero percent. We

20 have a physical location. We have merchandise on-site."

21       They try to get payments with Discover card.

22 They lie on that application. They gave the impression

23 they were a brick-and-mortar facility. They said they

24 had a cash register -- they answered "yes" to cash

25 register -- that they had merchandise on stock. They

1 didn't list their Web site on the address.

2          Look at the Medisca applications.  People

3 involved with Madison Pain Clinic had to lie.  Medisca is

4 a drug wholesaler, sells bulk hydrocodone to the

5 pharmacies.  Pharmacies use that to make the compounded

6 hydrocodone to sell.  Eric Fox lied on his application.

7 Jack Munn lied on his application.  Everybody who was

8 associated with Madison Pain Clinic had to lie or -- if

9 they were employees.  Or if they were business partners,

10 they ended up dropping them.

11          Let's quickly turn to the money laundering

12 counts.  These are essentially undisputed.  If you find

13 that Madison Pain Clinic issued invalid prescriptions

14 because they were issued not in the usual course of

15 professional medical practice or not for a legitimate

16 medical purpose, you're essentially done in this case

17 because they didn't dispute the fact that they had

18 proceeds and those proceeds were used to pay doctors,

19 they were used to pay pharmacists, they were used to put

20 ads on drugbuyers.com to solicit more drug users and

21 complete that cycle.  That's promotional money

22 laundering.  When you use the money, when you use the

23 profits from what you earn from your unlawful activity to

24 grow and feed that business, that's promotional money

25 laundering.  That's Count 2.

1     Let's look at Count 3 and Count 4.  When you

2   take profits out of your business, when you take profits

3   out of your business and you use them to buy other

4   things, that's a different kind of money laundering.  And

5   in this case David Vogel took money out of that cookie

6   jar.  It was his jar.  It was his cookies.  But if those

7   cookies are illegal cookies, then we got a problem -- and

8   that's our point.  All right -- if that jar is filled

9   with illegal cookies, it's filled with the money from an

10  illegal activity.  He used it to buy a 37,000-dollar rare

11  coin, he used it to buy a 2.2-million-dollar Trump condo;

12  and that's money laundering.  When you take money out and

13  you use it to buy big items, that's a form of money

14  laundering.

15     So, I just bring you back -- as I sit down and

16  yield my time, I bring you back to David Vogel prepared

17  his defense years in advance.  Exhibit 199a.  So, as you

18  hear his counsel talk about what he did and why he did it

19  and the guidance that he gave his staff -- he told his

20  employees that they must comply, they must follow the

21  protocol; he relied upon what doctors told him; he relied

22  upon what lawyers told him; he said that the law was

23  gray; and at worst, he was simply confused -- does that

24  sound familiar?  It's the same defense he laid out for

25  another drug dealer prescribing drugs over the Internet.

1780

1  Thank you.

2          THE COURT:  All right.  We're going to take a

3  recess, 15 minutes.

4          (Recess, 10:52 a.m. to 11:09 a.m.)

5          (Open court, defendant and jury present)

6          MR. BRETT SMITH:  If it pleases the court,

7  counsel for the government, ladies and gentlemen.

8          First of all, I want to slow it down just a

9  notch here.  I want to thank each and every one of you.

10 Thomas Jefferson is often quoted, "Second only to service

11 for your country in a time of war, the highest duty that

12 a citizen can perform is to serve on a jury."  I want to

13 thank each and every one of you.

14          I'm coming up on about my 80th jury trial, and

15 I've rarely seen juries as attentive as y'all.  You've

16 taken notes, and you've paid attention.  You even stayed

17 awake during the indictment and the charge, and that says

18 a lot.  I want to thank each and every one of you.

19          Each one of you will be able to filter through

20 the evidence in this case to get to the truth to

21 determine if the government has proven this case beyond a

22 reasonable doubt.  The government has the burden of proof

23 here.  David Vogel has to do nothing.  Use your common

24 sense.

25          Does the evidence in this case convince you in

1  your head, your heart, or your gut that David Vogel has

2  been proven guilty beyond -- beyond -- a reasonable

3  doubt?  Each and every element of this case.

4          My co-counsel will go through the other

5  evidence in this case and I think he'll focus on the lack

6  of evidence surrounding David's acts and intents, but I

7  want to focus on something different.

8          As you sit around this 4th of July weekend

9  watching NASCAR or hitting your favorite fishing hole or

10 spending time with your grandkids watching fireworks,

11 let's remember what the 4th of July is about.  The very

12 first 4th of July celebration was in 1820 in Eastport,

13 Maine.  It was to celebrate independence.  Independence

14 from what?  Oppressive government.  Celebration of

15 constitutional rights.  We were celebrating our freedom

16 from the British crown.  Celebrating rights like the

17 right to have a jury trial.  There's only 12 people that

18 can stop the power of the government, and the 12 people

19 are sitting in that box.  The rights to confront and

20 cross-examine your accusers and the constitutional rights

21 to call witnesses on your own behalf, that's what we

22 celebrate on the 4th of July.  And I want to tie that in

23 because I want to talk about what this case is about and

24 what this case is not about.

25          The government told you in opening that

1  Madison was a click-and-pop operation.  That's not what

2  this case is about.  The government has attempted at

3  every turn of the corner to paint a different picture of

4  Madison Pain Clinic, the protocol, and David Vogel; and

5  they have overreached on every occasion.  They even

6  overreached this morning.

7          You were told in their closing that Joe Geraci

8  was a fugitive.  Well, he is.  But did you hear any

9  evidence of that during trial?  You did not.  But they

10  threw it in there.  They threw it in there because they

11  want you to hear it.  It wasn't presented in evidence and

12  it's not supposed to be mentioned in closing, but they

13  did it anyway because they want to stick it out there.

14  Let's reach over the bar one more time.

15          How else have they reached over the bar in

16  this case?

17          Every time they presented a witness, the

18  witness would get on the stand for the government and he

19  would try to paint a version of the truth.  And then what

20  did you find on cross-examination?  When David Vogel

21  exercised his constitutional rights to cross-examine

22  witnesses, what did you find?

23          For the first time, we found out that the

24  government had made numerous attempts to buy from Madison

25  Pain Clinic and they all failed, but they didn't tell you

1 that on direct.  They wanted to paint a different

2 picture.  They never told you about the assumed names of

3 a Dimitri Reynolds or Mary Martinez or the twice-rejected

4 Chris Gattis.  They never told you about that because

5 they didn't want you to know.  We learned about those

6 failed attempts during cross-examination.

7          When the government was finally successful,

8 they acknowledged that they filled out a lengthy

9 questionnaire; but they never told you the steps that

10 Agent Fairbanks went.  It was through cross-examination,

11 that constitutional right of Mr. Vogel's, that we found

12 that Fairbanks went to the DPS and got a driver's

13 license, just like you and I would do, with his real

14 picture.  He got through DEA and got a fake Social

15 Security card.  They submitted fictitious medical

16 records.  He got a UA and a blood test.  And guess what

17 he found out?  Did you notice his surprise?  He's got

18 high cholesterol.  Do you think that was treated before

19 he went to the Madison Pain Clinic?  I doubt it.  I think

20 they were the first people who diagnosed it.  A good

21 example of diagnostic services being offered.

22          They went through a lot of steps in this case

23 after they finally figured out how to break the protocol,

24 but they never told you how they figured it out, because

25 they tried and tried and tried.  Despite those attempts,

1784

1 there was evidence supporting the staff and the doctors

2 were trying to comply with the protocol.

3          Now, we'll do something different than the

4 government.  I'll acknowledge the protocol was violated.

5 We're not going to stand here and argue that it wasn't.

6 The protocol was violated.  Dr. Hoblit violated the

7 protocol, but it certainly was not violated by David

8 Vogel.

9          Regarding those successful hydrocodone

10 purchases in 2007, they were all done through Dr. Hoblit.

11 Arguably, at the end Dr. Hoblit was getting sloppy.

12 Dr. Hoblit has been indicted, and he's paying for what he

13 did.  Dr. Hoblit wrote the prescriptions.  Dr. Samblanet

14 wrote the prescriptions.  Dr. Fabi wrote the

15 prescriptions.  Those doctors are responsible for the

16 ordinary course and usual custom of medicine.  They

17 violated those protocols, not David Vogel.  And the

18 government has not proven otherwise.

19          They wanted to have you believe, through

20 Special Agent Fairbanks, that he just went in and

21 somebody drew his blood.  Well, what did you find out

22 through the constitutional exercise of cross-examination?

23 That it was actually a phlebotomist, that, yeah, maybe

24 she did have some medical training.  Maybe she did, but

25 they didn't want you to know that.

1    And they also tried to make you believe -- the

2  government presents their case and they want to --

3  present to you through their witnesses that no doctor was

4  a pain specialist.  Well, what do you find out when

5  Mr. Vogel exercises his constitutional right of

6  cross-examination?  One of the doctors had worked at

7  K Clinic in pain management for ten years, and another

8  doctor was an internist in Dallas who makes the talk show

9  circuit.  They didn't want you to know that on direct.

10    We learned through cross-examination, not on

11  direct, that doctors licensed in one state could

12  prescribe medications in another state under certain

13  state exemptions.  They didn't tell you that.  They

14  didn't tell you that.

15    Now, they want to point the finger of blame,

16  point the finger of blame.  Well, you know what happens

17  when you point your finger at somebody?  You've got three

18  pointing back at you.  Let's point the finger of blame

19  over here for a minute.

20    They told you on direct, through their

21  witnesses that they want you to believe -- let's take

22  this jury through the blinders -- we didn't start our

23  investigation until 2006.  That was not true and they are

24  overreaching and they want to mislead you.

25    We learned through the constitutional exercise

1 of cross-examination that this investigation -- that the

2 DEA was getting tips about Madison Pain Clinic in 2002,

3 in 2003, in 2004, in 2005. And what they want you to

4 believe is that the entire United States Federal

5 Government and the United States Drug Enforcement Agency

6 was too busy. They didn't have time to come knock on the

7 door. Well, they've got time now to have an army of

8 United States attorneys and an army of investigators and

9 army with the DEA and the IRS to sit here and prosecute

10 David Vogel, but they did not have the time, for five

11 years, to knock on his door and enter into a memorandum

12 of understanding like they did with Eric Fox. They want

13 you to believe they did not have time to do that. Let's

14 point the finger of blame. They knew about Madison Pain

15 Clinic in 2002, and they could have done something then.

16 Point the finger of blame.

17         And let's put this in context, ladies and

18 gentlemen. Let's put it in context of the fact that they

19 went to Eric Fox. They'll make hay out of the people who

20 quit doing business with Madison, but they don't want you

21 to know -- they want to put little blinders on -- they

22 don't want you to know what really happened with Eric

23 Fox. Eric Fox was never indicted, never charged. The

24 single largest compounding pharmacy to provide

25 hydrocodone for the Madison Pain Clinic, three times the

1  number that Guss Naddaf did, Eric Fox has never been
2  prosecuted, but "Hey, stay tuned.  Keep the radio on.
3  Stay tuned.  Yeah, yeah.  We'll get there.  We'll get
4  there.  Stay tuned."  They never prosecuted him.

5          What did they do with Eric Fox?  They went to
6  him and they knocked on his door and they said, "Hey, we
7  don't like what you're doing.  We think what you're doing
8  is inappropriate with some of these pharmacies, and we
9  want you to stop."

10          So, what does the DEA do?  They sign a letter;
11  Eric Fox signs a letter.  It's called a "memorandum of
12  understanding."

13          Well, what did Eric Fox do?  He turned right
14  around and kept shipping drugs, and they never prosecuted
15  him.

16          Put it in context about what the DEA knows and
17  what the government knew and point the finger of blame
18  back here because Douglas Grover wrote a letter in August
19  of 2003 to the director or chief of the diversion and
20  liaison division of the Drug Enforcement Administration
21  and said, "Hey, this is what my client is doing" and he
22  set out the protocol.  He didn't identify his client.
23  That's not what an attorney does.

24          Not only did they get the letter but they sent
25  it again because the DEA called and said, "Hey, we lost

1788

1  the signature page."  So, he sends it again.

2         All the government had to do, instead of

3  pointing the finger at David Vogel, was pick up the phone

4  and call Mr. Vogel, "We got your letter.  We've reviewed

5  the protocol" and "we don't approve" or "we do approve."

6  That's all they had to do.

7         Or they could have typed out a letter and sent

8  it back to Mr. Grover and he could have advised his

9  client, but they never did that.  So, they want you to

10  point the finger at David.  Point the finger of blame at

11  the government.  They had every opportunity to shut this

12  down and stop it early on or to go to David and say,

13  "Look" -- I mean, that's what David was asking for the

14  whole time, an opinion, "Let me know."  I believe my

15  co-counsel is going to explain to you, from Ryan Haight

16  back until 2001, what really happened and why the law was

17  not clear.  They were too busy.  They were just too busy.

18         Now, what this case is not about.  This is not

19  the badest man in the world.  This is David Vogel.  The

20  government will overreach so much so that they want to

21  bring in a four-time convicted felon, an international

22  drug conspirator who brings in ephedrine from China by

23  the hundreds of kilos to put hundreds of pounds of

24  crystal methamphetamine on the streets of this state or

25  country.  They cut him a deal once, and they're going to

1 cut a second deal for him to come in and tell you that

2 David Vogel is the badest guy he's ever met.  It's

3 fiction, and they're overreaching.

4          There was no click-and-pop operation.  There

5 were over 4,000 patients in 6 years.  They brought you 3

6 addicts, and 5 or 6 dirty UAs.  That's it.

7          Protocol violated?  They did.  It happened.

8 The protocol was violated.  No doubt about it.

9          4,000 patients, 3 drug addicts, and 5 or 6

10 dirty UAs, that's what they brought you.

11          We learned on cross-examination that Kristine

12 Ward was already on methadone and hydrocodone from the

13 military doctors and that she was getting her drugs from

14 three other online pharmacies; but she told you Madison

15 was different, it was harder and they required her to

16 follow the protocol.  She also told you she would have

17 gotten her meds no matter what.  She was getting it from

18 doctors; she was getting it off the streets.

19          Danny Dickens came in; and they wanted you, on

20 direct examination, to believe he was heavily addicted

21 and he had to go to shock therapy because of the Madison

22 Pain Clinic.  But what did we learn on the constitutional

23 exercising of cross-examination?  That Danny Dickens was

24 already heavily addicted and he was getting all the

25 fentanyl and Valium and drugs he needed from Dr. Jones.

1790

1  That was the truth.

2         Through the constitutional right of David

3  Vogel to call witnesses on his own behalf, we learned

4  that Roy Heuss, Victoria Northrop, and Doug Cummins --

5  that Madison Pain Clinic serves a legitimate and

6  necessary purpose in helping patients with severe chronic

7  pain.  Those, I propose to you, are the real Madison Pain

8  Clinic patients.

9         It was through a protected and legitimate

10  opiate therapy program that these people got help.  We

11  learned about their dosing, that some of them were taking

12  six and seven pills a day.  That's 160 pills a month, and

13  that's what they needed to get by.

14         We learned about the chilling effect that the

15  DEA has on medical professionals that treat people with

16  pain.

17         Now, I'm going to try to wrap this up quickly;

18  but I want to talk to you about Counts 2, 3, and 4,

19  money laundering.  I hope you got where I was going with

20  Dana Bracy, about the Organized Crime Drug Enforcement

21  Task Force at 600 East Commerce, because I'm quite

22  familiar with it because they work gang enforcement and

23  drugs, like the Jamaican Shower Posse or the Mexican

24  prison gangs.

25         If you follow a money launderer, they don't

1  often launder their money through the Internal Revenue

2  Service.  And there was a paper trail from 2000 with the

3  Secretary of State for The Hamilton Agency.  So, it

4  wasn't real hard for Dana Bracy to go in and figure this

5  out.  In 2000 they were filing tax returns on The

6  Hamilton Agency for Internet drug sales and they were

7  listing their income and David Vogel was filing his tax

8  returns in 2001.  Through the entire period of this

9  conspiracy, through certified copies of the United States

10 Internal Revenue Service, we see that David Vogel again

11 has been filing his taxes.  He's paying taxes on a W-2

12 from The Hamilton Agency.  He's paying taxes on a K-1.

13 That's the dividends he got.  He funneled all his money

14 through the Internal Revenue Service.  That's not money

15 laundering.  That's being a taxpayer.  It's not money

16 laundering.  How hard was it for the IRS to figure out

17 that paper trail?

18         I don't care if you work as an educator,

19 you're in agriculture, you're an equipment operator, you

20 work in finance or construction, an administrator, in

21 food service, or a custodian or a homemaker -- it doesn't

22 matter what you do -- none of you left your common sense

23 at the footsteps of this courthouse.  And I think all of

24 you can see through the government's attempts in this

25 case to reach over and get David Vogel.  And they've got

1792

1  a lot of reasons to do it.  They want to distort the

2  truth.  They want to present to you a different version

3  of the facts, and they want to overreach.  They want to

4  overreach so much that they'll take a fine, distinguished

5  federal prosecutor like Doug Grover and try to accuse him

6  of committing a crime because he accepted hydrocodone

7  from a patient to test it in a lab; and they want to try

8  to say, "You're part of the conspiracy.  You violated

9  Title 21, Section 841."  That's overreaching on their

10 part, and they've done it every step of the way.

11            The truth be told, ladies and gentlemen, the

12 hardest part of this trial has yet to come; and the most

13 difficult job anyone has in this trial is the job the 12

14 of you will have when you go back in that jury room.  And

15 I anticipate that you'll deliberate and render the

16 rightful and just verdict.

17            MR. SCOTT SMITH:  Well, here we are.  And

18 thankfully, you've got it all figured out, right?  It's

19 so clear.  It's all right there for you, the law, very

20 clearly set forth.

21            I told you in opening, I told you in voir dire

22 that I was going to mention three times the burden of

23 proof; and this is the third.  The burden of proof that

24 the government has to bear is to prove their case beyond

25 a reasonable doubt, and I told you -- I think it was in

1  voir dire -- that innocence is not your job.  I'll tell

2  you, innocence has no place in a criminal trial because

3  that's not what this is about.

4          You're not expected to figure out whether he's

5  guilty or innocent.  Your job, your oath is to find

6  whether he is guilty, meaning the government has proved

7  their case beyond a reasonable doubt, or not guilty.

8          Now, not guilty may well be innocence.  Not

9  guilty may mean you think it happened but you don't know.

10  And in federal court, fortunately, you're given a

11  definition; and it really helps.  It's in the charge.

12          "Reasonable doubt is a doubt based upon reason

13  and common sense after careful and impartial

14  consideration of all the evidence in the case."  And more

15  importantly, "proof beyond a reasonable doubt, therefore,

16  is proof of such a convincing character that you would be

17  willing to rely and act upon it without hesitation in the

18  most important of your own affairs."  So, let's put that

19  in context.

20          How would you gauge that?

21          I think most of us would agree the most

22  important of our own affairs are the health and safety of

23  our loved ones.  Think about it.  If you're asking to

24  decide whether your wife or your son or your daughter or

25  your grandchild is going to have surgery and it depended

1 on whether you believed the government had proved this

2 case beyond a reasonable doubt, would you hesitate?

3 Would you hesitate?

4        And if you do, that is reasonable doubt.

5 Simply hesitating.  Not that you would ultimately go one

6 way or the other; but if you would stop and go (verbally

7 indicating) "I don't know about this," if you hesitate,

8 you've got reasonable doubt.

9        And I'll tell you, the defense didn't have to

10 do anything.  We've got 150 exhibits that we brought to

11 you.  We didn't go through them all.  Okay?  We did not

12 go through them all.  This case went a lot shorter than

13 we thought and there's a lot of stuff in those exhibits

14 that you haven't seen, but they're in evidence.  And what

15 we tried to do is make them chronological so that you

16 could see the passage of time.  As they move towards the

17 Ryan Haight Act, you can see the things they talk about.

18 These face-to-face visits became a dialogue that they

19 were engaging in.  "We've got to get ready for Ryan

20 Haight.  It's coming.  It's coming."  And you heard from

21 Joel Dunn, it came in 2009.  And when they talk about

22 face-to-face, that dialogue is moving towards Ryan Haight

23 compliance.  You can see it in the correspondence.

24        And if you want to look at some patient files,

25 that stack there on the end of the table are all in

1795

1  evidence.  If you want to look at them, there's Roy

2  Heuss' file; there's Virginia Northrop's file.  There's

3  about nine or ten others that you can look at and see

4  what's in there.  You're welcome to them.  All you have

5  to do is ask for the exhibits, and they're going to be in

6  the jury room.

7             And let me say this.  Obviously, I get worked

8  up.  And if there's something that we've done that you

9  don't like, put it on us.  Okay?  Because don't hold him

10 responsible for something you don't like that we did.

11 Okay?  It's not his fault.

12            In opening the government said, "All you need

13 is an Internet and a credit card and you get pills."

14 Now, come on.  You sat here for seven days, and you know

15 that's wrong.  Why would they tell you that?  And what

16 witness told you that?  Ray Robinson, the meth dealer.

17 Now, there is a drug dealer.  He's a real drug dealer.

18 That's what they should be doing.

19            And I'll tell you, when they talked about

20 Clayton Fuchs, that was a click-and-pop.  You heard me

21 say that word a bunch of times in this trial.  Because

22 when Agent Dunn testified, he said all the other ones

23 that we talked about -- the Pillbox, Clayton Fuchs --

24 those are click-and-pops.  You click the computer; you

25 get your pills.

1    This was a vastly different organization.

2    They had seven, eight steps, including consultation with

3    the physician.  It was not a click-and-pop.  And when you

4    saw that first exhibit they put up on the board where

5    David is talking with his attorney in 2000, mind you, and

6    they say, "Well, he was plotting a strategy," no, he was

7    getting ready to cooperate with the government to testify

8    against Clayton Fuchs.  That's what he was talking about.

9    He was going to cooperate with the government because he

10   was so disgusted with the way Clayton Fuchs did business.

11   "We will never be a click-and-pop."  You'll see it in all

12   those exhibits.  "We insist on compliance."  Compliance,

13   compliance, compliance.  You heard it a hundred times.

14        And why is that important?  Because it's not

15   whether the doctors made a mistake.  We got to get in

16   this man's head to find him guilty.  You've got to

17   believe he intended to violate the law.  So, that's why

18   compliance, compliance, compliance is -- we showed you

19   over and over again in the paper trail.

20        Now, it sounds like I hate the DEA.  I don't.

21   These are good people.  And God bless them on the border

22   doing their job trying to keep drugs from coming across

23   the border.  But, you know, when we asked you in voir

24   dire -- I said, "You know, we all have life experiences

25   that affect how we see a case."  And you got to talk

1797

1 about some things maybe you weren't comfortable with.
2 Well, I keep thinking of The Sixth Sense, that movie, and
3 what he keeps saying, "I see dead people.  I see dead
4 people."

5          Well, the DEA sees bad people; and it's just
6 part of their job.  They deal with bad people day-in
7 day-out, day-in day-out.  So, everybody they see is bad
8 to them.  That's the way they think.  They're not
9 objective.  Joel Dunn could never sit on this jury,
10 never.  And, so, they try to make everything sound bad.

11          My brother talked about overreaching.  Well,
12 "You mean somebody else picked up your prescription?"  We
13 all do that.  There is nothing wrong with that.  But they
14 make it sound like it's a violation of some federal law.
15 My brother mentioned Doug Grover.  He gets on the stand
16 and says, "We were testing the medicine to make sure the
17 pharmacy was getting it right."  How much more good faith
18 do you need?  And, so, they turn around and they try to
19 chase him down a track that "You're violating the law."

20          Again, I'm a fan of the DEA; but obviously you
21 think I may have some issues with them in this case.
22 Instead of skulking around picking up trash for two and a
23 half years, why didn't they just answer the question?
24 Why didn't they answer the question asked of them in 2003
25 by Doug Grover?

1798

1    And what question is it?  Well, it's the

2  64,000-dollar question that nobody has yet answered:   May

3  a physician prescribe opiates without personally

4  conducting a physical examination?

5    Instead of spending two and a half years of

6  man hours trying to build a case, just answer the

7  question.

8    Nothing David Vogel did was under a blanket.

9  He filed his returns.  He told everybody, "This is our

10  protocol."  And he had his lawyer raise his hand up

11  high -- now, admittedly, it was anonymous -- but he said,

12  "This is what we're doing.  This is what we're doing."

13  And they sent it to the DEA.  And why did Doug Grover do

14  that?  Because David Vogel asked him to do it.  Intent.

15  If you're going to violate the law, do you direct your

16  attorney to send something to the DEA?

17    And Doug Grover said something else.  David

18  Vogel came to him and said, "let's go to the courts.

19  Let's ask a judge to tell us if this is right or wrong."

20  So, Grover sends one of his associates out and they

21  research it and they say, "Can't do it.  No procedure."

22    If you are intending to violate the law, you

23  don't think about going to court and asking a judge.  You

24  don't do that.  Getting in his head, and it's just not

25  there.  The intent is not there.

1       And it must be willful.  Willfulness is an

2  element in all counts.

3       And let me just say this about the counts.  If

4  you find that he's not guilty on Count 1, which is the

5  drug distribution, the money laundering, same thing.

6  You've got to find the money laundering is proceeds of an

7  illegal activity.  So, if the first one is not guilty,

8  the rest are easy.  I think we agree on that.  They're

9  going to go one way or the other, and they're going to be

10 the same.  So, let me just say that.

11      But "willfully" is defined for you.  This is

12 what you must find:  That the act was committed

13 voluntarily and purposely with the specific intent to do

14 something the law forbids, with bad purpose, to disobey

15 the law.

16      Doug Grover told you -- and there's a man with

17 some good experience.  I mean, he's a mob fighter.  He's

18 been in the trenches, and David Vogel came to him.  Why

19 did he come to him?  He said, "I want to know if I'm in

20 compliance with the law."

21      And he said, "You know, I looked at this and

22 we had highly paid associates and assistants look at this

23 and I told David, 'I don't see how you can be

24 prosecuted.'"  That's what his lawyer told him, "I don't

25 see how you can be prosecuted based on this status of the

1  law."  This wonderfully clear status of the law that you

2  have before you now, "I don't see how anyone could

3  prosecute you"; yet, here we are today.

4         The protocol.  You probably have it memorized

5  by now, but Carrie Demers told you that every doctor was

6  able to tweak it.  Every doctor was able to come in and

7  put their spin on it.  And one of the exhibits that's

8  admitted into evidence but you haven't seen yet is

9  Exhibit No. 11, Defendant's Exhibit No. 11; and this is a

10  letter from Dr. Fabi to a prescription -- a pharmacy.

11  And he's very specific.  He's coming down on this

12  pharmacy and he says, (reading) in order for a patient to

13  be approved for a refill, according to our patient

14  agreement, they must submit monthly evaluation reports

15  and agree to random drug testing.  All refills are not

16  automatic under the agreed protocol unless the patient

17  meets my requirements.

18         Once again, the doctors are in control of the

19  medical situation.  Every doctor has a 30-, 40-page

20  agreement that is in evidence, if you want to see them.

21  All of them are defense exhibits.  And in those exhibits,

22  it's very clear the doctors are in control of the medical

23  decisions.  It also is very clear the doctors are to

24  advise Madison about compliance.  Compliance, compliance,

25  compliance, compliance.  How many times have we heard

1  that?  The doctors are to advise Madison about

2  compliance.

3          They want to say, "Oh, this is a smoke

4  screen."  But dang, there's so much consultation with the

5  doctors; and the doctors have participated in the

6  protocol and signed off on the protocol so many times.

7  Dr. Edwards, Dr. Fabi.

8          Now, this is -- I'll give you -- it's a bullet

9  point.  Obviously this isn't everything that happened,

10 but these doctors are signing off on it.  And they say a

11 patient/physician relationship is established by these

12 things.

13         Exhibit 57.  This is early when Dr. Hoblit is

14 being engaged by Madison.  David is not telling him what

15 the protocol is.  He says, Dr. Hoblit, send me your

16 protocols."  He's asking for the doctor's input.  If his

17 intent is to violate the law, he would be telling the

18 doctor, not asking the doctor.

19         Exhibit 72.  This is Dr. Hoblit writing to, of

20 all people, Eric Fox and he sends him the protocol and he

21 says, "Oh, by the way, we believe we properly comply with

22 DEA guidelines for both state and federal regulations.

23 The doctors are intimately involved with this."  Carrie

24 Demers herself told you the protocol is what

25 distinguished Madison from everybody else.

1    And remember about Eric Fox?  We heard about

2 his little Internet pharmacy he was running.  It was a

3 click-and-pop.  It was a click-and-pop.

4    Now, the government brought to you some

5 patient files; and there were some mistakes in them.  And

6 how did they present them to you?  They presented them to

7 you through Carrie Demers.  And I want to make note of

8 this.  She said, "Until they showed me those files, I

9 thought they were all in order.  They had to bring them

10 to me and show me the mistakes.  After their two and a

11 half years of investigation, they brought them to me and

12 showed me the mistakes."  She said, "I was there.  I

13 didn't know there were mistakes."

14    And, so, the next question I asked her was,

15 "Well, was David there?"

16    "No, he wasn't there."

17    "Well, he couldn't have known, could he?"

18    "No, he couldn't have known about those

19 mistaken files."

20    So, the person that was on-site, the person

21 charged with responsibility did not know those mistakes

22 were there until the government brought her the files.

23    Touch on a couple of things.  The DEA raids

24 the home in New Hampshire.  Tina Vogel has got her script

25 written by Dr. Hoblit.  And Agent Fairbanks says, "Oh,

1803

1  yeah, go ahead.  That's legitimate.  Take the pills."
2  So, they're not even consistent internally with how
3  they're treating this.

4          And then there's Bonnie Brown, the curious
5  case of Bonnie Brown.  Two months of marriage, 14 years
6  of divorce, and she's not bitter.  She can't even
7  identify him.  She points out Agent Carr here as her
8  husband.  We all had a little chuckle over that.  She is
9  obviously upset.  She wasn't making the money.  She was
10 disgruntled, she was bitter, and that's the reason she
11 wrote the letter.  It's about the money.  Don't kid
12 yourself.  It's about the money.

13          Tyra Barnett.  Tyra came to us; and she has a
14 coke issue or two, that's for sure.  But what she told
15 you was most important.  I asked her, "You had carte
16 blanche to call those attorneys, didn't you?"

17          "Oh, yes, I did."

18          "And you called them, didn't you?"

19          "Oh, yes, I did.  In fact, Susan Henricks came
20 to the facility twice."

21          And I had it wrong.  You may recall I made
22 some objection.  I thought Carrie Demers said that she
23 called Susan and Susan -- it wasn't.  It was Tyra.  And
24 to get it right, I got the transcript, just to refresh
25 you, because I wanted to make sure I didn't confuse you,

1804

1  and I did.

2          This is Tyra Barnett:  "You had carte blanche

3  to call those lawyers whenever you wanted, right?

4          "And you told us earlier that when you talked

5  to Susan Henricks, she said what you're doing at Madison

6  is legal, right?

7          "At the time, yes.

8          "And you relied on it?

9          "Yes.

10          "And you did that in good faith, didn't you?

11          "Yes."

12          Intent.  Willfulness.

13          Susan Henricks said, "You guys are compliant."

14  Compliance, compliance, compliance.  Now, she wouldn't

15  put it in writing.  You may have learned a little bit

16  about how lawyers act in this case.  You may think now

17  lawyers, all they do is cover their own behinds.  There's

18  some truth in that.  Mike Cooper sure did.  He had the

19  best disclaimer language I think you've seen in this

20  whole trial.  But he wouldn't answer the question that

21  was asked of him.  Because the question that David Vogel

22  asked him is shown in Government's Exhibit 180 and, of

23  course, the first thing I highlighted in pink is the

24  reason he came to Mike Cooper, "I want a written opinion

25  on how to do business correctly."

1805

1    So, Mike Cooper spends gobs of money, gobs of

2  time, and comes up with an answer; but he didn't answer

3  the questions.

4    (Reading) if a patient can't get it physically

5  done on premises, can we contact a firm that does

6  insurance physicals and have a doctor or a nurse give the

7  patient a physical out of state?

8    Mike Cooper never answered that question.

9    So, he writes his April 20th letter and then

10 there's, the same day, a second letter where he tells

11 Mr. Vogel, "I can't answer your other questions."

12    And, so, the government wants to turn the fact

13 that he gave a green light to face-to-face into a red

14 light for non-face-to-face.  That's not at all what he

15 did.  He simply said, "I think you can do this."  He

16 didn't say, "You can't do that."

17    No lawyer who's come to this courtroom has

18 told you what they were doing was illegal.  They simply

19 said, "We don't know.  We don't know."  That was what the

20 lawyers said.  That's not intent to violate the law.  You

21 can't turn an "I don't know" into a "you can't."

22    Now, Tyra told you that she did call Susan and

23 Susan told her it was legal, that she relied on that; and

24 then we have the lawsuit where she says, "It's all me.

25 I'm Madison."  And she put that in a lawsuit paper and

1  then they settled the lawsuit and a year later she calls

2  back and says, "Oh, David, guess what. I need work. You

3  were right. All along you were right and I was wrong and

4  would you please take me back?" And he was smart enough

5  to say no, I guess, because she did not get hired back.

6         Carrie Demers testified for you. I think

7  Carrie means compliance. When I hear Carrie, I think

8  compliance because I asked her probably 20, 25 times

9  about different emails where David is banging her,

10  banging her, banging her about "You've got to comply.

11  You've got to comply. You've got to comply."

12         And she said, "Yes, yes, he was very

13  interested in that."

14         And we have one email late in the game that

15  sort of doesn't have any context. And Carrie says, "I

16  understand not to lie or lie by omission about Madison or

17  any of its protocol"; and we didn't quite give you the

18  flavor of what prompted that email. It was Defendant's

19  Exhibit 74 where David is writing to her and he says,

20  "You cannot mislead a pharmacy. Telemedicine is

21  acceptable according to the DEA's own memo. If you hide

22  what we are doing from this pharmacy, you are sending a

23  message that what we are doing is something wrong. You

24  cannot do that. I want to be clear on this: Lying or

25  lying by omission is something that makes you look

1807

1  sinister.  Don't do it."

2          Now, do you think David Vogel is writing all

3  these emails over the course of six, five years thinking

4  that you're going to be reading them in 2010?  No, he

5  didn't.  He wrote this because he insists on compliance.

6          Another letter that is in evidence that we

7  didn't put before you is Defendant's Exhibit 25.  This is

8  interesting because it's David telling Beverley

9  Edwards -- excuse me.  It's the reverse.  It's Beverley

10 Edwards telling David, "Oh, thank you for insisting that

11 letters be sent to two patients abusing the program."

12 Somehow David picked up that two patients were violating

13 the protocol.  He alerted the doctor.  If he was just

14 about pushing pills, he would never have done that.  And

15 that is back in 2005.

16          Now, you know Carrie pled guilty.  She's going

17 to do 30 days.  Jonathan Vogel pled guilty to a

18 misdemeanor.

19          Now, you didn't -- like my brother said, you

20 didn't leave your common sense at the door.  They did

21 that to avoid the risk of being here on this table and

22 getting years in prison.  They took a sweet deal that was

23 offered to them, and that's the reason they pled guilty.

24          When Carrie was on the stand, I asked her,

25 "You were debriefed in June of 2009, last year, by all

1 the folks at this table; and what did you tell them?"

2 Now, this is seven months after the DEA had raided the

3 facility.

4        She said to her knowledge Madison operated

5 within the bounds of the law.  Now, she's sitting there

6 with these folks here; and she tells them, "I thought

7 Madison was legal."  And she said, "Also, if I didn't

8 understand some of the laws, I would call Dr. Venegas."

9        Three people came to you from inside the

10 clinic -- Tyra, Carrie, and Dr. Hoblit.  Now, Dr. Hoblit

11 was a strange witness indeed because they called him and

12 then they wanted to call him hostile, their own witness,

13 somebody that they've got a plea agreement with that's

14 cooperating with government, met with them so many times

15 he can't even remember.  And he gets up on that stand and

16 he tells you the truth and all of a sudden he's hostile

17 because -- what did he say?  He said -- No. 1, he didn't

18 lose his license because of Madison.  They talked about

19 writing prescripts.  That was the clinic after Madison.

20 He thought what he was doing was right.  "I thought what

21 we were doing was legal."  He said, "I talked to

22 Dr. Bridges, and Dr. Bridges told me the same thing.  I

23 thought it was legal."  That's people inside the clinic,

24 a doctor, a respected doctor.  Mike Millsap said he was a

25 good doctor.  He called him as an expert witness.  You

1809

1  heard those patients yesterday all say, "Gosh, he was

2  kind and caring and one of the best doctors I ever talked

3  with.  He spent more time with me on the phone than a

4  doctor in the office did."

5          And what else did he tell you?  "I never

6  conspired with David Vogel.  I never had any agreement

7  with David Vogel.  I never even met David Vogel."

8          Now the experts.  I suppose Dr. Nelson is

9  sitting in Salt Lake City looking out a top-floor window

10  pondering the world, looking at his diplomas.  He's

11  probably got his certificate for serving as president of

12  the AMA on the wall with a spotlight on it.  Because he

13  doesn't live in our world, folks.  If you don't know how

14  much you're getting paid, you don't live in our world.

15  We worry about such things.  He lives in a world of silk

16  stockings.

17          And Dr. Harmer, he told you, "I have 6,000

18  files."

19          I said, "Are there errors in there?  Are there

20  mistakes in there?"

21          He said, "Yeah, there sure are."

22          And he even said, "You know, it looks like

23  they were trying.  They don't do it the way I would do

24  it, but it looks like they were trying."  Intent.  Goes

25  to intent.

1    They all told you and Dr. Hoblit told you that

2 opiate therapy has a place in medicine.  And I talked to

3 him about some -- the American Pain Society stuff where

4 doctors shouldn't be responsible when patients lie to

5 them and that there is an epidemic of misdiagnosis of

6 pain.  They agreed with that.  All the doctors told you

7 that they made medical decisions.

8    Bottom line here.  Nothing was hidden.  The

9 government wants to call Mr. Vogel a drug dealer, and

10 they want to call him a money launderer.  I call them

11 patients; they call them customers.  Big dichotomy there.

12    But it's a curious drug dealer indeed who puts

13 it all out in the open, files his returns, raises his

14 hand, sends in his protocol.  No, no.  And most

15 peculiarly, sends a letter to the DEA and says, "This is

16 what I'm doing.  Let me know if you've got problems."

17    And the DEA says, "We can't figure it out.

18 It's going to be at least six months before we even know

19 where we are.  We're too busy.  We're too busy doing

20 other things.  We can't answer your question."

21    So, in the end, this case is about what the

22 government can prove, without hesitation, that David

23 believed.  You have his words -- compliance, compliance,

24 compliance.  You have all those documents.  Repetitively

25 he talked about compliance.

1        And, so, the real puzzling question for you

2  has to be:  How do they pick and choose who they

3  prosecute?  Why David but not Tina Vogel?  She signed all

4  those checks.  Why Carrie but not Tyra?  Tyra wasn't even

5  told she was a target, and she was with MPC for four

6  years.  Dr. Hoblit, but not Dr. Venegas, not Dr. Edwards?

7  Jonathan, but not Larry Schwartz?  And most interesting

8  of all Eric Fox.

9        Agent Dunn made it sound like they were too

10 busy to knock on the door to tell Madison, "Hey, we have

11 got some issues."  Not once did they visit Madison.

12 Again, they're out in the trash, picking up stuff like

13 that and doing investigations, gathering records.  But

14 they did visit Eric Fox in Pennsylvania; and they said,

15 "Eric, stop it.  Sign this agreement.  Don't do it

16 anymore."  They didn't do that over here.  No, no, no.

17 But they did do it with Eric Fox.  And Eric turns around,

18 goes right back to his click-and-pop, goes right back to

19 writing scripts, violating the memorandum of

20 understanding.  And, yet, he's out on the street; and

21 David Vogel is sitting here before you.

22        Why didn't they enter a memorandum of

23 understanding with David Vogel?

24        It's about the money.  It is about the money.

25        Days after he closes the deal on the Trump

1812

1  condo to sell it, "Woo, here's a seizure.  We got

2  $3.7 million."  Don't you think it's about the money?

3  The government thinks about the money.  The agents think

4  about the money.  Everybody thinks about the money.

5         And I know what they're going to say.  I have

6  to sit down in a minute, and I'm not going to be able to

7  say anything more to you.  They going to come up here and

8  say, "David Vogel thinks about the money, too."  You know

9  he does.  You know he does.  And there's nothing wrong

10 with that.  Nothing wrong with capitalism.  But that's

11 what makes David Vogel a defendant and Eric Fox not a

12 defendant.  It is the money.

13        I told you in opening that the one thing that

14 would be clear to you at the end of this case is that

15 nothing is clear.  Hopefully you agree with me there.

16 It's all confused.  It's all ambiguous.  It's all subject

17 to interpretation.  And another way to put that is it's

18 all reasonable doubt.  It's all reasonable doubt.

19        Ladies and gentlemen, again, thank you very

20 much for your attention.  We look forward to your

21 deliberations and verdict.

22        MS. SMITH:  There is nothing wrong with

23 capitalism as long as you're not capitalizing by using

24 illegal activity and at the expense of others.  I'll

25 agree with that.  Nothing wrong with it.  And I will

1813

1  agree it is all about the money.  It's all about the

2  money that David Vogel made and why he completely

3  disregarded his own protocol.  That's what it's about.

4            You don't have to decide today whether you

5  think Eric Fox should be prosecuted or you think someone

6  else should or you think somebody got a fair deal.  Your

7  job is to look at the evidence against David Vogel and

8  decide is he the one who violated the protocol, is he the

9  one who violated the law, is he the one who created

10 Madison Pain Clinic to distribute hydrocodone over the

11 Internet against the law, not in the usual medical

12 practice, not in -- not for a legitimate medical purpose.

13 That's what you have to decide.

14            And ladies and gentlemen, if the law is so

15 unclear, then why time after time after time are people

16 saying, "Oh, I'm not working with Madison Pain Clinic.

17 They're not seeing people face-to-face."  Time after

18 time.  Mark Sullivan, Warren Craig, pharmacists, "Oh, my

19 goodness.  I went to Madison Pain Clinic.  We are not

20 supplying them anymore."  Why did they do that?  Because

21 they weren't following the law.

22            What about PayPal?  "We can't -- granted,

23 we're making $11 million off you.  We cannot fill your

24 orders anymore.  We cannot take your payments anymore

25 because you are not -- you cannot prove to us that

1814

1  patients are being seen in the clinic."  Time after time

2  after time.

3          Attorneys.  "You can't use my opinion

4  anymore," says Michael Cooper.  "You know why?  Because

5  you told me you weren't having people seen in the

6  facility when in my original opinion letter you told me

7  they were."  It's not unclear.  It's perfectly clear.

8          And what's also clear is that David Vogel

9  wanted to manipulate the system to get around that so

10 that he could make the money, and that's why it's all

11 about the money.

12         Ladies and gentlemen, to come in here and say,

13 "I, in good faith, was following the law," the faith has

14 to be good.  It has to be honest.  You can't come in here

15 and say, "Oh, I didn't know.  I didn't know" and then

16 time after time after time completely ignore everyone who

17 is telling you have to have a face-to-face examination.

18         Now, defense counsel wants to come in here and

19 say, "Nobody said you had to do that."  What?  Everybody

20 said you had to do that.  Even the attorneys who wouldn't

21 give a written legal opinion said, "You know what?

22 You'll definitely be in compliance if you have a

23 face-to-face."  We all heard that over and over and over

24 again.

25         And why was that hammered?  Because that's how

1  David Vogel violated the law.

2          Granted, they did more than the click-and-pop.

3  They did.  We heard that.  We're not contesting that.

4  But they didn't do enough.  They still violated the law.

5  They did not follow the standard of care.

6          Now, if David Vogel wanted to be legal, he

7  would have.  He had plenty of opportunities.  Everyone

8  told him how to do it.  "You need a doctor/patient

9  relationship.  Patients need to be seen at the facility.

10  Your doctors have to be licensed in all 50 states.  Your

11  pharmacists have to be licensed wherever the patients

12  reside, wherever they're distributing hydrocodone."

13          But we're going to ignore that.  You know why?

14  You know why he wanted to ignore that?  He wanted to

15  ignore that because that would slow down the sales.  You

16  have the exhibits.  Marketing, marketing, get more

17  customers, get more customers.  What?  These are people

18  who are getting hydrocodone after hydrocodone, dangerous

19  narcotics.  Get more customers, get more customers so I

20  can make my $26 million, $8 million in my account.

21          You saw that chart.  I believe it's

22  Government's Exhibit 149, the hydrocodone charts where

23  his main pharmacies, the bulk hydrocodone they were

24  getting compared to the rest of the country.  That is

25  shocking.  Those kind of narcotics going all over the

country, he didn't want that to slow down. That would

cut down the millions. He did not want to follow the

law. He could have.

And, so, what did he do so that he wouldn't

have to? He kept manipulating the system. He hired

employees that would listen to what he had to say. He

got unqualified, non-medically trained employees to be

his CEO to run his company that would listen to whatever

he said. He would tell them, "Oh, we're following the

protocol. Comply with the protocol." And they would

listen. Why? Because they were making a lot of money

and they didn't know. They were not medically trained.

Why do you think he got not-medically-trained

people? So they wouldn't know what you were supposed to

do. That's why.

He recruited and hired starving doctors,

starving, down-on-their-luck doctors, doctors who drank

Scotch at 9:30 in the morning, doctors who write

prescriptions from their hospital bed, doctors who will

prescribe every opiate imaginable. That's who he wanted

for his doctors. So, he hired those people to manipulate

the system so he could come in here and blame it on the

doctor, "Well, the doctor said it was okay." Come on.

He was paying the doctor, which, by the way, also is

another piece of advice he was given. You can't collect

1  the money.  The doctor has to run the clinic.  The

2  pharmacies have to take the money for the prescriptions.

3  He ignored that.  Why?  Because he wanted to control the

4  profits.  He wanted the money.  He wanted the bean count

5  checks.  He wanted the dividends.  That's why he sort of

6  went around that, essentially just ignored it.  He was

7  involved in the corporate practice of medicine, which is

8  against the law.  You heard Susan Henricks say it; you

9  heard Michael Cooper say it.

10         Now, defense counsel says nothing was hidden.

11  You have -- you can take back two exhibits that are a

12  perfect example of how David Vogel manipulated the law

13  and what was told to him to conform to what he wanted it

14  to be, what he wanted the protocol to be.

15         I'm going to ask you to look at Exhibits 205

16  and 206.  Remember when we talked to Attorney Grover,

17  when David Vogel forwarded to Tyra Barnett, the employee

18  that he hired with no medical training, the notice from

19  Grover that he needed the extra pages of the Cooper

20  opinion, he omitted the language where Grover told him,

21  "I do note that Cooper says all patients shall be seen

22  for their initial consultation by a physician at the

23  facility."  David Vogel took that out.  He took out the

24  doctor/patient relationship.

25         Why?  Because he would have to pay those

1  doctors to see all those patients.  That takes time; that

2  takes money.  That's what he didn't want to lose.  He's

3  the one who deleted that.  Something was hidden, hidden

4  by David Vogel.  He didn't want his employees to know

5  that.

6          Now, the other thing that was told to you was

7  that the protocol wasn't violated.  I would like you to

8  look at Government's Exhibit 156 in the jury room.

9  That's David Vogel's medical file.  David Vogel violated

10 his own protocol.  How do we know?  Look at his medical

11 file.  There's nothing in there other than lists of how

12 many hydrocodone pills he got and lists of prescriptions

13 written.  There is one lab test from 2006, but you'll

14 notice that the hydrocodone that he was getting, just in

15 that file, which wasn't even the whole time Madison was

16 open, 2003 to 2007, over 15,000 hydrocodone pills.  No

17 physical examination, no medical records.  He violated

18 his own protocol.

19          And how else did you see he violated his

20 protocol?  He wanted automatic refills.  There's no

21 questionnaire in his file.  There's no refill forms.

22 Every time he violated his own protocol and had his

23 employees violate his protocol for him, that's a

24 conspiracy.  You can find him guilty just for that.  It's

25 right in there.  Nobody disputed that.  That, as David

1819

1    Vogel called it and as Doug Grover called it, is

2    Exhibit A.  He came up with it.  We're just using it.  He

3    violated his own protocol.

4            Ladies and gentlemen, you've heard all the

5    evidence.  We gladly accept the verdict.  We want you to

6    use your common sense.  We want you to think about this

7    seriously and examine all the evidence because it has

8    been proven to you by more than beyond a reasonable

9    doubt.  David Vogel set up Madison Pain Clinic, David

10   Vogel called the shots, David Vogel paid the doctors,

11   David Vogel controlled his employees, David Vogel

12   distributed this hydrocodone, David Vogel violated his

13   own protocol, and he needs to be held accountable for it

14   and we're going to ask you to find him guilty for it.

15           Now, they told you we -- we did bring in Ray

16   Robinson, David Vogel's roommate in the jail, who said --

17           MR. SCOTT SMITH:  Your Honor, object to that

18   and ask the jury be instructed to disregard.

19           THE COURT:  Sustained as to the latter part of

20   that comment.

21           MR. SCOTT SMITH:  Move for a mistrial at this

22   time.

23           THE COURT:  Overruled.

24           MS. SMITH:  Ray Robinson in jail.

25           MR. SCOTT SMITH:  What?  You just said it

1820

1  again?

2          MS. SMITH:  I said Ray Robinson was in jail.

3  I must have misspoke.  I didn't even realize I did it,

4  your Honor.  I thought I said Ray Robinson.

5          Anyway, Ray Robinson said he knew David

6  Vogel -- that what David Vogel said to him was all you

7  needed to get hydrocodone from Madison Pain Clinic was a

8  valid credit card and a computer mouse, and that's how

9  David Vogel wanted it.  He wanted it that way so he could

10  make his $26 million, so he could have his Trump Tower

11  condo, and so he could get hydrocodone whenever he wanted

12  it without being seen by a doctor.  And we're going to

13  ask you to find him guilty of conspiracy to distribute

14  hydrocodone not for a legitimate medical purpose; and

15  we're going to also ask you to find him guilty of the

16  money laundering because the money derived from that

17  illegal activity is money laundering, even if you pay

18  your taxes on it.

19          So, the coin he bought with the money he

20  derived from Madison Pain Clinic, the condo he bought

21  from money he derived from the proceeds he made from

22  Madison Pain Clinic, and all of the money that went

23  through that clinic is all money laundering.

24          We're going to ask you to find him guilty of

25  all four counts.

1   THE COURT:  All right.  At this point you

2   should retire for your deliberations.  I have the

3   original of the charge and the verdict form.  You know

4   where the jury room is.  The alternates need to be

5   excused down to the jury assembly room, but you need to

6   stick around because you never know.  I hope the jury

7   stays resilient, but you never know.

8        You can take breaks whenever you want.  Just

9   let us know when you're doing that.  If you're leaving

10  the building, please tell the CSO.  If you haven't

11  reached a verdict before 5:00 o'clock, you need to

12  continue to deliberate at least until 5:00 o'clock.  In

13  other words, don't leave early.  I think that's it.

14        (Recess, 12:07 p.m. to 4:00 p.m.)

15        (Open court, defendant and jury not present)

16        THE COURT:  Okay.  We have a note.

17        (Reading) Regarding the verdict of the jury

18  form, how is it filled out?  Does the foreperson check,

19  like with a check mark, "guilty" or "not guilty"; or does

20  the foreperson initial the spaces?

21        MR. BUYS:  I think you said, when you

22  described the verdict form, that they can use a check

23  mark or an "X" in the space.

24        THE COURT:  Well, I'm going to say:  You may

25  put a check mark or an "X" in the appropriate space,

1822

1  "guilty" or "not guilty"; and then you --

2           MR. BUYS:  The government is fine with that.

3           MR. SCOTT SMITH:  That's --

4           THE COURT:  You may place a check mark or an

5  "X" in the appropriate space for "guilty" or "not

6  guilty."  Then you should place your initials on the

7  signature line -- or the foreperson signature line.

8           It says "date," and then it says "foreperson."

9  There's a signature line.

10          MR. BUYS:  Right.

11          THE COURT:  That's where they're supposed to

12 put the initials, on that line.

13          MR. BUYS:  But it's the foreperson's initials,

14 right?

15          THE COURT:  Right.  You may place -- the

16 foreperson should then place -- I'll put "his/her

17 initials," but we know -- initials on the signature line

18 which states "foreperson" underneath it -- the signature

19 line indicated for the foreperson.

20          MR. BUYS:  Yeah, that sounds good.

21          THE COURT:  This is not good.  Okay.  So, I

22 said:  You may place a check mark or an "X" in the

23 appropriate place for guilty or not guilty.  The

24 foreperson should then place his/her initials on the

25 signature line indicated for the foreperson.

1      Is that acceptable --

2              MR. SCOTT SMITH:  Seems pretty clear.

3              THE COURT:  -- for everybody?  All right.

4              MR. BUYS:  Do we need to remind them to date

5  it?

6              THE COURT:  Well, there is a space for that.

7  That wasn't part of the question.

8              MR. SCOTT SMITH:  Let's challenge them and see

9  if they date it.

10             THE COURT:  We'll just -- since they didn't

11 ask about the date, I'm not going to answer that.

12             Okay.  I'm going to send that back, then.

13             (Recess, 4:02 p.m. to 4:18 p.m.)

14             (Open court, defendant present, jury not

15 present)

16             THE COURT:  The jury has reached a verdict.

17 So, we'll go ahead and have the jury brought in.

18             Did you want to say anything before they come

19 in?

20             MR. BUYS:  Nothing from the government, your

21 Honor.

22             MR. SCOTT SMITH:  No, your Honor.

23             THE COURT:  Okay.  Let's go ahead and get

24 them.

25             (Jury enters courtroom, 4:20 p.m.)

1824

1     THE COURT:  I'm advised that the jury is ready

2  to return its verdict.  And who speaks as the foreperson

3  of the jury?

4     JURY FOREPERSON:  I do.

5     THE COURT:  All right.  Ms. Broomes, has the

6  jury unanimously agreed on its verdict?

7     JURY FOREPERSON:  Yes, your Honor, we have.

8     THE COURT:  All right.  Could you please hand

9  the verdict form to the court security officer.

10     All right.  The verdict will now be published.

11     COURTROOM DEPUTY:  As to Count 1 of the first

12  superseding indictment, we, the jury, find David A. Vogel

13  guilty.

14     As to Count 2 of the first superseding

15  indictment, we, the jury, find David A. Vogel guilty.

16     As to Count 3 of the first superseding

17  indictment, we, the jury, find David A. Vogel guilty.

18     As to Count 4 of the first superseding

19  indictment, we, the jury, find David A. Vogel guilty.

20     Signed June 30, 2010, by the jury foreperson.

21     THE COURT:  Is there a request to poll the

22  jury?

23     MR. SCOTT SMITH:  Yes, your Honor.

24     COURTROOM DEPUTY:  Juror No. 1, is the verdict

25  as published your verdict in all respects?

1825

1    JUROR NO. 1:  Yes.

2    COURTROOM DEPUTY:  Juror No. 2, is the verdict

3 as published your verdict in all respects?

4    JUROR NO. 2:  Yes.

5    COURTROOM DEPUTY:  Juror No. 3, is the verdict

6 as published your verdict in all respects?

7    JUROR NO. 3:  Yes.

8    COURTROOM DEPUTY:  Juror No. 4, is the verdict

9 as published your verdict in all respects?

10    JUROR NO. 4:  Yes.

11    COURTROOM DEPUTY:  Juror No. 5, is the verdict

12 as published your verdict in all respects?

13    JUROR NO. 5:  Yes.

14    COURTROOM DEPUTY:  Juror No. 6, is the verdict

15 as published your verdict in all respects?

16    JUROR NO. 6:  Yes.

17    COURTROOM DEPUTY:  Juror No. 7, is the verdict

18 as published your verdict in all respects?

19    JUROR NO. 7:  Yes.

20    COURTROOM DEPUTY:  Juror No. 8, is the verdict

21 as published your verdict in all respects?

22    JUROR NO. 8:  Yes.

23    COURTROOM DEPUTY:  Juror No. 9, is the verdict

24 as published your verdict in all respects?

25    JUROR NO. 9:  Yes.

1826

1  COURTROOM DEPUTY:  Juror No. 10, is the

2  verdict as published your verdict in all respects?

3  JUROR NO. 10:  Yes.

4  COURTROOM DEPUTY:  Juror No. 11, is the

5  verdict as published your verdict in all respects?

6  JUROR NO. 11:  Yes.

7  COURTROOM DEPUTY:  Juror No. 12, is the

8  verdict as published your verdict in all respects?

9  JUROR NO. 12:  Yes.

10  THE COURT:  All right.  The verdict is

11  confirmed and accepted.  The court administrator will

12  file and record the verdict.

13  There is another set of questions, however,

14  that the jury must answer.  So, if you would retire to

15  the jury room, we'll get that ready for you; and there

16  will be another charge for you to consider.

17  (Jury exits courtroom, 4:23 p.m.)

18  THE COURT:  All right.  We'll make copies of

19  the supplemental instructions.  You've already been given

20  a copy.  But at this point, are there any objections to

21  the court's supplemental instructions?

22  MR. BUYS:  Your Honor, I believe that the

23  parties have gone over that yesterday; and the government

24  has no objection to the supplemental instructions.

25  MR. SCOTT SMITH:  We don't have any either,

1827

1  your Honor.

2              THE COURT:  All right.  We'll make copies for

3  the jury, and everybody can read along with me when I

4  read it.

5              Now, I take it you're not going to introduce

6  any additional evidence.  Is that true?

7              MR. COLLINS:  Your Honor, we have one

8  demonstrative, to the extent that that would help the

9  jury.  It's been marked as Government's Exhibit 210; and

10  it simply summarizes the bank accounts, the source of the

11  proceeds, and the amounts seized.

12              THE COURT:  Has that already been --

13              MR. COLLINS:  No, ma'am.  We created it last

14  night.

15              THE COURT:  Okay.  For the forfeiture?

16              MR. COLLINS:  And I can provide a copy to

17  defense counsel.  He's not seen it yet.

18              THE COURT:  All right.  If you'd do that.

19              Is defense -- are you going to have any other

20  evidence?

21              MR. SCOTT SMITH:  No, ma'am.

22              THE COURT:  All right.  But there will be

23  argument.  How much time do you want for argument?

24              MR. COLLINS:  Five minutes.

25              MR. SCOTT SMITH:  That will be more than

1828

1  ample.

2          THE COURT:  Five minutes.  All right.  So, you

3  will have five minutes.

4          Okay.  Let me see your little chart.

5          All right.  Have you had a chance to look at

6  this?

7          MR. SCOTT SMITH:  Co-counsel is going to

8  handle this part, your Honor.  I'll let him speak.

9          THE COURT:  All right.

10          MR. BRETT SMITH:  Your Honor, my only thought

11  is it's redundant of what's already in the charge.  I

12  think the information that's in the charge is reflective

13  enough for the jury to reach a proper decision.

14          THE COURT:  But the charge isn't evidence.

15  This is a demonstrative aid.  I don't -- I think it's

16  good to have it in one spot, on one piece of paper

17  instead of many pieces of paper.  I'm going to allow it.

18  I don't see that there's anything -- if there's anything

19  inaccurate about it, please let me know.  I don't want it

20  in if there's a problem, an inaccuracy.  But if it's

21  accurate as to what's been admitted into evidence, I'm

22  going to allow it.

23          MR. BRETT SMITH:  I don't know if the numbers

24  are accurate, but I don't have any dispute that they are

25  or are not.  That's not what I'm...

1829

1    THE COURT:  All right.  Well, I think it's an
2    apt summary chart that would assist the jury in reaching
3    its decision.  I think it should be used.
4        MR. COLLINS:  Thank you, your Honor.
5        THE COURT:  All right.  We'll go make copies;
6    and as soon as they're made, then we'll get the jury
7    back.
8        (Recess, 4:27 p.m. to 4:50 p.m.)
9        (Open court, defendant and jury present)
10       THE COURT:  All right.  These are the court's
11   supplemental instructions to the jury.
12       Members of the jury, in view of your verdict
13   that the defendant is guilty of the drug and money
14   laundering offenses charged in Counts 1, 2, 3, and 4 of
15   the first superseding indictment, you have one more task
16   to perform before you are discharged.  I now must ask you
17   to render a special verdict concerning whether certain
18   property is subject to forfeiture.  "Forfeiture" means
19   that the defendant loses any ownership interest he has or
20   claims to have in the property as a part of the penalty
21   for engaging in criminal activity.
22       Under federal law, any person who is convicted
23   of drug conspiracy shall forfeit to the United States any
24   property constituting or derived from proceeds the person
25   obtained directly or indirectly as a result of the drug

1   conspiracy and any of the person's property used or

2   intended to be used in any manner or part to commit or to

3   facilitate the commission of the drug conspiracy.

4            Similarly, federal law provides that any

5   person who is convicted of money laundering or money

6   laundering conspiracy shall forfeit to the United States

7   any property involved in each of those offenses and all

8   right, title, and interest in any and all property

9   traceable to such property involved in each of those

10  offenses.

11           You must now consider what verdict to render

12  on the question of whether there is a nexus -- that is, a

13  connection -- between the property that the government

14  seeks to forfeit and the drug and money laundering crimes

15  of which you have already found the defendant guilty.  In

16  other words, you must find whether that property is

17  connected to the underlying crimes in the way the law

18  provides.

19           I instruct you, however, that your previous

20  finding that the defendant is guilty of the drug and

21  money laundering violations is final, conclusive, and

22  binding.  Because you are bound by your previous finding

23  that the defendant is guilty, I direct you not to discuss

24  in your forfeiture deliberations whether the defendant is

25  guilty or not guilty of any drug or money laundering

1831

1  violation.

2          All of my previous instructions regarding

3  direct and circumstantial evidence, credibility of

4  witnesses, and duty to deliberate apply with respect to

5  your verdict regarding forfeiture.

6          Government's burden of proof regarding

7  forfeiture.  However, my previous instructions to you on

8  the government's burden of proof regarding your verdict

9  on the guilt of the defendant do not apply to your

10  deliberations and verdict regarding forfeiture.  In

11  deliberating and deciding your verdict regarding

12  forfeiture, I instruct you that the government need only

13  prove by a preponderance of the evidence that the

14  property it seeks to forfeit constitutes or is derived

15  from proceeds of the drug and money laundering violations

16  of which you have found the defendant guilty.  The

17  government is not required to prove this beyond a

18  reasonable doubt.

19          "Preponderance of the evidence" means that

20  something is more likely true than not true.  Thus, the

21  government has to produce evidence which, considered in

22  light of all of the facts, leads you to believe that it

23  is more likely true than not true that the property at

24  issue is subject to forfeiture.  The government need only

25  prove property is subject to forfeiture based on the

1  property's connection to either the drug violation or the

2  money laundering violations, not both.  Thus, the

3  government meets its burden by proving by a preponderance

4  of the evidence that the property it seeks to forfeit

5  constitutes or is derived from proceeds the person

6  obtained directly or indirectly as a result of the drug

7  conspiracy of which you have convicted the defendant or

8  that the property was used in any manner or intended to

9  be used to commit or facilitate the drug conspiracy.

10  Alternatively, the government can meet its burden by

11  proving by a preponderance of the evidence that the

12  property it seeks to forfeit was involved in or is

13  traceable to property involved in the money laundering

14  offenses of which the defendant has been found guilty.

15          The particular properties alleged to be

16  forfeitable to the United States are as follows:

17          $3,756,920.61 found in David A. Vogel's First

18  Republic Bank Account No. 3755;

19          $384,669.25 found in David A. Vogel's Chase

20  Investment Services Account No. 7634;

21          $160,211.49 found in The Hamilton Agency LP's

22  Washington Mutual Bank Account No. 8996;

23          $27,785.65 found in Tina Vogel's First

24  Republic Bank Account No. 7395;

25          $24,814.13 found in Tina Vogel's TD Bank North

1833

1  Account No. 2097; and

2          $22,070.26 found in David A. Vogel's First

3  Republic Bank Account No. 6959.

4          Consideration of trial evidence as well as

5  additional evidence.  While deliberating, you may

6  consider any evidence, including testimony, offered by

7  the parties at any time during the trial.

8          Money judgment.  As explained above, under

9  federal law, any person who is convicted of a drug

10  conspiracy is required to forfeit to the United States

11  any property constituting or derived from proceeds

12  obtained directly or indirectly as a result of the drug

13  conspiracy and property used or intended to be used in

14  any manner to commit or to facilitate the commission of

15  the drug conspiracy.  Any person convicted of money

16  laundering or money laundering conspiracy is required to

17  forfeit to the United States any property involved in

18  those crimes or traceable to such property.

19          The government is entitled to a personal money

20  judgment against the defendant for an amount equal to the

21  value of all money and property that is subject to

22  forfeiture.  The government is seeking a money judgment

23  for $24,743,000 in this case.  It is your duty to

24  determine whether it is more likely than not that this

25  amount constitutes or is derived from proceeds of the

1834

1  drug crime or was used to commit or facilitate that crime

2  or, alternatively, that it is more likely than not that

3  this amount is property involved in the money laundering

4  offenses or traceable to property involved in those

5  crimes.

6           Definition of "proceeds."  As you have been

7  instructed, under federal law, any person who is

8  convicted of drug conspiracy is required to forfeit to

9  the United States any property constituting or derived

10  from proceeds obtained directly or indirectly as a result

11  of the drug conspiracy violation.  I instruct you that,

12  in this context, the term "proceeds" means property of

13  any kind obtained directly or indirectly as a result of

14  the commission of the offense giving rise to the

15  forfeiture, and any property traceable thereto, and is

16  not limited to the net gain or profit realized from the

17  offense.  Property constitutes proceeds of the drug

18  conspiracy violation if the property actually is the

19  proceeds of the violation.

20           Definition of "property involved in."  As you

21  have been instructed, under federal law, any person who

22  is convicted of money laundering or money laundering

23  conspiracy is required to forfeit to the United States

24  any property involved in any of those offenses and all

25  right, title, and interest in any and all property

1835

1 traceable to such property involved in any of those

2 offenses. I instruct you that in this context the term

3 "property involved in" includes all money or property

4 laundered, any commissions and fees paid to the money

5 launderer, and any property or money used to facilitate

6 the money laundering offenses.

7 Duty not to consider certain issues that the

8 court will decide. What happens to any property that is

9 declared forfeited is exclusively a matter for the court

10 to decide. You should not consider what might happen to

11 the property in determining whether the property is

12 subject to forfeiture. In this connection, you should

13 disregard any possible claims that other persons may have

14 to the property. The interest that other persons have in

15 the property will be taken into account by the court at a

16 later time. Similarly, any claims that the forfeiture of

17 the property would constitute excessive punishment will

18 be taken into account by the court at a later time.

19 Similarly, you are not to consider whether the

20 property is presently available. That matter also will

21 be considered solely by the court in imposing sentence.

22 Your sole concern now is to determine whether

23 the property charged for forfeiture is connected to the

24 crimes of which you have found the defendant guilty as

25 described above.

1         Special verdict form.  The special verdict

2 form lists the property that the government asserts is

3 forfeitable.  As to each item listed, you must determine

4 whether it is connected to the drug or money laundering

5 violations for which the defendant was convicted

6 according to the instructions given above.

7         You may answer by simply putting an "X" or

8 check mark in the space provided next to the words "yes"

9 or "no."  If you answer "no," there will be a follow-up

10 question that you must answer.  The foreperson must then

11 date and sign the special verdict form with his or her

12 initials.

13         Unanimous verdict.  You must reach a unanimous

14 verdict as to each question on the special verdict form.

15 Everyone must agree to any "yes" or "no" answer and to

16 any amount you enter on the special verdict formal.

17         Signed in Beaumont, Texas, this 30th day of

18 June, 2010, Marcia A. Crone, United States District

19 Judge.

20         Turning to the special verdict form.

21         We, the jury, having found the defendant

22 guilty of Counts 1, 2, 3, and 4 of the first superseding

23 indictment make the following findings:

24         A, Specific Property.

25         1, we, the jury, unanimously find by a

1 preponderance of the evidence that the $3,756,920.61

2 found in David A. Vogel's First Republic Bank Account

3 No. 3755 is:

4         (a) property constituting or derived from

5 proceeds obtained directly or indirectly as a result of

6 the drug conspiracy charged in Count 1 of the first

7 superseding indictment or was used or intended to be used

8 in any manner to commit or to facilitate the commission

9 of that violation; and/or

10         (b) property involved in the money laundering

11 or money laundering conspiracy violations charged in

12 Counts 2 through 4 of the first superseding indictment or

13 is traceable to such property.

14         Yes or no.

15         If you answer "no," state the amount of these

16 funds, if any, that is subject to forfeiture.

17         Amount, dollar sign, blank.

18         2, we, the jury, unanimously find by a

19 preponderance of the evidence that the $384,669.25 found

20 in David A. Vogel's Chase Investment Services Account

21 No. 7634 is:

22         (a) property constituting or derived from

23 proceeds obtained directly or indirectly as a result of

24 the drug conspiracy charged in Count 1 of the first

25 superseding indictment or was used or intended to be used

1838

1    in any manner to commit or to facilitate the commission

2    of that violation; and/or

3                (b) property involved in the money laundering

4    or money laundering conspiracy violations charged in

5    Counts 2 through 4 of the first superseding indictment or

6    is traceable to such property.

7                Yes or no.

8                If you answer "no," state the amount of these

9    funds, if any, that is subject to forfeiture.

10               Amount, dollar sign, blank.

11               3, we, the jury, unanimously find by a

12   preponderance of the evidence that $160,211.49 found in

13   The Hamilton Agency LP's Washington Mutual Bank Account

14   No. 8996 is:

15               (a) property constituting or derived from

16   proceeds obtained directly or indirectly as a result of

17   the drug conspiracy charged in Count 1 of the first

18   superseding indictment or was used or intended to be used

19   in any manner to commit or to facilitate the commission

20   of that violation; and/or

21               (b) property involved in the money laundering

22   or money laundering conspiracy violations charged in

23   Counts 2 through 4 of the first superseding indictment or

24   is traceable to such property.

25               Yes or no.

1839

1    If you answer "no," state the amount of these

2  funds, if any, that is subject to forfeiture.

3    Amount, dollar sign, blank.

4    4, we, the jury, unanimously find by a

5  preponderance of the evidence that the $27,785.65 found

6  in Tina Vogel's First Republic Bank Account No. 7395 is:

7    (a) property constituting or derived from

8  proceeds obtained directly or indirectly as a result of

9  the drug conspiracy charged in Count 1 of the first

10 superseding indictment or was used or intended to be used

11 in any manner to commit or to facilitate the commission

12 of that violation; and/or

13    (b) property involved in the money laundering

14 or money laundering conspiracy violations charged in

15 Counts 2 through 4 of the first superseding indictment or

16 is traceable to such property.

17    Yes or no.

18    If you answer "no," state the amount of these

19 funds, if any, that is subject to forfeiture.

20    Amount, dollar sign, blank.

21    5, we, the jury, unanimously find by a

22 preponderance of the evidence that the 24,814.13 found in

23 Tina Vogel's TD Bank North Account No. 2097 is:

24    (a) property constituting or derived from

25 proceeds obtained directly or indirectly as a result of

1  the drug conspiracy charged in Count 1 of the first

2  superseding indictment or was used or intended to be used

3  in any manner to commit or to facilitate the commission

4  of that violation; and/or

5          (b) property involved in the money laundering

6  or money laundering conspiracy violations charged in

7  Counts 2 through 4 of the first superseding indictment or

8  is traceable to such property.

9          Yes or no.

10          If you answer "no," state the amount of these

11  funds, if any, that is subject to forfeiture.

12          Amount, dollar sign, blank line.

13          6, we, the jury, unanimously find by a

14  preponderance of the evidence that the $22,070.26 found

15  in David A. Vogel's First Republic Bank Account No. 6959

16  is:

17          (a) property constituting or derived from

18  proceeds obtained directly or indirectly as a result of

19  the drug conspiracy charged in Count 1 of the first

20  superseding indictment or was used or intended to be used

21  in any manner to commit or to facilitate the commission

22  of that violation; and/or

23          (b) property involved in the money laundering

24  or money laundering conspiracy violations charged in

25  Counts 2 through 4 of the first superseding indictment or

1841

1 is traceable to such property.

2          Yes or no.

3          If you answer "no," state the amounts of these

4 funds, if any, that is subject to forfeiture.

5          Amount, dollar sign, blank line.

6          B, money judgment.

7          We, the jury, unanimously find by a

8 preponderance of the evidence that $24,743,000 is the

9 amount equal to the money and value of the property that

10 is subject to forfeiture.

11         Yes or no.

12         If you answer "no," state the amount of money,

13 if any, you find is equal to the money and value of the

14 property that is subject to forfeiture.

15         Amount, dollar sign, blank line.

16         And then lines for the date and foreperson's

17 initials.

18         And at this time we'll have additional

19 argument.

20         MR. COLLINS:  Thank you, your Honor.

21         May it please the court, ladies and gentlemen

22 of the jury.  I just want to address the asset forfeiture

23 portion of today's proceedings.  We've prepared a

24 demonstrative to help you with this.  I think if you have

25 your special verdict form out, you can follow along with

1  the demonstrative.  This will make sense.

2         This is a different burden imposed on the

3  government.  This is a preponderance of the evidence.

4  Think about a scale, 51 percent versus 49 percent.  If

5  the government's 51 percent right, you can mark "yes" on

6  your special verdict form with respect to each of these

7  counts.

8         Your Honor, may we at this time publish

9  Government's Exhibit 210, a demonstrative to help the

10  jury understand the asset forfeiture proceedings?

11         THE COURT:  Yes.

12         MR. COLLINS:  Now, recall that Special Agent

13  Dana Bracy took the stand and testified about all the

14  accounts, all the financial information.  If you have

15  your special verdict form in front of you, the first

16  question, Question No. 1, relates to the first account,

17  which is I believe the First Republic Bank account.

18  There's an exhibit in evidence about this account.  This

19  is the account numbers you see on your special verdict

20  form.  This is the amount of money that was seized from

21  the account; and this is one of the questions in front of

22  you, is this the appropriate amount of money to be seized

23  from this account.  The government's position is it is

24  because David Alan Vogel received royalty checks, bean

25  count checks, K-1 dividend checks, and deposited those

1843

1  checks into this First Republic account.  These checks

2  came from the Madison Pain Clinic.  They are proceeds

3  that came from the illegal operation of a drug

4  distribution program, and they went into this account.

5       He also used the funds in this account to

6  purchase a Trump Tower condominium.  You recall the

7  evidence.  We went through all the down payments and

8  where that money came from with Special Agent Bracy.

9  That was money that came out of the Madison Pain Clinic.

10 So, that was tainted funds that went into this account.

11      He sold the account *[sic]* and had $4 million

12 at one point in the account; and the government seized

13 it, 3.7 million.

14      With respect to your special verdict form, if

15 you can follow the flow and say that tainted money went

16 into this account because it came from Madison Pain

17 Clinic's operations, running an illegal drug distribution

18 program, then the government is entitled to seize that

19 money because it's tainted funds.  And on your special

20 verdict form, if you look on first Question No. 1, if you

21 can answer "yes," then that's it.  You don't have to go

22 any further.  You don't have to come up with a dollar

23 figure.

24      So, at this point the government has

25 illustrated through the testimony from Special Agent

1844

1  Bracy that royalty checks, bean checks, and deposits from
2  Madison Pain Clinic went into that First Republic account
3  and then he used that First Republic account to cash his
4  check from his condo.

5          With respect to the second account, Chase
6  Investment Services, there's an exhibit in evidence that
7  talks about this account.  It's Account No. 7634.  This
8  particular account received transfers from two other
9  Chase accounts, and we walked through this during the
10 course of the trial.

11         Special Agent Bracy demonstrated that Chase
12 Accounts 5965 and 765 *[sic]* received tainted money from
13 the sale of drugs.  That went into those two accounts.
14 And from those two accounts, Mr. Vogel transferred that
15 money into this account, this 7634; and this is the total
16 amount that he transferred.  The government seized this
17 amount (indicating).

18         So, just like a moment ago, if you follow the
19 logic of the money, tainted money went into an account,
20 that tainted money was transferred into this account, and
21 the government seized that money.  That's tainted money
22 that comes from the sale -- the illegal sale and
23 distribution of hydrocodone.

24         So, on your special verdict form, this is
25 Question No. 2, the $384,000.  And if you can follow that

1845

1  flow and understand that tainted money from the sale of

2  drugs went into that account and then the government

3  seized that money, that's Question No. 2.  And, again,

4  it's just a preponderance of the evidence standard.

5          The third account is this Washington Mutual

6  account, this 8996 account.  Everybody remembers that

7  account.  That is one of the two Madison Pain Clinic

8  operating accounts.  That's deposits that were made into

9  that account from the sale of hydrocodone, the sale of

10 drugs over the Internet; and at one point over $9 million

11 went into that account.  The government -- when it seized

12 that account, it was able to seize $160,000.

13         So, again preponderance of the evidence.  If

14 it's more likely than not that tainted money is in that

15 account, then that can be seized.  And, again, on your

16 special verdict form, you just answer "yes."  You don't

17 have to come up with the amount number.

18         With respect to the First Republic Bank

19 account, Bank Account No. 7395, again, salary and

20 dividend checks went into that First Republic Bank

21 account.  $317,000 worth, we were able to trace it.  And

22 from that amount, 27,000 was in the account on the day

23 that the government seized the account.  They were

24 spending the money; but there was $27,000 in there.

25         So, again, tainted money from the sale of

1846

1 drugs goes into an account. The government seized that

2 account. As long as it's more likely than not that that

3 money came from Madison Pain Clinic sales of drugs over

4 the Internet, then the government is entitled to seize

5 that money.

6          The same is true with the TD Bank North

7 account. Again, salary and dividend checks from the

8 Madison Pain Clinic went into that account; and at the

9 day of seizure, there was 24,000.

10          And, also, with First Republic Bank, over

11 $2 and a half million went into that account through

12 salary, royalty checks, and bean checks. $22,000 was

13 left, and that's the amount that was seized.

14          Just to be clear, Madison Pain Clinic ran an

15 operation that was the illegal sale of drugs. They got

16 money for that. They put that money into bank accounts.

17 When you put illegal funds into a bank account, that's an

18 illegal act; and it's subject to forfeiture. And that's

19 your job today with the special verdict form, is just to

20 say that the money that the government seized in those

21 accounts was in fact subject to forfeiture.

22          Now, there's one more question on the special

23 verdict form on the last page with respect to money

24 judgment. You heard Special Agent Bracy give you a

25 number. It was $26 million, $26 million worth of

1  deposits.  $26 million flowed into this organization.

2  The government is seeking a personal money judgment

3  against Mr. Vogel for 24,743,000 of those dollars.  We

4  were conservative.  We gave him a couple of allowances;

5  and we've come up with a conservative figure of

6  $24,743,000.

7           And just to remind you of the evidence that

8  you saw when Dana Bracy was on the stand, remember he had

9  dozens and dozens of boxes of those two Washington Mutual

10 accounts that had every check, every deposit, every wire

11 transfer and he went through every single one of those

12 and he figured out where the money went.  Sometimes the

13 money went to pharmacists and sometimes the money went to

14 advertisers and doctors, but most of the money went to

15 David Vogel and Tina Vogel.  And he was able to see the

16 payments from those Washington Mutual accounts and how

17 they flowed into Mr. Vogel and Mrs. Vogel's accounts, and

18 that's what this part of the trial is about.

19           If you look on that special verdict form and

20 you can see that tainted money moved from Madison Pain

21 Clinic into one of their accounts, then that's money

22 subject to forfeiture.

23           Thank you.

24           MR. BRETT SMITH:  Just briefly, ladies and

25 gentlemen.

1848

1    Based on your verdict, the only thing I would

2  point out to you, on paragraph B, the money judgment, I

3  think you'll recall the testimony of Dana Bracy, that all

4  the money was paid through the IRS.  There were tax

5  returns filed by The Hamilton Agency.  David Vogel filed

6  taxes.  In fact, his testimony was David Vogel made

7  approximately $8.5 million personally; and he was

8  probably in a 50 percent tax bracket, which would knock

9  that number down by at least 50 percent.

10    The government has got everything.  They're

11  going to get everything.  You're probably going to say

12  "yes" to all the other questions and forfeit it, but a

13  money judgment against David Vogel in the amount of

14  $24 million is a bit excessive.  I don't think it follows

15  the evidence even by a preponderance.

16    THE COURT:  Anything further?

17    MR. COLLINS:  No, your Honor.

18    THE COURT:  All right.  Well, at this time

19  we'll send you back with the special verdict instructions

20  and form.  Again, the bond paper is the official one.

21    (Recess, 5:13 p.m. to 6:11 p.m.)

22    (Open court, defendant present, jury not

23  present)

24    THE COURT:  Okay.  I have a note.  It says:

25  Chase Investment Services Account 7634, we cannot find an

1849

1 exhibit regarding that account.  What is the exhibit

2 number?

3          They have a list of the exhibits.  There's

4 nothing that's exactly described that way.  The

5 demonstrative thing shows that it's 153D003, but 153 on

6 this list just says "Summary Schedules of MPC Transfer

7 Payments to Various Accounts."

8          MR. COLLINS:  Yes, your Honor.  There's

9 153b -- 153 is composed of, I think, five different

10 subparts -- A, B, C, D, and E.  So, they have to do some

11 digging to find that.  They've got to go to 153b and then

12 to page 3 to see it.  It's a long *Excel* spreadsheet.

13          THE COURT:  Well...

14          MR. COLLINS:  It's there.  It's just -- and

15 it's small, I think.  I mean, they probably may need a

16 magnifying glass.  At one point we had a copy of the

17 exhibits in the room.

18          THE COURT:  Right.  This is -- the exhibit

19 list went back.  It's just you can't tell.

20          MR. COLLINS:  Right.  I'm speaking about the

21 actual exhibit itself.  153 --

22          THE COURT:  Well, I'm sure they have it.

23          COURTROOM DEPUTY:  They have it.

24          THE COURT:  So, what do you want me to tell

25 them?

1    MR. COLLINS:  They need to look into 153, find

2 the page at the bottom that has the letter B, and then

3 find page 3 from that sequence.  It's a thick spreadsheet

4 and they're going to have to do some digging to get to

5 that point, but we gave them the page reference, 153b --

6    THE COURT:  The demonstrative gives it, but

7 they don't have this.  Do you understand they don't have

8 this, this demonstrative?

9    MR. COLLINS:  Oh.  Then I think the answer to

10 the jury's question, your Honor, is:  See Exhibit

11 153b-003.

12    MR. SCOTT SMITH:  I think the answer is "You

13 have all the evidence before you."  I don't think we can

14 comment and direct them to a specific --

15    THE COURT:  That's the problem.

16    MR. COLLINS:  Okay.

17    THE COURT:  "You have all the evidence before

18 you."  It is there.

19    MS. SMITH:  Yeah.  I mean, I think you can say

20 it's Exhibit 153, as it says on the evidence list; but I

21 don't think we can specify where in Exhibit 153.

22    THE COURT:  No.  Well, I usually don't tell

23 them; but, you know, federal courts can comment on the

24 evidence.  So, I could just say "Please refer to Exhibit

25 153" but nothing more than that.

1851

1       MR. COLLINS:  Okay.

2       MR. SCOTT SMITH:  Please note our exception

3  for the record, please.

4       THE COURT:  And note it's after 6:00 o'clock.

5  I don't want to sit here while they dig through all these

6  things, because it's there.

7       MR. SCOTT SMITH:  I understand that.

8       THE COURT:  It's not a matter of, oh, it's not

9  there and they would never find it.  It is there.

10       Is the government concerned about directing

11  them to exhibit --

12       MR. COLLINS:  No, your Honor.  I mean,

13  Exhibit 153 is in the record.  Exhibit 153b is labeled.

14  They just need to go to the exhibit.

15       THE COURT:  "Please refer to Exhibit 153."

16       Okay.  That's what's going to happen.

17       (Recess, 6:15 p.m. to 6:38 p.m.)

18       (Open court, defendant and jury present)

19       THE COURT:  All right.  Ms. Broomes, has the

20  jury unanimously agreed on its verdict?

21       JURY FOREPERSON:  Yes, ma'am, we have.

22       THE COURT:  Okay.  Would you please hand that

23  to the court security officer.

24       JURY FOREPERSON:  (Complies)

25       THE COURT:  All right.  I will publish the

1852

1  verdict.

2          It reads:  We, the jury, having found the

3  defendant guilty of Counts 1, 2, 3, and 4 of the first

4  superseding indictment, make the following findings:

5          Specific property.

6          We, the jury, unanimously find by a

7  preponderance of the evidence that the $3,756,920.61

8  found in David A. Vogel's First Republic Bank Account

9  No. 3755 is:

10          (a) property constituting or derived from

11  proceeds obtained directly or indirectly as a result of

12  the drug conspiracy charged in Count 1 of the first

13  superseding indictment or was used or intended to be used

14  in any manner to commit or to facilitate the commission

15  of that violation; and/or

16          (b) property involved in the money laundering

17  or money laundering conspiracy violations charged in

18  Counts 2 through 4 of the first superseding indictment or

19  is traceable to such property.

20          "Yes."

21          No. 2, we, the jury, unanimously find by a

22  preponderance of the evidence that the $384,669.25 found

23  in David A. Vogel's Chase Investment Services Account

24  No. 7634 is:

25          (a) property constituting or derived from

1  proceeds obtained directly or indirectly as a result of

2  the drug conspiracy charged in Count 1 of the first

3  superseding indictment or was used or intended to be used

4  in any manner to commit or to facilitate the commission

5  of that violation; and/or

6           (b) property involved in the money laundering

7  or money laundering conspiracy violations charged in

8  Counts 2 through 4 of the first superseding indictment or

9  is traceable to such property.

10          "Yes."

11          3, we, the jury, unanimously find by a

12  preponderance of the evidence that the $160,211.49 found

13  in The Hamilton Agency LP's Washington Mutual Bank

14  Account No. 8996 is:

15          (a) property constituting or derived from

16  proceeds obtained directly or indirectly as a result of

17  the drug conspiracy charged in Count 1 of the first

18  superseding indictment or was used or intended to be used

19  in any manner to commit or to facilitate the commission

20  of that violation; and/or

21          (b) property involved in the money laundering

22  or money laundering conspiracy violations charged in

23  Counts 2 through 4 of the first superseding indictment or

24  is traceable to such property.

25          "Yes."

1854

1      4, we, the jury, unanimously find by a

2  preponderance of the evidence that the $27,785.65 found

3  in Tina Vogel's First Republic Bank Account No. 7395 is:

4      (a) property constituting or derived from

5  proceeds obtained directly or indirectly as a result of

6  the drug conspiracy charged in Count 1 of the first

7  superseding indictment or was used or intended to be used

8  in any manner to commit or to facilitate the commission

9  of that violation; and/or

10      (b) property involved in the money laundering

11  or money laundering conspiracy violations charged in

12  Counts 2 through 4 of the first superseding indictment or

13  is traceable to such property.

14      "Yes."

15      5, we, the jury, unanimously find by a

16  preponderance of the evidence that the $24,814.13 found

17  in Tina Vogel's TD Bank North Account No. 2097 is:

18      (a) property constituting or derived from

19  proceeds obtained directly or indirectly as a result of

20  the drug conspiracy charged in Count 1 of the first

21  superseding indictment or was used or intended to be used

22  in any manner to commit or to facilitate the commission

23  of that violation; and/or

24      (b) property involved in the money laundering

25  or money laundering conspiracy violations charged in

1855

1 Counts 2 through 4 of the first superseding indictment or

2 is traceable to such property.

3          "Yes."

4          6, we, the jury, unanimously find by a

5 preponderance of the evidence that the $22,070.26 found

6 in David A. Vogel's First Republic Bank Account No. 6959

7 is:

8          (a) property constituting or derived from

9 proceeds obtained directly or indirectly as a result of

10 the drug conspiracy charged in Count 1 of the first

11 superseding indictment or was used or intended to be used

12 in any manner to commit or to facilitate the commission

13 of that violation; and/or

14          (b) property involved in the money laundering

15 or money laundering conspiracy violations charged in

16 Counts 2 through 4 of the first superseding indictment or

17 is traceable to such property.

18          "Yes."

19          B, money judgment.

20          We, the jury, unanimously find by a

21 preponderance of the evidence that $24,743,000 is the

22 amount equal to the money and value of the property that

23 is subject to forfeiture.

24          "Yes."

25          Dated 6/30/10, signed with the initials of the

1856

1  foreperson.

2        All right.  Is there a request to poll the

3  jury?

4        MR. SCOTT SMITH:  No.

5        THE COURT:  All right.  The verdict is

6  confirmed and accepted, and the court administrator will

7  file and record the verdict.

8        If the jury would just return to the jury room

9  briefly, you will be discharged and you will be given

10  certificates, et cetera.  And you will be free to discuss

11  the case with anyone you wish and you may speak with the

12  lawyers and the media, but you're not obligated to do so.

13  And, of course, you will be paid for each day of jury

14  service.

15        So, if you would just return briefly to the

16  jury room, I will come and talk to you in a minute.

17        (Jury exits courtroom, 6:43 p.m.)

18        THE COURT:  All right.  A written presentence

19  report will be prepared by the probation office to assist

20  the court in sentencing.  And, Mr. Vogel, you will be

21  asked to give information for the report; and your

22  attorney may be present if you wish.  You and your

23  counsel will review and fully discuss the presentence

24  report before the sentencing hearing, and you may make

25  any objections that you deem necessary.  You and your

1857

1  attorney will have an opportunity to address the court at

2  the sentencing hearing.

3          The defendant is referred to the probation

4  office for a presentence investigation and report.

5          And defendant is remanded to the custody of

6  the United States Marshal and, pending preparation of the

7  presentence report, will be again delivered to this court

8  for purposes of sentencing.

9          All right.  Now, I'm going to go talk to the

10  jury briefly.  Usually I let the jury talk to the

11  lawyers; but in view of the hour, 20 till 7:00, they

12  probably don't want to stick around and talk to you.  So,

13  I was just going to thank them for their service.  I

14  mean, I can ask them, if you want to talk to them.

15          MR. SCOTT SMITH:  I would just like to say

16  "thank you."  If they want to.

17          THE COURT:  Okay.

18          MR. BUYS:  Judge, if they're willing to talk

19  to us, we always want to talk to them.

20          THE COURT:  Yeah, you always want to talk to

21  them.

22          MR. BUYS:  Yeah, yeah.

23          THE COURT:  Okay.  I just think they're not

24  going to be real thrilled to stay.

25          MR. BUYS:  Yeah.  Our feelings won't be hurt

1858

1  if they want to get out of here.

2          THE COURT:  Okay.  I will go talk to them.

3          (Proceedings concluded, 6:45 p.m.)

4

5  COURT REPORTER'S CERTIFICATION

6          I HEREBY CERTIFY THAT ON THIS DATE, MARCH 7TH,

7  2011, THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE

8  RECORD OF PROCEEDINGS.

9

10                    /s/ Tonya Jackson
                      TONYA JACKSON, RPR-CRR
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25